UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| |
|---|
| JOHN DOE,[1] |
| Plaintiff, |
| v. |
| TRUSTEES OF DARTMOUTH COLLEGE, |
| Defendant. |

Civil Action No.

## **VERIFIED COMPLAINT AND JURY DEMAND**

### **INTRODUCTION**

1.     This lawsuit arises out of defendant Dartmouth College's ("Dartmouth") unjust and unlawful expulsion of plaintiff John Doe ("Doe"), a former student at the Geisel School of Medicine at Dartmouth College ("Geisel"), in October 2021 for alleged sexual misconduct following an unfair, biased, and inept investigation, all to Doe's detriment.

2.     In July 2020, Doe had an intimate encounter with Sam Smith ("Smith"), another student at Geisel and his roommate at the time.   Both parties allege the encounter was nonconsensual.

3.     Almost a year later, in April 2021, Smith made a complaint to Dartmouth, alleging that "on July 12, 2020 [Doe] sexually assaulted [Smith] by having oral intercourse with him while he was asleep."  Dartmouth opened an investigation into his complaint under its sexual misconduct policy.

---

[1] Plaintiff seeks to file this complaint and all pleadings under pseudonym due to the serious and false nature of the allegations against him and the privacy implications to both himself and Sam Smith and has concurrently filed with this complaint a motion requesting such a designation.  Plaintiff will file an affidavit, under seal, providing his name, address, and attesting to the accuracy of the facts alleged in the Complaint if the Court so requests.

4.      In June 2021, Doe filed a complaint against Smith for his conduct during the same encounter, specifically alleging that Smith initiated and caused the sexual activity without Doe's consent and while Doe was incapacitated by alcohol.

5.      Dartmouth's quasi-judicial process for hearing Smith's and Doe's complaints utilized the widely discredited single investigator model and lacked basic elements of due process and/or fundamental fairness.

6.      Dartmouth failed to fulfill its contractual obligation under its policy on sexual assault investigations to provide sufficient notice of the allegations to Doe because the ultimate finding of responsible does not comport with the notice from the Title IX office as the final report found Doe responsible for an act not set forth in the notice.

7.      Dartmouth failed to fulfill its contractual obligation under its policy on sexual assault investigations to provide a fair, thorough, and impartial investigation in that it failed to appropriately apply the preponderance standard of evidence in making its final findings by failing to fairly, thoroughly, and impartially consider evidence provided by Smith that he was sober and awake when the alleged incident occurred while Doe was admittedly impaired by alcohol to the point of incapacitation and by failing to apply the standard for incapacitation by alcohol in Dartmouth's sexual misconduct policy fairly and impartially.

8.      Dartmouth's finding that an intoxicated male student, who could remember some but not all of the specific details of a sexual encounter, lacks credibility would be inconceivable if applied to an intoxicated female student.  Dartmouth's finding in this matter involving two men demonstrates an inconsistent application of the preponderance of the evidence standard and bias based on gender and LGBTQ+ stereotypes in violation of Title IX and Dartmouth's sexual misconduct policies.

4882-6525-7226, v. 1

9.    Doe has suffered and will continue to suffer serious damages as a result of Dartmouth's actions, including but not limited to the loss of his Geisel degree, loss of other educational opportunities, the loss of job opportunities, reputational harm, and emotional distress.

## PARTIES

10.    John Doe is a U.S. citizen who resides outside of New Hampshire.  At all times relevant to this complaint, he was a student at the Geisel School of Medicine at Dartmouth College.

11.    Defendant Trustees of Dartmouth College is a partially federally funded private liberal arts college in Hanover, New Hampshire.  Geisel School of Medicine at Dartmouth is a trade name registered with the State of New Hampshire and owned by the Trustees of Dartmouth College.

## JURISDICTION AND VENUE

12.    This action arises out of Dartmouth's breach of its contractual and other obligations to Doe, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681).

13.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the federal law claims arise under the constitution and statutes of the United States and because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of separate states, and the amount in controversy exceeds $75,000.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTS

### John Doe's Academic Background and Goals

16.     Doe is a first-generation American who was raised in California in a multicultural household with an emphasis in morality and integrity.  Growing up, Doe's primary goal in his future career was to help people.

17.     Prior to the July 2020 incident and Doe's decision to take leave, Doe was entering his fourth year as a medical student at Geisel and was on track to graduate in the Spring of 2021.

18.     As a student at Geisel, Doe was involved in student government and service organizations, organizing events to promote student interaction and community service.

19.     Doe planned to pursue a career as a Primary Care Physician.

### John Doe's Interactions with Sam Smith

20.     Doe and Smith both enrolled and Geisel in the Fall of 2017.

21.     Doe and Smith both spent time studying at the medical school library during their first year, and then gradually became closer friends during their second year of medical school. They decided to become roommates at the end of their second year.

