UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOHN DOE,

                    Plaintiff,

         v.                                              Civil Action No.

TRUSTEES OF DARTMOUTH COLLEGE,

                    Defendant.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJNCTON AND EXPEDITED RELIEF**

Plaintiff John Doe ("Doe") respectfully offers this Memorandum of Law in Support of His Motion for Preliminary Injunction and Expedited Relief.

**STATEMENT OF FACTS**

**Background**

At all times relevant to this case, Doe was a student at the Geisel School of Medicine at Dartmouth ("Geisel"). Verified Complaint ("Compl.") ¶ 17. In the early morning hours of July 12, 2020, Doe and his roommate, another Geisel student Sam Smith, engaged in oral sexual intercourse to which neither party claims to have consented. Compl. ¶¶ 28-29, 45-46, 48. On April 28, 2021, Smith submitted a formal complaint to Dartmouth College's ("Dartmouth") Title IX Office, alleging that Doe had performed oral sexual intercourse on Smith while he was asleep. Compl. ¶ 44. Smith chose to file the formal complaint only after he was incorrectly informed by Dartmouth's Title IX Coordinator and Acting Senior Director of Institutional Diversity and Equity ("Title IX Coordinator"), that Doe was returning to Geisel for the Spring 2022 semester, while Smith would still be enrolled. Compl. ¶¶ 43-44. On June 15, 2021, Doe filed his own formal Title

IX complaint against Smith, alleging that Smith had initiated the oral sexual intercourse while Doe was incapacitated by alcohol and unable to consent.  Compl. ¶¶ 48-49.  On October 6, 2021, Dartmouth decided that Doe had engaged in some undefined nonconsensual sexual contact with Smith while he was asleep but did not find that Doe had engaged in oral sexual intercourse with Smith while he was asleep, as alleged in the Notice.  Compl. ¶ 80.  As a result, Dartmouth expelled Doe from the medical school.  *Id.*  On November 10, 2021, Dean Duane A. Compton of Geisel upheld the findings by the Investigator and Hearing Panel from the Title IX office and confirmed Doe's expulsion.  Compl. ¶ 82.

### Dartmouth's Procedurally Deficient Investigation

Dartmouth's investigation into Smith's and Doe's allegations and the proceedings that resulted in the sanction against Doe were procedurally deficient.  The Investigator hired by Dartmouth committed a procedural error by making a finding of responsible that did not comport with the allegation presented in the Notice of Investigation from the Title IX Office.  Compl. ¶¶ 6, 83-101.  Specifically, the Investigator failed to find that Doe performed oral sexual intercourse while Smith was asleep, as alleged in the Notice, but still found him responsible for other alleged sexual contact **not** included in the Notice.  *Id.*  Doe was found responsible for an act that was not alleged in the Notice.  There is perhaps no greater egregious procedural error than being found responsible and expelled for an act for which the responding party was not accused and not alleged in the Notice as required by Dartmouth policy, prior precedent, and fundamental concepts of basic fairness.  This finding and expulsion must be enjoined.

The Investigator also failed to appropriately apply the preponderance standard of evidence in making its final findings by failing to consider evidence provided by Smith that he was sober and awake when the alleged incident occurred while Doe was admittedly impaired by alcohol to

the point of incapacitation, and by failing to apply the standard for incapacitation by alcohol in Dartmouth's sexual misconduct policy fairly and impartially, finding that Doe "subjectively" experienced blackouts but was still responsible for initiating the intercourse, even though Smith was sober.  Compl. ¶¶ 7, 102-09.  Upon information and belief, the Investigator applied the preponderance standard inconsistently from how Dartmouth has applied the standard to intoxicated, female students in the past.  Compl. ¶¶ 110, 118-21.

### Dartmouth's Errors Have Resulted and Will Result in Harm to Doe

As a result of Dartmouth's erroneous proceeding and decision, Doe is suffering and will continue to suffer irreparable harm.  The expulsion from Geisel will significantly affect Doe's ability to have a medical career.  Compl. ¶¶ 111-13.  When the incident occurred, Doe was 89% finished with his degree, less than one year away from graduating from Geisel.  Compl. ¶¶ 17, 112. Since the incident Doe has struggled with his mental health and decided to take a leave of absence from Geisel of his own accord, knowing that he could return to Geisel when he was ready.  Compl. ¶¶ 38-40.  The decision to expel Doe took away his ability to return to Geisel and created a longer gap in his education that will need to be explained to future employers, which may require disclosure of his expulsion.

The fact that Doe has been expelled—and the reason therefore—also place doubt in his ability to transfer to another medical school.  Without redress from this Court, Doe's transfer application to any medical school will have to disclose the expulsion from Geisel, which will weigh against his admission.  If Doe is unable to finish medical school, he will be unable to obtain a residency or to become a Primary Care Physician—a career of which he has always dreamed and of which our society is in desperate need.  Doe's expulsion also leaves Doe with substantial student loan debt without the promised earning capacity necessary to pay it off in a timely manner.