22.     In June 2019, Doe and Smith rented a two-bedroom apartment near the Dartmouth-Hitchcock Medical Center in Lebanon, New Hampshire.  They renewed the lease in the Spring of 2020.

23.     When the COVID-19 pandemic spread in early 2020, Doe and Smith increasingly spent more time together inside their apartment, socially distancing from others.  At that point, the two men also began to drink more alcohol to pass the time.

24.     On the night of July 11, 2020, the roommates decided to stay in and order sushi for dinner.  Then, the roommates began to play drinking games.

25.     After approximately six or seven beers, Smith challenged Doe to wrestle.  Smith pinned Doe and said something like, "See, I'm the alpha.  You're the beta."

4

26.    After they wrestled on the floor of their apartment, the roommates began to consume bourbon cocktails.  At that point, Doe became incredibly drunk, and his memory began to fade.  During Dartmouth's investigation, he described himself as "blackout drunk."

27.    Then the roommates decided to watch a movie.  Smith sat down on the left side of their L-shaped sectional couch with his feet up on the ottoman.  Doe laid down on his left side with his head next to Smith's right leg.  Doe shortly fell asleep.

28.    After he fell asleep, Doe's memory only came back to him in short bursts of time, a medical reaction described as fragmentary blackouts.  The next thing Doe remembers is being stirred by Smith running his fingers through Doe's hair.  Doe opened his eyes to see Smith's exposed, erect penis.  Smith then lifted Doe's head over his right thigh toward his penis.

29.    Then, Doe remembers performing oral sex on Smith's penis.  Doe remembers pausing and looking up at Smith at some point during the oral sexual intercourse.  After an unknown amount of time, Doe became tired, stopped, and fell back asleep on the couch. He had remained laying on the couch to the right of Smith throughout the entire encounter.

30.    The next thing Doe remembers is being woken up from his place on the couch by Smith tapping him on the right shoulder and saying he needed to speak with him.  Doe followed Smith to his bedroom, feeling very nauseous.

31.    Smith told Doe that he was uncomfortable with what had just happened.  Doe did not remember what had happened and was terrified when Smith explained it to him.  Doe was still feeling nauseous, and he went into Smith's bathroom and vomited.

32.    After Doe vomited, he sat on the floor of Smith's room because he could not stand due to his level of intoxication.  Smith said that he felt gross, and Doe apologized again and explained that he did not remember what happened.

33.     Doe vomited again, this time in the kitchen of the apartment, and returned to his conversation with Smith.  Smith acknowledged that Doe was drunk and that it would make sense to go to sleep and continue the conversation the following day once Doe had sobered up.

34.     Doe returned to his room, vomiting one more time in his own bathroom before laying on his bed.

35.     Smith then left the apartment.

36.     Doe then texted members of their friend group and, having nothing to go on aside from Smith's version of the events, apologized for what Smith said had happened.  After sobering up, Doe stopped apologizing because he realized that he had been taken advantage of by Smith, not the other way around.

### Doe's Reaction to the Incident

37.     One or two days after the incident, Doe received a call from his mother, telling him that his aunt had been admitted to the Intensive Care Unit with a high fever.  His family was worried that his aunt had contracted COVID-19.

38.     Feeling overwhelmed, ashamed, and violated, Doe drove out to a bridge in Vermont, got on the ledge, and prepared to jump.

39.     In that moment, Doe realized that harming himself would only hurt his family more. He got down from the ledge, called his father, and told him what happened in the early morning of July 12, 2020.

40.     Doe's father suggested that he take a leave of absence from Geisel for both his mental wellness, safety, and to help support his family during that difficult time.  Doe did so and returned home to California.

41.     In early 2021, Doe was able to procure mental health services.  He was diagnosed with Post-Traumatic Stress Disorder and has since been prescribed medication.  He continues in mental health treatment to this day.

42.     On March 10, 2021, in a conversation with a friend, Doe expressed that he was considering filing a Title IX complaint against Smith but was afraid to do so and did not want to pay for a lawyer.

### Sam Smith's Complaint to Dartmouth

43.     In or around April 2021, Smith asked Dartmouth's Title IX Coordinator and Acting Senior Director of Institutional Diversity and Equity ("Title IX Coordinator"), whether Doe was returning to Geisel.  The Title IX Coordinator incorrectly informed Smith that Doe would return in the Spring of 2022 while Smith was still enrolled at Geisel.  The Title IX Coordinator knew or should have known that the information provided to Smith was incorrect because in December 2020, Doe informed the Geisel Registrar via email that he intended to return in the Fall of 2022 or after Smith had graduated, in order to graduate in Spring of 2023.  The Title IX Coordinator violated federal law when providing Smith information regarding Doe's enrollment status.