Without a preliminary injunction issued by this Court, Doe will continue to suffer these and other irreparable harms.  Doe seeks redress from the Court to undo the harms Dartmouth has caused and to avoid further irreparable harm.  To that end, Doe is entitled to a preliminary injunction enjoining his expulsion and any other disciplinary action pending the outcome of this case.

## ARGUMENT

"A district court, faced with a motion for preliminary injunction, must assess the request in four particular ways, evaluating (1) the movant's probability of victory on the merits; (2) the potential for irreparable harm if the injunction is refused; (3) the balance of interests as between the parties, *i.e.*, whether the harm to the movant if the injunction is withheld outweighs the harm to the nonmovant if the injunction is granted; and (4) the public interest."  *Cohen v. Brown Univ.*, 991 F.2d 888, 902 (1st Cir. 1993) (upholding the grant of a preliminary injunction under Title IX against a private university seeking to discontinue its varsity women's volleyball and gymnastic teams).  The Court in *Cohen* further elucidated, "It is old hat, but still very much in fashion, that a movant's likelihood of success at trial is particularly influential in the preliminary injunction calculus."  *Id.* at 903.  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail."  *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (upholding the grant of a preliminary injunction in the First Amendment context) (internal citation omitted).  Importantly, the *Cohen* Court cautioned:

> It is similarly fundamental that a preliminary injunction, by its very nature, is sometimes ephemeral.  Hence, the risk that some observers might read into a temporary restrainer more than it eventually proves to mean is endemic to the equitable device and cannot tip the scales against its use in any particular circumstance.  It defies elemental logic to say that parties who the court has

determined will probably succeed at trial should be denied the interim relief to which they are entitled because their ultimate victory is less than absolutely certain.

*Cohen*, 991 F.2d at 905.  All of these factors weigh in favor of a preliminary injunction here.

**I.     Doe Has Shown a Likelihood of Success on the Merits of His Breach of Contract and Title IX Claims.**

**A.     Breach of Contract Claims**

Doe has alleged sufficient facts to demonstrate a likelihood of success on the merits of his breach of contract claims against Dartmouth.  The relationship between a university and its students is contractual in nature.  *Marlowe v. Keene State Coll.*, 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (applying New Hampshire law).  *See Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 415 (D.R.I. 2018) ("[A] student's relationship to his university is based in contract.") (internal citation omitted); *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 169 (D. Mass. 2017) ("[T]he relationship between a student and a university is based on contract."); *see also Doe v. Trs. of Dartmouth Coll.*, No. 21-cv-85-JD (D.N.H. July 8, 2021) (docket no. 24) (denying the school's motion to dismiss the student's based on breach of contract); *Doe v. Trs. of Dartmouth Coll.*, No. 19-cv-13-JL (D.N.H. Apr. 7, 2019) (denying the school's motion to dismiss the student's claim based on breach of contract orally from the bench).  "The terms of this contract [are] the terms contained in the Student Handbook and other college materials."  *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013).

When reviewing the contractual relationship and the relevant documents, courts "employ a reasonable expectations standard," which requires that they "ask what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it."  *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (internal citations and quotation marks omitted).  "In the context of disciplinary hearings, [courts 'review the procedures followed

5

to ensure that they fall within the range of reasonable expectations of one reading the relevant rules.'" *Id.* (quoting *Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983)).  "[I]f the facts show that the university has failed to meet [the student's] reasonable expectations the university has committed a breach." *Id.* (quoting *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61-62 (1st Cir. 2016)) (internal quotation marks omitted).

Based on these standards, for the reasons set forth below, John Doe is likely to succeed on his breach of contract claims.

### i.      Claim Based on the Family Educational Rights and Privacy Act

The Family Educational Rights and Privacy Act ("FERPA") is a federal law that protects the privacy of student education records.  20 U.S.C. § 1232g; 34 C.F.R. pt. 99.  There is no private right of action under FERPA.  *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002).  A FERPA violation can, however, serve as the basis for a breach of contract claim.  *See, e.g.*, *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 485 (N.D. Ohio 2007) (considering plaintiff's breach of contract claim based on a FERPA violation).

Universities who receive federal funds are not allowed to release education records, including enrollment information, to third parties without the written consent of the student or their parents, with limited exceptions.  20 U.S.C. § 1232g(b)(1).  A fellow student is not such an exception.  *See id.*  Following a Title IX investigation, a school may disclose to the victim **only** "the final results of the disciplinary proceeding." 34 C.F.R. § 99.31(a)(13).  There is no disclosure exception for a student who is inquiring about filing a Title IX complaint but has not yet done so.