44.     In light of the Title IX Coordinator's misrepresentation regarding the timing of Doe's return, on April 28, 2021, Smith filed a formal Title IX complaint in which he alleged that Doe engaged in sexual misconduct by performing oral sexual intercourse on him while he was asleep.  During the investigation that followed Smith stated that he filed the complaint because, based on the information provided to him by the Title IX Coordinator, he was concerned that Doe would be in school with him.

45.     In his complaint, Smith alleged that he had fallen asleep watching the movie on the night of July 11, 2020 and had later awoken to Doe performing oral sexual intercourse on him.

46.     During interviews as part of Dartmouth's investigation, Smith later claimed rather that he was awakened by feelings of someone touching his genitals and opened his eyes to see Doe kneeling between his legs, looking up at him, then placing Smith's exposed penis into his mouth. In that version of the events, most consistently presented by Smith, Smith acknowledged that he was awake and sober when the oral sexual intercourse began and as it continued to its conclusion.

47.     On May 5, 2021, the Title IX Coordinator issued a Notice of Investigation to both parties, which included Smith's allegation "that on July 12, 2020 [Doe] sexually assaulted [Smith] by having **oral intercourse** with him **while he was asleep**." (emphasis added).

### John Doe's Complaint to Dartmouth

48.     On June 15, 2021, Doe filed a formal Title IX complaint against Smith, alleging that Smith had engaged in sexual misconduct by initiating oral sexual intercourse with Doe while Doe was incapacitated due to alcohol consumption.

49.     On June 16, 2021, the Title IX Coordinator issued a Notice of Investigation to both parties, which included Doe's allegations that Smith initiated sexual activity with Doe without his consent and while Doe was incapacitated by alcohol.

### Dartmouth's Relevant Policies and Procedures

50.     At the time of the events relevant to this case, Dartmouth investigated and administered discipline for allegations of sexual assault against students in accordance with both its "Sexual and Gender-Based Misconduct Policy" ("SMP") and its "Process for Resolving Complaints Against Students" ("PRP").  The SMP and the PRP that were in effect on July 12, 2020, are attached hereto as **Exhibit A** and **Exhibit B**.[2]

---

[2] The Notice of Investigation issued May 5, 2021, referenced the current policies, *i.e.*, the policies in place the day the incident was reported.  The revised Notice indicated that the investigation would be governed by the policies in place on the date of the incident, policies which are less favorable to the Respondent.

4882-6525-7226, v. 1

51.    Included as "Prohibited Conduct" under the SMP is "sexual assault," which is defined in the SMP as:

> [H]aving or attempting to have sexual contact with another individual without consent . . . .  Sexual contact includes:
>
> 1. sexual intercourse (anal, oral, or vaginal), including penetration with a body part (*e.g.*, penis, finger, hand, or tongue) or an object, or requiring another to penetrate themselves with a body part or an object, however slight; or
>
> 2. sexual touching, including, but not limited to, intentional contact with the breasts, buttocks, groin, genitals, or other intimate part of an individual's body.

Exhibit A, at VII.B.

52.    The SMP defines "consent" as "an affirmative and willing agreement to engage in specific forms of sexual contact with another person," and states that "**[c]onsent cannot be obtained** through: 1. the use of coercion or force; or 2. **by taking advantage of the incapacitation of another individual**."  Exhibit A, at VIII.A (emphasis added).

53.    The SMP defines "incapacitation" as "the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, **asleep**, unconscious, or unaware that sexual activity is occurring."  Exhibit A, at VIII.C (emphasis added).  "Mentally helpless" is a defined as "temporarily incapable of appraising or controlling one's own conduct." *Id.*

54.    With regard to alcohol or drugs, "incapacitation is a state beyond impairment or intoxication." *Id.*  When the investigator evaluates incapacitation due to alcohol or drugs, he or she must consider: "how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness." *Id.*

55.    The PRP applies to Prohibited Conduct when:

1. the conduct occurs on Dartmouth premises or premises leased by or otherwise under the control of Dartmouth; and/or

2. the conduct occurs in the context of a Dartmouth employment, education, or research program or activity, including but not limited to Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad, research, internship, mentorship, summer session, conferences, meetings, social events, or other affiliated programs or premises, either online or in person; and/or

3. the conduct, regardless of location or context, has continuing adverse effects occurring on Dartmouth premises or in any Dartmouth employment, education, or research program or activity.

Exhibit B, at I; *see also* Exhibit A, at III (setting almost identical parameters for when the SMP applies).