Dartmouth violated FERPA in this case when the Title IX Coordinator, informed Smith (incorrectly) that Doe was returning to Geisel for the Spring 2022 semester.  Compl. ¶ 43.  That incorrect information set in motion the formal complaint that led to Doe's expulsion.  Compl. ¶

44.  Smith's correspondence with the Title IX Office prior to filing the formal complaint and his decision to proceed after learning Doe planned to return to school is acknowledged by the Investigator.  Final Report, at 14.  Accordingly, Doe has shown a likelihood of success on the merits of this breach of contract claim.

### ii.      Claims Based on Dartmouth Policies

#### a.      Relevant Contractual Provisions

The terms of the contractual relationship between Doe and Dartmouth include the provisions in Dartmouth's "Sexual and Gender-Based Misconduct Policy" ("SMP") and its "Process for Resolving Complaints Against Students" ("PRP").  Once a formal complaint has been filed and the formal resolution process initiated, "[t]he Title IX Office will appoint one or more trained investigators to conduct a **prompt**, **thorough**, **fair** and **impartial** investigation."  Compl. ¶ 57.  At the outset of the investigation, the Title IX Coordinator provides notice to the Complainant and the Respondent that is required to include, *inter alia*, **the nature of the reported conduct and the reported policy violations**.  Compl. ¶ 58.  "If the investigation reveals the existence of additional or different potential policy violations, . . . the Title IX Office will issue a supplemental notice of investigation."  *Id.*

After gathering all of the facts, the Investigator must produce an initial written investigation report, which is intended to be "a fair and thorough summary of all relevant information gathered that supports (or detracts from) the accounts of the Complainant, the Respondent, or other witnesses."  Compl. ¶ 59.  The initial report is provided to the Complainant and the Respondent and they have an opportunity to submit feedback to the investigator, after which the investigator produces a final investigative report, which "include[s] a finding as to whether there is sufficient information, by a preponderance of the evidence, to support responsibility for a violation of the

[SMP] or any other Dartmouth policies that were implicated in [the] investigation." *Id.* "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated." Compl. ¶ 56.

> **b.  Dartmouth's Procedurally Deficient Investigation Failed to Conform to Doe's "Reasonable Expectations" and Elements of Procedural Fairness**

The SMP guarantees that Dartmouth will "conduct a **prompt**, **thorough**, **fair** and **impartial** investigation." Compl. ¶ 57. Dartmouth also has an "obligation to provide basic fairness in its proceedings [that] is separate from and in addition to its contractual obligations to follow the rules set forth in the [SMP]." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016) (citing *Cloud*, 720 F.2d at 725). "Basic fairness" in university disciplinary proceedings includes both "procedural fairness"—"whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself"—and "substantive fairness"—"whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness." *Id.* at 602.

"It is well-established . . . that a private university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts. . . . However, courts may refer to those rules in evaluating the fairness of a particular disciplinary hearing." *Id.* (internal citations and quotation marks omitted).

Dartmouth breached its contract with Doe by failing to conduct the investigation in a "fair, thorough, and impartial manner," and without comporting to standards of "basic fairness," in three ways. First, by committing one major procedural error: it found Doe responsible for an act not alleged in the Notice of Investigation. Second, by failing to appropriately apply the preponderance of the evidence standard in making its final findings by failing to fairly, thoroughly, and impartially

8

consider evidence provided by Smith that he was sober and awake when the alleged incident occurred while Doe was admittedly impaired by alcohol to the point of incapacitation. And, third, by failing to apply the standard for incapacitation by alcohol in Dartmouth's sexual misconduct policy fairly and impartially.

        **1.**        **Dartmouth Failed to Provide Adequate Notice of the Charge Against Doe Because the Finding of Responsible Does Not Comport with the Allegation Presented in the Notice from the Title IX Office.**

First, specifically, the Notice alleged that Doe engaged in sexual misconduct by performing oral sexual intercourse on Smith while Smith was asleep. Compl. ¶ 83. The Investigator did not find that Doe engaged in oral sexual intercourse while Smith was asleep. Compl. ¶ 85. Instead, the Investigator found that Doe made undefined sexual contact with Smith while he was asleep. Compl. ¶ 91. That procedural error amounts to a breach of contract.

In *Nokes v. Miami University*, No. 1:17-cv-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017), the court granted a preliminary injunction where the notice of violation alleged that the plaintiff had committed sexual misconduct by use of force, but then expelled the plaintiff for sexual misconduct **not involving** the use of force. *Id.* at \*10-11. The plaintiff's accuser had later issued a "second statement," which alleged instead that she was too intoxicated to consent, a statement that plaintiff received notice of only a week before the hearing, thus leaving him inadequate time to prepare. *Id.* at \*11. The court did not hold, as a matter of law, that a week was an insufficient amount of time to prepare for the hearing but found that it was too early to hold that plaintiff was unlikely to succeed on the merits. *Id.* Therefore, the court granted the preliminary injunction. *Id.*

Similarly, in *Doe v. Western New England University*, the court held that the "lack of adequate notice of the charges suffices to state a claim for a breach of contract," where the school found plaintiff responsible for violations not alleged in the notice issued to him at the start of the

investigation.  228 F. Supp. 3d at 174-75.  The court further held that the complaint sufficiently stated that plaintiff's hearing was unfair due to the lack of adequate notice.  *Id.* at 175.