56. "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated." Exhibit B, at IV.

57. Once a formal complaint has been filed and the formal resolution process is initiated, "[t]he Title IX Office will appoint one or more trained investigators to conduct a **prompt**, **thorough**, **fair** and **impartial** investigation." Exhibit B, at VII.A.2 (emphasis added). "Any investigator used by Dartmouth will receive annual training on the issues related to . . . sexual assault . . . and on how to conduct an investigation that is fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of complainants while promoting accountability." *Id.*

58. At the outset of the investigation, the Title IX Coordinator provides notice to the Complainant and the Respondent that is required to include*, inter alia*, **the nature of the reported conduct and the reported policy violations**. *See id.* "If the investigation reveals the existence of additional or different potential policy violations, . . . the Title IX Office will issue a supplemental notice of investigation." *Id.*

4882-6525-7226, v. 1

59.     Once the fact-gathering portion of the investigation is concluded, the investigator must produce an initial written investigation report, which is intended to be "a fair and thorough summary of all relevant information gathered that supports (or detracts from) the accounts of the Complainant, the Respondent, or other witnesses." Exhibit B, at VII.A.9. The initial report is provided to the Complainant and the Respondent and they have an opportunity to submit feedback to the investigator, after which the investigator produces a final investigative report, which "include[s] a finding as to whether there is sufficient information, by a preponderance of the evidence, to support responsibility for a violation of the [SMP] or any other Dartmouth policies that were implicated in [the] investigation." Exhibit B, at VII.A.10.

60.     Following the issuance of the final investigative report, a Title IX Hearing Panel will review the finding of responsibility for procedural error that substantially affected the outcome and for proper application of the evidence standard. Exhibit B, at VII.A.11. "A Title IX Hearing Panel comprises three Dartmouth Employees . . . : [1] The Director of Judicial Affairs; [2] The Dean responsible for Student Affairs designated by . . . the Dean of the Respondent's School; and [3] A trained staff member, who holds an appointment outside the Complainant's and Respondent's . . . School . . . ." Exhibit B, at VII.B. "The Complainant and Respondent will be informed of the composition of the Hearing Panel and may raise a challenge for actual bias or conflict of interest to the Title IX Coordinator" who "shall render a determination in writing on any such challenge, which determination shall be final." *Id.*

61.     Both parties have the opportunity to submit a written statement to the Hearing Panel. "In lieu of, or in addition to, submitting a written statement, the parties will also have the opportunity to meet with the Hearing Panel if either so wishes." Exhibit B, at VII.B.2.a. Additionally, while "[t]he Hearing Panel has the discretion to determine the format for the hearing"

and "may convene remotely or in person to conduct the hearing and its deliberations," the parties "have the right to be heard by the Hearing Panel and may each decide whether to exercise that right in person or remotely." *Id.*

62.    Following a determination of responsibility, the Hearing Panel then determines an appropriate sanction, based on a number of factors for mandatory consideration, which can range from a fine or warning to suspension or expulsion.  Exhibit B, at VII.B.3.

63.    Either party may appeal a final determination or responsibility and/or the sanction imposed based on: "1. Substantial procedural error or bias that materially affected the outcome and/or sanction; or 2. New evidence not reasonably available at the time of the hearing."  Exhibit B, at VII.C.

64.    "Dartmouth's overarching goal is that all Complaints be investigated in a prompt, fair and impartial manner."  Exhibit B, at VIII.

### **Dartmouth's Procedurally Deficient Investigation**

65.    The Notices of Investigation that the Title IX Coordinator provided to the parties on May 5 and June 16, 2021, informed the parties that an investigator from a prestigious out of state law firm ("Investigator") had been assigned to conduct the investigation into each of their complaints ("Investigation").

66.    At all times relevant to the Investigation, the Investigator was an agent of Dartmouth.

67.    The Investigator interviewed Doe, Smith, and other witnesses, and gathered evidence from the parties and witnesses.

68.    Doe was interviewed on three separate dates: May 28, June 24, and July 1, 2021.

69.    Smith was interviewed on two dates: May 17 and June 27, 2021.

70.    The Investigator interviewed an additional nine witnesses in between May 20 and June 27, 2021.

71.    On July 21, 2021, the Investigator issued a preliminary report ("Preliminary Report").  The Preliminary Report contained a recitation of the evidence that the Investigator gathered but did not include any conclusions about responsibility.

72.    Both Doe and Smith submitted responses to the Preliminary Report.

73.    On August 31, 2021, the Investigator issued a final report ("Final Report").  In addition to the recitation of evidence from the Preliminary Report, the Final Report includes two general conclusions: 1) that "the credible evidence is ***sufficient***, by a preponderance of the evidence standard to support a finding that [Doe] engaged in conduct that constitutes sexual assault as that term is defined in the Policy"; and 2) that "the credible evidence is ***insufficient***, by a preponderance of the evidence standard, to support a finding that [Smith] engaged in conduct which would constitute sexual assault as it is defined in the Policy."  Final Report, at 53.