The Title IX regulations confirm the importance of adequate notice of charges to the accused party:

> Upon receipt of a formal complaint, a recipient must provide the following written notice to the parties who are known: (A) Notice of the recipient's grievance process . . . .  (B) Notice of the allegations of sexual harassment potentially constituting sexual harassment as defined in § 106.30, **including sufficient details known at the time** and with sufficient time to prepare a response before any initial interview.  Sufficient details include the identities of the parties involved in the incident, if known, **the conduct allegedly constituting sexual harassment** under § 106.30, and the date and location of the alleged incident, if known.  . . . .

34 C.F.R. § 106.45(b)(2) (emphasis added).

Dartmouth's notice to Doe of the charges did not meet the standard in the Title IX regulations because it failed to put him on notice of the conduct of which Dartmouth ultimately found him responsible.  For that reason, and the case law supporting it, Doe has a likelihood of success on the merits of his breach of contract claim based on the inadequacy of the notice of the charges against him.

> **2.   Dartmouth Failed to Apply the Preponderance of the Evidence Standard by Failing to Fairly, Thoroughly, and Impartially Consider Evidence that Smith Was Sober and Doe Was Incapacitated by Alcohol.**

Second, and relatedly, while Smith alleged in his complaint giving rise to the Notice that Doe "sexually assaulted [Smith] **by having oral intercourse with him while he was asleep**," Compl. ¶ 83 (emphasis added), by his own account as quoted by the Investigator in the Report, Smith reported a different version of events during the investigation:

> And I was asleep, felt a sensation like somebody was **caressing** me **around** my penis and I shifted a little bit . . . .  I shifted, with this sensation and half-opened my eyes . . . .  I was still in a sleepy state and looked down . . . still not knowing if this was real or if I was dreaming and I kept my eyes half open . . . .  When I first moved

10

and shifted and aroused, **I looked down and he was looking up at me, he wasn't touching me**.  But as I mentioned, my penis was out, my pants were unbuttoned and erect.  **And then after I settled, stopped moving, <u>I saw him reach down and grab my penis and put it in his mouth.</u>**

Compl. ¶ 92 (quoting Final Report, at 9 (emphasis added)).

Further compounding Smith's lack of credibility, in his first interview, Smith explicitly stated that when he "stopped moving, then that's when [Doe] grabbed [his] penis and put it inside his mouth."  Compl. ¶ 93 (quoting Final Report, at 10).  Smith described the caressing "sensation" he felt while he was asleep as similar to someone "jerking [him] off" and not as oral intercourse. *Id.*  In his second interview, Smith attempted to modify his statement to comport with the Notice but ultimately conceded that any oral intercourse took place only when he was awake.  Smith initially stated that he saw Doe "go down and grab it and start to suck it **again**."  Compl. ¶ 94 (quoting Final Report, at 10 (emphasis added)).  However, when specifically questioned on his use of the word "again," Smith corrected his statement and conceded that "when [he] saw [Doe] grab it and suck it, **was the first time I saw him do it**." *Id.* (emphasis added).  Smith never stated in any of his interviews that he woke up to Doe performing oral sex on him, as he alleged in the Formal Complaint.

Oral sexual intercourse and caressing are not the same.  Oral intercourse requires penetration.  Compl. ¶ 97.  In contrast, "caress" means "to touch or stroke in a loving or endearing manner."  *See id.*  Indeed, sexual intercourse and sexual touching are recognized in the SMP as separate and distinct violations.  *See id.*

The Investigator failed to appreciate or properly apply the distinctions and actually merged the concepts of oral intercourse and caressing to improperly find Doe responsible.  The Investigator credited Smith's "account of the event [because it had] been consistent throughout his retellings."  Compl. ¶ 99 (quoting Final Report, at 43).  However, that credibility finding, while itself not

11

accurate, as Smith contradicted his first statement in his second interview only to ultimately confirm the statement he made in his first interview, also ignored that Smith's consistent statements throughout his interviews were **inconsistent** with his statements in the Title IX Formal Complaint he submitted on April 28, 2021, which stated that Doe performed oral sex on him while he was asleep.