74.    The Investigator made particular findings with regard to the parties' allegations of incapacitation.  Specifically, the Investigator found that there was "***sufficient evidence*** to support a finding, by a preponderance of the evidence, that [Doe] engaged in sexual contact with [Smith] at a time when [Smith] was unable to consent because he was incapacitated due to being asleep."  Final Report, at 51.

75.    The Investigator also found that "while [Doe] may have subjectively experienced an alcohol-induced fragmentary blackout, the available evidence show[ed] that [Doe] initiated the sexual contact while [Smith] was asleep," and that, therefore, there was "***insufficient evidence*** to support a finding, by a preponderance of the evidence, that the sexual contact [between the parties]

13

occurred at a time when [Doe] was unable to consent due to incapacitation."  Final Report, at 51-52.

76.    With regard to Smith's allegations that Doe had filed his counter-complaint purely for retaliatory reasons, the Investigator found that there was "insufficient evidence to support a finding, by a preponderance of the evidence, that [Doe's] filing of a Title IX Formal Complaint Form amounted to retaliation as defined in the Policy."  Final Report, at 52.

### The Hearing Panel

77.    On September 16, 2021, Doe submitted a statement to the Hearing Panel in response to the Final Report.

78.    On September 27, 2021, Smith submitted a statement to the Hearing Panel in response to Doe's statement.

79.    On September 28, 2021, Doe submitted a sanctioning statement to the Hearing Panel.

80.    On October 6, 2021, the Hearing Panel upheld the Investigator's findings and decided to permanently separate Doe from Dartmouth.

81.    On October 13, 2021, Doe submitted a request to the Title IX Office and Dean Duane A. Compton of Geisel ("Dean Compton") to have the Hearing Panel's decision reviewed and reconsidered.

82.    On November 10, 2021, Dean Compton upheld the Investigator's and the Hearing Panel's finding of responsible and the permanent separation imposed by the Hearing Panel.

### Dartmouth Failed to Provide Adequate Notice of the Charge Against Doe in Violation of the SMP and the PRP Because the Ultimate Finding of Responsible Does Not Comport with the Allegation Presented in the Notice from the Title IX Office

4882-6525-7226, v. 1

83.    The Notice of Investigation issued to Doe on May 5, 2021, from the Title IX Coordinator specifically stated that "it is alleged that on July 12, 2020 [Doe] sexually assaulted [Smith] **by having oral intercourse with him while he was asleep**."  (emphasis added).

84.    The revised Notice of Investigation issued to Doe on May 28, 2021, contained the exact same allegation.

85.    The Investigator **did not find** that oral sexual intercourse occurred **while Smith was asleep**.

86.    The Investigator's finding of responsible, based upon an allegation not set forth in either notice and not supported by Smith's own statements, resulted in a procedural error that substantially impacted the outcome of the investigation and violated Dartmouth's contractual obligation to Doe under the SMP and PRP.

87.    The Hearing Panel both dismissed and compounded the procedural error.

88.    As part of the hearing, Doe requested that the Hearing Panel pose two questions to the Investigator: (1) where in the Final Report is there a finding that oral intercourse took place while Smith was asleep?; and (2) where in the transcript does Smith say that oral intercourse took place while he was asleep?

89.    Rather than asking those questions, however, the Hearing Panel asked the Investigator where in the Final Report is there a finding that oral intercourse took place, ignoring whether or not Smith was asleep.  The change in the question posed allowed the Investigator to point to a finding that is clearly in the Final Report—that oral intercourse took place—and evade the fact that there is no finding that oral intercourse took place while Smith was asleep, as was required by the Notice.

90.    Specifically, the Investigator found that:

[Smith] provided a credible, detailed account of the sensation he felt as he was asleep on the couch and his initial belief that he was having a sexual dream. He credibly described the process of **waking up** and becoming aware of what was taking place when he described how he shifted his body, half-opened his eyes, and saw [Doe] kneeling on the ground in front of him. Considering this evidence, along with the other credible, relevant evidence, the Investigator found sufficient evidence, by a preponderance of the evidence standard, that [Smith] was asleep when the sexual contact began.

Final Report, at 51 (emphasis added).

91.    The Investigator, an experienced attorney in a prestigious law firm, clearly understood the Notice as issued required a finding that sexual contact took place while Smith was asleep to support a finding of responsible. However, the Investigator did not find that the oral sexual intercourse alleged in the Notice occurred while Smith was asleep. Rather, he found that some undefined "sexual contact", but not oral intercourse, occurred and then, when Smith woke up, Doe was not touching him.