Contrarily, Doe consistently maintained that he was incapacitated by alcohol to the point he was experiencing fragmentary blackouts while Smith took advantage of his intoxication and induced him to perform oral sex on Smith. Compl. ¶¶ 26-29. The Investigator acknowledged in the Report that Doe "may have subjectively experienced an alcohol-induced fragmentary blackout" but inexplicably decided that did not matter because "the available evidence show[ed] that [Doe] initiated the sexual contact, while [Smith] was asleep." Compl. ¶ 104 (quoting Final Report, at 51-52). The Investigator also held Doe's incapacitation due to alcohol against him, finding that Doe's

> inability to provide detail or specificity about the event negatively affected the reliability of the other information he provided. For example, [Doe] was unable to explain how the act of [Smith] running his fingers through his hair caused his head to lift to initiate the sexual activity, as he contended. Similarly, [Doe] could not elaborate on what took place between the time he saw [Smith's] exposed, erect penis and when he put his mouth on [Smith's] penis.

Compl. ¶ 105 (quoting Final Report, at 45).

The Investigator's crediting of Doe's statement that he was blackout drunk during the encounter and, at the same time, consciously initiating sexual contact cannot both be true under Dartmouth's policy or a proper application of the preponderance of the evidence standard.

Under Dartmouth's policy:

> Where alcohol or other drugs are involved, evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed,

rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness. The assessment is based on objectively and reasonably apparent indications of incapacitation when viewed from the perspective of a sober, reasonable person.

Compl. ¶ 107 (quoting Exhibit A, at VIII.C).

The Investigator's finding that Doe's actions in initiating sexual activity were "inconsistent with him being incapacitated" ignores that incapacitation by alcohol can also impede a person's ability to consent to an act he allegedly initiated, including impairing his ability to make informed, rational judgments, or the capacity to appreciate the nature and quality of the act. Additionally, the Investigator's inconsistent findings regarding Doe's incapacitation due to alcohol fail to meet the preponderance standard of evidence properly, fairly, and impartially applied, as it must be under Dartmouth's policies.

In *Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017), the court denied the school's motion to dismiss and allowed the claim that the school breached its contractual obligations to the student in that the school's "decision was not supported by a preponderance of the evidence" to proceed. *Id.* at 216. Specifically, the student alleged that because the evidence showed and the school based its finding of responsibility on the student's credible statement that he was blackout drunk, "there was insufficient evidence that, under the terms of the *Student Handbook*, he was responsible for sexual misconduct." *Id.* (emphasis in original); *see also, e.g.*, *Doe v. Princeton Univ.*, No. 3:19-CV-07853-BRM-TJB, 2020 WL 7383192, at *4 (D.N.J. Dec. 16, 2020) (denying motion to dismiss where plaintiff sufficiently alleged that university breached contract where it, among other things, "failed to address Doe's report that Roe had sex with him while he was incapacitated" and failed to "'conduct an inquiry and determine, by a preponderance of the evidence' whether the Policy was violated."). Similarly, in this case, the Investigator

13

credited Doe's statement that he was blackout drunk during the encounter while nonetheless finding Doe responsible for sexual misconduct under Dartmouth's policy.  Compl. ¶¶ 102-09.

Dartmouth's finding that Doe was responsible notwithstanding its crediting his statement that he was experiencing fragmentary blackouts is inconsistent with its own policy and not supported by a preponderance of the evidence.  For that reason, and the case law supporting it, Doe has a likelihood of success on the merits of his breach of contract claim based on Dartmouth's failure to apply the preponderance of the evidence standard fairly, thoroughly, and impartially to the investigation process in his case.

   3.   **Dartmouth Applied the Preponderance of the Evidence Standard Differently to Doe Because He Is Male.**

Third, Dartmouth applied the preponderance of the evidence standard differently in this case because Doe is a male student rather than a female student in violation of its contractual obligation to provide Doe with a fair, thorough, and impartial investigation process.  Upon information and belief, Dartmouth has credited intoxicated cisgender female students alleging sexual assault against cisgender male students when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances, whereas the Investigator in this case held the same facts against Doe's credibility, resulting in a finding that Doe was responsible against the preponderance of the evidence.

In *Amherst College*, the court denied the school's motion to dismiss and allowed to proceed the student's claim that the school breached its contractual obligations by "conduct[ing] its disciplinary proceeding against [the student] in a discriminatory manner due to his gender . . . ." 238 F. Supp. 3d at 218.  There, the student alleged that the school had encouraged the female accuser in his case to file a formal complaint against him but had not similarly encouraged him to

14

file a complaint when he alleged the female student may have sexually assaulted him while he was incapacitated by alcohol. *Id.* On those facts, the court found that the student had sufficiently alleged "specific factual allegations that the College responded differently to similar reports when the genders of the potential victims and aggressors were different. They provide a foundation from which a court can infer gender-based discrimination may have played a role in the College's responses." *Id.* Similarly in *Doe v. Embry-Riddle Aeronautical University, Inc.*, No. 6:20-cv-1220-WWB-LRH, 2021 WL 5141032 (M.D. Fla. Nov. 4, 2021), the court denied summary judgment on the breach of contract claim because there were existing material issues of fact "regarding whether the investigation was impacted by gender bias" where the school credited and thoroughly investigated the allegations of an intoxicated cisgender female student but did not credit or investigate as thoroughly the allegations of a cisgender male student under similar circumstances. *Id.* at *6; *see also, e.g.*, *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1212 (M.D. Fla. 2019) (denying motion to dismiss because plaintiff sufficiently alleged, in part, a biased investigator assessed the female as more credible than the male). In this case, Doe has alleged on information and belief that Dartmouth has applied the preponderance of the evidence standard differently when a cisgender female student alleged that she was sexually assaulted while she was too drunk to remember specific details of the alleged assault clearly or in a linear fashion. Under those circumstances, her statements were fully credited by the investigator.