92.    Specifically, the Investigator quotes Smith saying the following:

And I was asleep, felt a sensation like somebody was **caressing** me **around** my penis and I shifted a little bit . . . . I shifted, with this sensation and half-opened my eyes . . . . I was still in a sleepy state and looked down . . . still not knowing if this was real or if I was dreaming and I kept my eyes half open . . . . When I first moved and shifted and aroused, **I looked down and he was looking up at me, he wasn't touching me**. But as I mentioned, my penis was out, my pants were unbuttoned and erect. **And then after I settled, stopped moving, <u>I saw him reach down and grab my penis and put it in his mouth</u>.**

Final Report, at 9 (emphasis added).

93.    In his first interview, Smith explicitly stated that when he "stopped moving, then that's when [Doe] grabbed [his] penis and put it inside his mouth." Final Report, at 10. Smith described the caressing "sensation" he claims to have felt while he was asleep as similar to someone "jerking [him] off" and not as oral intercourse. *Id.*

94.     In his second interview, Smith attempted to modify his statement to comport with the Notice but ultimately conceded that any oral intercourse took place only when he was awake. Smith initially stated that he saw Doe "go down and grab it and start to suck it **again**." Final Report, at 10 (emphasis added). However, when specifically questioned on his use of the word "again," Smith corrected his statement and conceded that "when [he] saw [Doe] grab it and suck it, **was the first time I saw him do it**." *Id.* (emphasis added).

95.     Smith never stated in any of his interviews that he woke up to Doe performing oral sex on him, as he alleged in the Formal Complaint.

96.     The totality of Smith's statements is that he felt caressing while he was asleep and then, after he woke up and saw Doe, who was not then touching him, Doe engaged in oral sexual intercourse with him.

97.     Oral sexual intercourse and caressing are not the same. Oral intercourse requires penetration. *See* Exhibit A, at VII.B.1 (defining sexual intercourse, including oral, as requiring penetration). In contrast, "caress" means "to touch or stroke in a loving or endearing manner." *See* Webster's Third New International Dictionary Unabridged. Indeed, sexual intercourse and sexual touching are recognized in the SMP as separate and distinct violations. *See* Exhibit A, at VII.B.

98.     The Investigator failed to appreciate or properly apply the distinctions and actually merged the concepts of oral intercourse and caressing to improperly find Doe responsible. In addition to divergence between the offense noticed and the offense found, the incongruity of the Notice and finding raises another procedural error: the failure to properly apply the preponderance of the evidence standard.

99.    The Investigator credited Smith's "account of the event [because it had] been consistent throughout his retellings."  Final Report, at 43.  However, that credibility finding ignored that Smith's consistent statements throughout his interviews were **inconsistent** with his statements in the Title IX Formal Complaint he submitted on April 28, 2021, which stated that Doe performed oral sex on him while he was asleep.

100.    That core inconsistency in Smith's account undermines both his credibility and his narrative.  The Investigator's contrary findings require reversal on both a procedural and evidentiary basis.

101.    Dartmouth's finding that Doe engaged in sexual contact but not oral sexual intercourse with Smith while Smith was asleep results in a finding of responsible against Doe for an act that was not alleged in the Notice.  That result constitutes a procedural error and a violation of Dartmouth's contractual obligations to Doe.

### Dartmouth Failed to Apply the Preponderance of the Evidence Standard Properly, Fairly, and Impartially in Its Finding Regarding Doe's Incapacitation

102.    Compounding the procedural error regarding Notice, the Investigator makes several inconsistent findings regarding Doe's incapacitation due to alcohol on the night of the event.

103.    First, the Investigator found that Doe "demonstrated through his physical actions that he freely chose to engage in sexual contact."  Final Report, at 51.  Specifically, the Investigator found that Doe's "act of pausing and later stopping the sexual activity are evidence that he was aware of what was taking place and in control of his actions."  *Id.* at 45.

104.    Then, the Investigator acknowledged that Doe "may have subjectively experienced an alcohol-induced fragmentary blackout," but decided that did not matter because "the available evidence show[ed] that [Doe] initiated the sexual contact, while [Smith] was asleep."  Final Report,

at 51-52.  Ignoring Doe's statement that Smith initiated contact by putting fingers through Doe's

hair and lifting Doe's head over his right thigh.