Dartmouth holding Doe's incapacitation due to alcohol against his credibility where it has not done so when the complaining student is cisgender female is inconsistent with its own gender discrimination policy and is evidence that Dartmouth applies the preponderance of the evidence standard differently based on the gender of the complaining student. For that reason, and the case law supporting it, Doe has a likelihood of success on the merits of his breach of contract claim

15

based on Dartmouth's failure to apply the preponderance of the evidence standard fairly, thoroughly, and impartially to the investigation process in his case.

### B.      Title IX Claim

"Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions." *Amherst Coll.*, 238 F. Supp. 3d at 221 (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)).  "One of the purposes of Title IX is 'to provide individual citizens with effective protection against [discriminatory] practices.'"  *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).  Specifically, "Title IX provides that '[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  *Trs. of Boston Coll.*, 892 F.3d at 89-90 (quoting 20 U.S.C. § 1681(a)).  The U.S. Department of Education interprets "program" to include "all of the operations of . . . [a] college, university, or other postsecondary institution." 34 C.F.R. § 106.2(h)(2)(i).  Title IX "is enforceable through an implied private right of action." *Trs. of Boston Coll.*, 892 F.3d at 90 (internal quotation marks and citations omitted).

In this age of heightened sensitivity to allegations of sexual misconduct, a court in this circuit has pointed out that "[c]ourts increasingly see claims brought pursuant to Title IX by male students who have been found responsible and disciplined for violating the sexual misconduct policies colleges use to deter and respond to sexual misconduct." *Amherst Coll.*, 238 F. Supp. 3d at 222 (collecting cases).  And, while "[n]either the Supreme Court nor [the First] Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX," the courts in both the *Amherst College* and the *Boston College* cases apply the framework set out by the Second Circuit in *Yusuf v. Vassar College*,

16

35 F.3d 709 (2d Cir. 1994). *Trs. of Boston Coll.*, 892 F.3d at 90; *see also Amherst Coll.*, 238 F. Supp. 3d at 222. In the absence of authority to the contrary, Doe argues his claims pursuant to that framework and establishes that his claims are likely to succeed when viewed in light of a full evidentiary record.

"In *Yusuf*, the Second Circuit described two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX cases. In one category are claims alleging bias in the disciplinary process led to an erroneous outcome. The other category includes claims asserting selective enforcement." *Amherst Coll.*, 238 F. Supp. 3d at 222 (citing *Yusuf*, 35 F.3d at 715). In this case, Doe has a reasonable likelihood of success on both types of Title IX claims.

### i. Erroneous Outcome

"To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances causally connecting gender bias to the erroneous outcome." *Amherst Coll.*, 238 F. Supp. 3d at 222 (internal citations omitted).

In stating an erroneous outcome claim under Title IX, Doe "may rely on circumstantial evidence alone to prove that there was a discriminatory pattern of decision-making" to show that gender bias was a "motivating factor" behind the report finding him responsible. *Trs. of Boston Coll.*, 892 F.3d at 92.

In this case, there is abundant evidence that Dartmouth failed to consider Doe's incapacitation by alcohol in a way that it would not have done if a female student had been intoxicated to the point of blacking out. Compl. ¶¶ 114-21. Upon information and belief, Dartmouth has pursued complaints against cisgender male students brought by cisgender female

students who claimed they were sexually assaulted while incapacitated by alcohol and credited the statements of those female students even though they could not remember the specific details of the alleged incident or could not remember the details of the alleged incident and contextualizing facts in a linear fashion, even though the female student had allegedly initiated or mutually agreed to the sexual contact.  Other universities have done the same.  *See, e.g.*, *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 972-75 (S.D. Ohio 2018) (denying motion to dismiss on erroneous outcome Title IX claim in a case in which the university credited statements of the intoxicated female accuser who had allegedly initiated the sexual contact and had given contradictory statements on her level of intoxication).