105.    The Investigator also held Doe's incapacitation due to alcohol against him, finding

that Doe's

> inability to provide detail or specificity about the event negatively affected the
> reliability of the other information he provided.  For example, [Doe] was unable to
> explain how the act of [Smith] running his fingers through his hair caused his head
> to lift to initiate the sexual activity, as he contended.  Similarly, [Doe] could not
> elaborate on what took place between the time he saw [Smith's] exposed, erect
> penis and when he put his mouth on [Smith's] penis.

Final Report, at 45.

106.    The Investigator's crediting of Doe's statement that he was blackout drunk during

the encounter and, at the same time, consciously initiating sexual contact cannot both be true under

Dartmouth's policy.

107.    As explained in paragraph 54:

> Where alcohol or other drugs are involved, evaluating incapacitation requires an
> assessment of how the consumption of alcohol and/or drugs affects a person's
> decision-making ability; awareness of consequences; ability to make informed,
> rational judgments; capacity to appreciate the nature and quality of the act; or level
> of consciousness.  The assessment is based on objectively and reasonably apparent
> indications of incapacitation when viewed from the perspective of a sober,
> reasonable person.

Exhibit A, at VIII.C.

108.    The Investigator's finding that Doe's actions in initiating sexual activity were

"inconsistent with him being incapacitated" ignores that incapacitation by alcohol can also impede

a person's ability to consent to an act he allegedly initiated, including impairing his ability to make

informed, rational judgments, or the capacity to appreciate the nature and quality of the act.

109.    The Investigator's inconsistent findings regarding Doe's incapacitation due to

alcohol and his responsibility for violating Dartmouth's SMP fail to meet the preponderance

standard of evidence properly, fairly, and impartially applied, as it must be under Dartmouth's policies.

110.    Additionally, Dartmouth applied the preponderance of the evidence standard differently in this case because Doe is a male student rather than a female student in violation of its contractual obligation to provide Doe with a fair, thorough, and impartial investigation process. Upon information and belief, Dartmouth has credited intoxicated cisgender female students alleging sexual assault against cisgender male students when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances, whereas the Investigator in this case held the same facts against Doe's credibility, resulting in a finding that Doe was responsible against the preponderance of the evidence.

## Consequences of Dartmouth's Decision

111.    If Dartmouth's expulsion of Doe is allowed to remain, Doe will be irreparably harmed.

112.    The expulsion from Geisel prevents Doe from finishing medical school. When the incident occurred and Doe took leave, he was 89% finished with his degree, less than one year away from graduating. It leaves him with substantial student loan debt without the earning capacity to be able to pay it off in a timely manner. It also prevents him from becoming a Primary Care Physician, a career he desires to fulfill his lifelong goal of helping people.

113.    Without appropriate redress, the unfair outcome of Dartmouth's flawed and biased disciplinary process will cause irreparable harm to Doe by not permitting him to complete his education at Geisel, impairing his ability to continue his education elsewhere, and impacting his ability to work in his chosen field should he eventually be able to complete his medical degree.

## CAUSES OF ACTION

### I. Title IX

114.    John Doe repeats and realleges the allegations above as if fully set forth herein.

115.    Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is prohibited from subjecting Doe to a disciplinary proceeding where sex is a motivating factor in the decision to impose sanctions.

116.    Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is further prohibited from providing a disciplinary proceeding that is not prompt or equitable.

117.    Dartmouth's employees made incorrect determinations of fact, ignoring substantial evidence presented that supported Doe's innocence and undermined Smith's claims against him, resulting in an erroneous outcome in his case.

118.    Specifically, Dartmouth's finding that an intoxicated student who could remember some but not all of the specific details of a sexual encounter therefore lacks credibility requiring a finding against them sets a dangerous precedent for analysis of future sexual assault allegations on campus and reverts to outdated, discarded stereotypes that people who do not recall the details of what happened when they were assaulted (or who do recall events in a nonlinear, fragmented way with significant gaps) are not credible and cannot be victims of sexual assault.

119.    If Doe were a cisgender woman and the allegation were that she performed nonconsensual oral sexual intercourse on a cisgender man and her defense was that, in actuality, he assaulted her because she was blackout drunk and too incapacitated to consent, it is inconceivable that her inability to recall the exact details of the encounter due to her intoxication would be used as a cudgel by Dartmouth to undermine her credibility.

120.    Upon information and belief, Dartmouth has credited intoxicated cisgender female students alleging sexual assault against cisgender male students when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances.

121.    The Investigator's finding that Doe could consent despite his blackout state in a situation involving two cisgender men demonstrates an inconsistent application of Dartmouth's sexual misconduct policies and the preponderance of the evidence standard and bias based on gender and LGBTQ+ stereotypes and constitutes selective enforcement.

## II. Breach of Contract

122.    John Doe repeats and realleges the allegations above as if fully set forth herein.

123.    Doe paid Dartmouth sums of money for his education, and in return, the University contracted to provide Doe with access to its medical degree program at Geisel.