For example, in *Prasad v. Cornell University*, No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016), the school found the plaintiff responsible for sexual misconduct when he engaged in what he perceived as consensual sexual contact with an intoxicated, female accuser who had initiated the interaction, crediting her statements notwithstanding her admitted intoxication.  *See id.* at *4, *6-7.  Specifically, the university credited the female accuser's statement that she had consumed approximately eighteen alcoholic beverages the night of the incident (and calculated her blood alcohol through an online program based on that number) despite multiple witnesses saying that she was "buzzed" but not "messy drunk" and definitely not incapacitated.  *Id.* at *3-5.  Prasad also clearly described his accuser's advances, stating that she said that "she was 'horny' but that she did not want to have sex" and that the two engaged in sexual activity that did not include intercourse.  *Id.* at *4.  The investigators concluded that Prasad should be expelled because failing "to recognize that the victim was too drunk to consent is no defense to a charge of sexual assault," and the accuser's blood alcohol content, by their online calculations, was slightly higher than Prasad's.  *Id.* at *6.

In *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020), the Sixth Circuit held that Doe had sufficiently stated his claim that the college's decision led to an erroneous outcome where the investigator found that the female accuser was too intoxicated to consent but did not find that she was incapacitated, and, per the college's policy, only incapacitation invalidates consent. *See id.* at 588. Similarly, in this case, the Investigator found that Doe "subjectively experienced an alcohol-induced fragmentary blackout," but that his actions in initiating the oral sex were inconsistent with incapacitation. Compl. ¶¶ 104-05. That finding is inconsistent with Dartmouth's definition of incapacitation which does not exclude people who initiate sexual acts and includes the consideration of the effect of alcohol on a "person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness." Compl. ¶ 107. Accordingly, like in *Oberlin*, the procedural error of not appropriately applying the definition of incapacitation led to an erroneous outcome.

In light of the cited precedent and the evidence that Dartmouth treated Doe's intoxication differently as a male than they would have if he were a female, Doe is likely to prevail on the erroneous outcome claim.

  **ii. Selective Enforcement**

"In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of the punishment to impose upon him." *Amherst Coll.*, 238 F. Supp. 3d at 223. "Unlike an erroneous outcome claim, a plaintiff can prevail on a

selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding." *Id.* at 222 (citing *Yusuf*, 35 F.3d at 715).

As stated above, upon information and belief, Dartmouth has treated intoxicated female accusers who allegedly initiated or were complicit in the sexual interaction differently than they have treated Doe. That is the definition of selective enforcement. Doe can cite to at least one relevant example without the benefit of discovery.[1] Additionally, based on this example and with the benefit of discovery, Doe will be able to make "specific factual allegations that the College responded differently to similar reports when the genders of the potential victims and aggressors were different" and those specific allegations can provide "a foundation from which a court can infer [that] gender-based discrimination may have played a role in the College's responses." *Amherst Coll.*, 238 F. Supp. 3d at 218.

Selective enforcement claims have been upheld in cases where universities have allowed a female student to make a claim that they did not allow a male student to make. For example, in *Doe v. Embry-Riddle Aeronautical University*, two students—one male and one female—filed complaints against each other, each alleging they were too intoxicated to consent, but the university considered only the female student's complaint in its finding against the male. *See* 2021 WL 5141032, at *3-5. In *Doe v. Syracuse University*, 457 F. Supp. 3d 178 (N.D.N.Y. 2020), the court denied summary judgment on a selective enforcement claim where a material dispute remained on Doe's allegations that he was treated differently than his female accuser because they were both too incapacitated to consent and the university did not properly evaluate that claim. *See id.* at 194-200. In *Doe v. Rollins College*, the court allowed the plaintiff's selective enforcement

---

[1] Due to confidentiality issues, Doe has not included the details of that example here but is willing to do so under seal if it would be helpful to the Court.

4865-5372-8010, v. 1

claim to proceed where he alleged that the college did not properly consider his intoxication and encouraged his female accuser to file a complaint, but not him.  *See* 352 F. Supp. 3d at 1211-12.

Like the plaintiffs in the cases cited above, Doe has alleged sufficient facts to establish a likelihood of success on the merits of his Title IX selective enforcement claim based on the different manner in which Dartmouth has treated female students who have alleged they were too incapacitated to consent to sexual activity.

**II.       Doe Will Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Courts have held that allegations that a suspension or expulsion from college would damage a student's academic and professional reputation are sufficient to establish irreparable harm at the preliminary injunction stage.  *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016).  More specifically, courts have recognized that,

> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . . Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015). Similarly, a court granted a preliminary injunction against a university in part because the plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester" because the gap created in his record would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admission committees, which would require him to reveal that he was found guilty of sexual misconduct by [the university]."  *King v. DePauw Univ.*, No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014).  *See also Ritter v. Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) (plaintiff seeking a TRO demonstrated that the "loss of educational and career opportunities he will

encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages."). The plaintiffs in the *DePauw* and *Middlebury* cases both sought and were granted injunctions to return to their respective universities and complete the school year, thus avoiding any appearance of a gap in their education while their cases proceeded.