124.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

125.    By the facts alleged herein, Dartmouth breached its contract with Doe by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures.

126.    Specifically, Dartmouth failed to fulfill its contractual obligation under its policy on sexual assault investigations to provide sufficient notice of the allegations to Doe because the ultimate finding of responsible does not comport with the notice from the Title IX office as the final report found Doe responsible for an act not set forth in the notice.

127.    Additionally, by the facts alleged herein, Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

128. As a direct and proximate result of that breach plaintiff suffered the harms described above.

### III. Breach of Contract

129. John Doe repeats and realleges the allegations above as if fully set forth herein.

130. Doe paid Dartmouth sums of money for his education, and in return, the University contracted to provide Doe with access to its medical degree program at Geisel.

131. The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

132. By the facts alleged herein, Dartmouth breached its contract with Doe by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures.

133. Specifically, Dartmouth failed to fulfill its contractual obligation under its policy on sexual assault investigations to provide a fair, thorough, and impartial investigation in that it failed to appropriately apply the preponderance standard of evidence in making its final findings by failing to fairly, thoroughly, and impartially consider evidence provided by Smith that he was sober and awake when the alleged incident occurred while Doe was admittedly impaired by alcohol to the point of incapacitation and by failing to apply the standard for incapacitation by alcohol in Dartmouth's sexual misconduct policy fairly and impartially.

134. Additionally, by the facts alleged herein, Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

135. As a direct and proximate result of that breach plaintiff suffered the harms described above.

### IV. Breach of Contract

23

136.    John Doe repeats and realleges the allegations above as if fully set forth herein.

137.    Doe paid Dartmouth sums of money for his education, and in return, the University contracted to provide Doe with access to its medical degree program at Geisel.

138.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

139.    By the facts alleged herein, Dartmouth breached its contract with Doe by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures.

140.    Specifically, Dartmouth failed to fulfill its contractual obligation under its policy on sexual assault investigations to provide a fair, thorough, and impartial investigation in that it applied the preponderance of the evidence standard differently and in a discriminatory manner because Doe is a male student rather than a female student.

141.    Upon information and belief, Dartmouth has credited intoxicated cisgender female students alleging sexual assault against cisgender male students when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances, whereas the Investigator in this case held the same facts against Doe's credibility, resulting in a finding that Doe was responsible against the preponderance of the evidence.

142.    Dartmouth's holding Doe's incapacitation due to alcohol against his credibility where it has not done so when the complaining student is cisgender female is inconsistent with its own gender discrimination policy and it is evidence that Dartmouth applies the preponderance of the evidence standard differently based on the gender of the complaining student in violation of its obligation to apply its sexual misconduct policies fairly and impartially.

143.    Additionally, by the facts alleged herein, Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

144.    As a direct and proximate result of that breach plaintiff suffered the harms described above.

## V. Breach of Contract

145.    John Doe repeats and realleges the allegations above as if fully set forth herein.

146.    Doe paid Dartmouth sums of money for his education, and in return, the University contracted to provide Doe with access to its medical degree program at Geisel.

147.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

148.    By the facts alleged herein, Dartmouth breached its contract with Doe by revealing his alleged enrollment status to another student without his permission in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

*        *        *

WHEREFORE, John Doe respectfully requests that this Court enter judgment against defendant on all counts of this complaint. Doe further requests that this Court:

1.    Issue a preliminary injunction enjoining Dartmouth from enforcing Doe's expulsion and ordering it to allow him to return to campus, attend classes, and participate in all campus activities pending the outcome of this action;

2.    Order Defendant to reverse its finding that Doe violated its policies, and expunge his record;

3.    Order Defendant to reinstate Doe as a student in good standing;

25

4.      Award Doe damages and enhanced compensatory damages in an amount to be determined at trial;

5.      Award Doe the reasonable costs of this action, including attorneys' fees;

6.      Grant such other and further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

4882-6525-7226, v. 1

## <u>VERIFICATION</u>

I, John Doe, declare as follows:

1.      I am the plaintiff in this action.

2.      I have personal knowledge of the facts set out in the foregoing Verified Complaint and Jury Demand, and if called upon to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Jury Demand and true and correct.


Date: January 20, 2022                             /s/ *John Doe*
                                                  John Doe

4882-6525-7226, v. 1

Date: January 20, 2022

Respectfully submitted,

/s/ *William E. Christie*
William E. Christie (NH Bar #11255)
S. Amy Spencer (NH Bar #266617)
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street
Concord, NH 03302
(603) 225-7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com
obensinger@shaheengordon.com

*Attorneys for plaintiff John Doe*

4882-6525-7226, v. 1