While Doe already has a gap in his record that will need to be explained, the gap can be accounted for by his need for personal and family leave during the COVID-19 pandemic. If the gap continues longer, and the expulsion is enforced, Doe will be forced to explain the expulsion as the reason for the gap to all future employers and to any medical school at which he may seek to finish out his degree. Delays in Doe obtaining his degree and starting his residency only serve to deprive him of the career in helping people of which he has always dreamed and the world of one of the many Primary Care Physicians it needs. Additionally, if Doe is forced to pursue his education at a medical school outside of the United States or at an osteopathic medical school in the United States, he will likely have difficulties getting into a residency program in the United States or require additional education or training in the United States that he would not have if he were to graduate from Geisel. Thus, Doe has experienced and will continue to experience irreparable harm in the absence of a preliminary injunction.

Additionally, Doe would suffer irreparable harm in the denial of his constitutional right to equal treatment under the Fourteenth Amendment. *See Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016). In the *Portz* case, the court recognized that even though the school was a private institution, the plaintiffs suffered irreparable harm due to their "expectation that they may be treated unequally in violation of Title IX's terms," because "when the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm regardless of whether the plaintiff seeks redress under the Fourteenth Amendment itself or under

22

a statute enacted via Congress's power to enforce the Fourteenth Amendment," such as Title IX. *Id.*  As such, Doe has suffered irreparable harm that will only continue and increase in the absence of an injunction in this case.

### III.    The Balance of Equities Weighs in Favor of a Preliminary Injunction.

In this case, the balance of the equities weighs in favor of a preliminary injunction because, while Doe will suffer immediate and lasting irreparable harm without one, Dartmouth will suffer only limited harm if it ultimately prevails, and the injunction is lifted.  There will be no harm to Smith because he will no longer be present on campus by the time Doe returns, as he had originally planned before the Title IX Coordinator wrongfully and in breach of Dartmouth's contractual allegations represented to Smith that Doe would return imminently.

In *Doe v. Middlebury College*, the court found that, while the plaintiff was "likely to suffer irreparable harm if he is expelled, it is unlikely [the university] will suffer great damage or loss as a result of the issuance of a preliminary injunction preventing the expulsion of [the plaintiff] for the fall semester."  2015 WL 5488109, at *4.  In so holding, the court recognized that the university would suffer interference with its process for dealing with allegations of sexual misconduct if an injunction were granted, but that if the university ultimately prevails, it can refuse to confer a degree on the plaintiff and maintain his disciplinary record in their files.  *See id.*  On the other hand, the court found that plaintiff "will suffer if he is not permitted to return to campus but ultimately prevails in the case."  *Id.*  Therefore, the balance of the equities favored granting the injunction in favor of the plaintiff.  *See id.*; *see also King*, 2014 WL 4197507, at *14 (recognizing the harm that the university would suffer in terms of being denied the right to enforce its policies and being second guessed by the court but finding that harm was outweighed by the harm to the

plaintiff in loss of education, job opportunities, and having to explain a gap year for the rest of his life).

Similarly, Dartmouth will not suffer harm while its process in this case is subject to judicial scrutiny sufficient to outweigh the tangible harm Doe will certainly suffer as he will be unable to finish his medical degree in the absence of an injunction.

## IV.    A Preliminary Injunction Is in the Public Interest.

Courts have recognized that when a plaintiff has a likelihood of success on a Title IX claim, "the public interest weighs in Plaintiffs [*sic*] favor because the public's interest in eradicating sex discrimination is compelling."  *Portz*, 196 F. Supp. 3d at 978 (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983)).  Also, courts have recognized "that there is a broad public interest in enforcing fundamental constitutional principles" and that contractual fairness claims against universities in the Title IX context are sufficient to justify issuing a preliminary injunction against allegedly unfair disciplinary proceedings.  *See, e.g.*, *Univ. of Cincinnati*, 223 F. Supp. 3d at 712.  It is critical in this day and age, both in terms of practical application and in terms of perception, that fairness and impartiality to all parties be the rule in Title IX cases.  Consequently, in this case, granting a preliminary injunction is in the public interest.

## CONCLUSION

For the foregoing reasons, Doe has made a showing entitling him to preliminary injunctive relief.  Accordingly, Doe respectfully requests that the Court grant his motion for preliminary injunction and enjoin Dartmouth's expulsion of Doe pending the outcome of this case.  Doe requests oral argument and an expedited hearing.

4865-5372-8010, v. 1

Respectfully submitted,

Dated: January 20, 2022

/s/ *William E. Christie*_____
William E. Christie (NH Bar #11255)
S. Amy Spencer (NH Bar #266617)
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street, P.O. Box 2703
Concord, NH 03302
(603) 225-7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com
obensinger@shaheengordon.com

## CERTIFICATE OF SERVICE

I, William E. Christie, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be served conventionally on all parties or their counsel.

/s/ *William E. Christie*_____
William E. Christie

4865-5372-8010, v. 1