UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOHN DOE,

                          Plaintiff,

          v.                                        Civil Action No. 1:22-cv-00018-LM

TRUSTEES OF DARTMOUTH COLLEGE,

                          Defendant.

**PLAINTIFF'S REPLY TO DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION AND EXPEDITED RELIEF**

        Plaintiff John Doe ("Doe") submits this memorandum of law in reply to the objection (doc.
no. 17) of Defendant Trustees of Dartmouth College ("Dartmouth") to Doe's motion for a
preliminary injunction and expedited relief (doc. no. 3).[1]

**RELEVANT FACTUAL DISPUTES**

        Doe's Verified Complaint (doc. no. 1) sufficiently states the relevant facts; however, Doe
must address here certain facts that Dartmouth incorrectly claims are undisputed.  Dartmouth states
in its "Relevant Facts" that the following facts are "undisputed":

> Smith woke up to a sensation of "caressing" around his penis.  [Complaint] ¶ 92.
> As he was opening his eyes, he saw that his underwear was pulled down, with his
> erect penis exposed, and then saw Doe perform oral sex on him.  At no point did
> Smith indicate that he consented to Doe performing oral sex on him.

Doc. no. 17 (Objection), at 1.  Doe acknowledges that these were the facts found by the
investigator, but states that these facts are unequivocally disputed.  As Doe consistently stated
throughout the investigation, he was awakened by Smith running his fingers through his hair, then

---

[1] This Reply addresses specific issues raised by Dartmouth's Objection.  Doe reserves the right to present additional
facts and legal argument at the March 29, 2022 hearing.

Smith lifted Doe's head to Smith's already exposed penis.  *See* doc. no. 17-13 (Def. Exh. 10, Investigation Report), at 17.  Investigator Michael J. Stackow's ("Stackow") finding that, even if Smith had run his hands through Doe's hair, it "would not have amounted to an 'outward demonstration' indicating that [Smith] had freely chosen to engage in the sexual contact" ignores Doe's allegations that Smith lifted Doe's head and that Smith's penis was already exposed and erect.  Def. Exh. 10, at 51.  These factual disputes are key to Doe's substantive fairness arguments below and cannot be brushed aside.  Further, Dartmouth's characterization of Doe's defense as simply that Smith was not asleep during the oral sex, *see* doc. no. 17, at 6, ignores Doe's consistent allegations that Smith initiated the action as demonstrated in Doe's Title IX complaint against Smith in which Doe was the complaining student and was entitled to the same rights under Dartmouth's sexual misconduct policies—a fair, thorough, and impartial process free of gender discrimination—as Smith and all other complaining students, rights Doe did not receive.

Also essential to Doe's substantive fairness argument is the difference between the written report and what Stackow said during the hearing.  In the written report, Stackow is clear that Smith was asleep when he "felt a sensation as if someone was caressing his penis," he then shifted his body and saw that his penis was exposed, then he noticed Doe kneeling in front of his penis.  Def. Exh. 10, at 46.  Stackow then found that Smith saw Doe place Smith's penis in Doe's mouth.  *Id.* With these findings, Stackow stated that he found "sufficient evidence, by a preponderance of the evidence standard, that [Smith] was asleep when the sexual contact began."  *Id.* at 51.  Nowhere in the report did Stackow find that Smith was asleep when Doe performed oral intercourse as alleged in the Notice.  The reason is plain.  When interviewed, Smith **never said this happened**. Implicitly acknowledging he did not make the necessary finding in his report that Doe performed **oral intercourse** on Smith while Smith **was asleep**, Stackow stated during the hearing that, by

2

drawing "reasonable inferences," he did, in fact, find that Doe had oral sexual intercourse with Smith while Smith was asleep. *See* doc. no. 17-15 (Def. Exh. 12, Hearing Transcript), at 14. Under Dartmouth's Sexual and Gender-Based Misconduct Policy ("SMP"), sexual contact consists of a broad array of conduct including both sexual intercourse (anal, oral, or vaginal) and more general sexual touching, which includes intentional contact with the genitals or groin without penetration. *See* doc. no. 1-1 (Pl. Exh. A, SMP), at VII.B.1, B.2. Oral sexual intercourse while asleep as alleged in the Notice is not interchangeable with the much broader term "sexual contact" under Dartmouth's policy or in reality, as discussed more fulsomely below. Stackow's attempt to revise the factual findings in his report through his hearing testimony to support his erroneous conclusion proves that the factual findings in his report did not support the conclusions, by a preponderance of the evidence, that Doe was responsible and Smith was not and provides strong evidence to support both Doe's notice and substantive fairness claims below.

## ARGUMENT

### I.      Doe Does Not Seek Mandatory Relief.

Dartmouth first argues that Doe seeks a so-called "mandatory injunction" instead of an ordinary preliminary injunction intended to preserve the status quo. *See* doc. no. 17 (Objection), at 9. As Dartmouth implicitly acknowledges, the status quo is that Doe was on leave from the Geisel School of Medicine ("Geisel") **with a plan to return no earlier than the fall of 2022**. That is the status quo that Doe seeks to maintain. He is not asking to come back sooner than that or even before Smith graduates. He seeks to come back and finish his degree after Smith graduates like he had planned, nothing more.

Even if the Court finds that Doe is seeking a mandatory injunction, the analysis remains the same. While Dartmouth appropriately states that mandatory injunctions "should be granted

only in those circumstances when the exigencies of the situation demand such relief . . . , those exigencies should still be measured according to the same four-factor test" through which preliminary injunctions are evaluated. *Braintree Labs., Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Crowley v. Local No. 82*, 679 F.2d 978, 996 (1st Cir. 1982), *rev'd on other grounds by* 467 U.S. 526 (1984). As set forth below and in Doe's opening brief (doc. no. 3-1), in this case, the Court must grant the preliminary injunction to prevent irreparable injury to Doe.

## II.     Doe Is Likely to Succeed on the Merits

### a.   Breach of Contract Claims

#### i.  FERPA Claim

Dartmouth argues that it did not violate the Family Educational Rights and Privacy Act ("FERPA") when the Title IX Coordinator, Kristi Clemens ("Clemens"), incorrectly disclosed to Smith that Doe was expected to return to campus in the spring of 2022 because Clemens simply released "directory information." Doc. no. 17 (Objection), at 10-11. Schools are allowed to release directory information without prior consent of the student if the school provides an "annual notification" to the students defining what constitutes "directory information." *See* 34 C.F.R. § 99.37. Dartmouth's definition of directory information includes "enrollment status" and "dates of attendance." *See* doc. no. 17-4 (Def. Exh. 1, Records Policy), at 3. "Dates of attendance" is defined as "the period of time during which a student **attends** or **attended** an educational agency or institution. Examples of dates of attendance include an academic year, a spring semester, or a first quarter." 34 C.F.R. § 99.3 (emphasis added). "The term does not include specific daily records of a student's attendance at an educational agency or institution." *Id.* Under the same

regulation, examples of "enrollment status" are presented as "undergraduate or graduate, full-time or part-time." *Id.* Similarly, the U.S. Department of Education Federal Student Aid Office provides in its glossary, "Enrollment status is reported by the school you attended, and indicates whether you **are**, or **were**, full-time, three-quarter time, half-time, less than half-time, withdrawn, graduated, etc." *Glossary*, Federal Student Aid, https://studentaid.gov/help-center/answers/topic/glossary/articles (last visited Feb. 22, 2022) (emphasis added). The information Clemens disclosed to Smith was not solely directory information based on the applicable definitions. Rather, it was inaccurate speculation on Doe's subjective future intent to enroll at a particular time. As such, as set out in Doe's Memorandum in Support of Preliminary Injunction, Doe is likely to prevail on his breach of contract claim based on Dartmouth's FERPA violation.

Secondarily, Dartmouth argues that Doe's claim that Dartmouth violated FERPA cannot support a breach of contract clam because the harm was not a "foreseeable consequence of the breach." Doc. no. 17 (Objection), at 11. However, Doe's expulsion was clearly foreseeable because, as Stackow acknowledges in his report on more than one occasion, Smith filed this complaint ***because*** he believed that Doe was returning to Geisel before Smith would graduate and leave. *See* Def. Exh. 10, at 14 ("[Smith] said that once he learned that [Doe] planned to return to school, he decided he wanted to proceed with a formal complaint."); *see also id.* at 30, 32. The false information that Clemens provided to Smith in violation of FERPA directly led to Smith filing his Title IX complaint and to Doe being expelled. Indeed, it was the purpose of Smith's inquiry and complaint. Therefore, Doe's expulsion was foreseeable to Clemens when she disclosed to Smith the information regarding her belief about Doe's future intent.

### ii.  Notice Claim

Dartmouth argues that Doe misstates the record while blatantly misstating the record itself. The Notice of Investigation issued to Doe alleged that "on July 12, 2020 [Doe] sexually assaulted [Smith] by having oral sexual intercourse with him while he was asleep."  Doc. no. 7-6 (Def. Exh. 3, Notice of Investigation to Doe), at 1.   Contrary to Dartmouth's contention, (doc. no. 17 (Objection), at 12), Stackow did not find in his written report that Doe performed oral sex on Smith while he was asleep, nor did Smith ever report that oral intercourse took place while he was asleep in any of his Statements during the investigation.  Rather, Smith reported:

> And I was asleep, felt a sensation **like somebody was caressing me** around my penis and I shifted a little bit.  I was lying down, there was the ottoman just in front, to the side.  I was lying down, I shifted, with this sensation and half-opened my eyes.  I was still in a **sleepy state** and looked down, saw [Doe] kneeling in front of the couch, in front of me.  And my jeans had been unbuttoned, with my boxer briefs pulled down and I was fully erect.  I guess it totally shocks, still not knowing if this was real or if I was dreaming and I kept my eyes half open, just like they are right now.  When I first moved and shifted and aroused, I looked down and he was looking up at me, **he wasn't touching me**.  But as I mentioned, my penis was out, my pants were unbuttoned and erect.  And then after I settled, stopped moving, **I saw him reach down and grab my penis and put it in his mouth**.

Def. Exh. 10, at 9 (bold added).  In his second interview, Smith said that he "*saw him go down and grab it and start to suck it **again***" but when Stackow questioned his use of the word "again" Smith clarified that he "*hadn't seen it before that. . . . it kind of felt like somebody was **caressing** [him] or something. . . . So, when [he] saw him grab it and suck it, was the **first time** [he] saw him do it.*"  Def. Exh. 10, at 10 (bold added).  Significantly, Smith described the caressing "sensation" he felt while he was asleep as similar to someone "jerking [him] off" and not as oral intercourse.  *Id.*

From those statements, Stackow made the following conclusions.  First, in his listed "Findings of Fact" Stackow found that:

> [Smith] was asleep on the couch when he felt a sensation **as if someone was caressing his penis**, a sensation he described as similar to a sexual dream.  [Smith] then shifted his body to the right and as he did so, saw that his underwear was pulled

6

down to the point where the shaft of his penis was exposed over the waistband of his underwear.  [Smith's] penis was erect.

[Doe] was on his knees on the floor in front of [Smith's] penis.  At one point during the sexual contact, [Doe] paused and looked up at [Smith].

After [Smith] shifted his body [Doe] took [Smith's] penis with his left hand and placed it in his mouth.  [Doe] then moved both his head and his hand up and down on the shaft of [Smith's] penis.

Def. Exh. 10, at 46 (numbered bullets omitted, bold added).  Based on those findings, Stackow concluded that he had "found sufficient evidence, by a preponderance of the evidence standard, that [Smith] was asleep when the sexual contact began."  Def. Exh. 10, at 51.  Nowhere does Stackow find that Smith was asleep when the ***oral sexual intercourse*** began.

Despite that, Stackow testified at the hearing that the "sexual contact" he was referring to in the report included oral sexual intercourse.  *See* Def. Exh. 12, at 13.  In Dartmouth's sexual misconduct policy, "sexual contact" is the broad umbrella term that includes sexual intercourse (including, oral), and sexual touching, *i.e.*, "caressing."  *See* Pl. Exh. A, SMP, at VII.B.  Stackow's testimony that "the definition of sexual assault includes the term sexual contact, which is an umbrella term that includes the activity of oral sexual intercourse," proves too much.  Def. Exh. 12, at 14.  Stackow's use of the term "sexual contact" in the report includes, under the policy, *both* the "caressing" that Smith alleged he felt while he was asleep and the oral sexual intercourse Smith alleged in the Notice but never claimed actually happened during his statements to Stackow.  It, therefore, cannot be fairly said that Stackow found in his report that Doe performed oral sexual intercourse while Smith was asleep.

Further, and perhaps more importantly, Stackow's concession that sexual contact is an umbrella term that includes, among many other activities, sexual touching and oral sexual intercourse supports rather than undermines Doe's Notice claim.  What Dartmouth has done, by

analogy, is the functional equivalent of making a guilty finding against a defendant who was indicted for Aggravated Felonious Sexual Assault by penetration when the alleged victim was asleep—i.e., physically helpless to resist under RSA 632-A:2, I(b)—based on testimony at trial that only non-penetrative sexual touching took place when the alleged victim was asleep. The indictment would not have sufficiently notified the defendant that he was being charged with the touching (sexual contact under RSA 632-A:1, IV) rather than the oral intercourse (sexual penetration under RSA 632-A:1, V(3)).

Additionally, contrary to Dartmouth's erroneous representations in its Objection (doc. no. 17, at 12), Doe responded to Smith's statements in two ways: factually and legally. First, Doe filed his own complaint, which was simultaneously investigated by Stackow in which Doe described being awakened by Smith running his fingers through Doe's hair and lifting his head, causing Doe to look up and see Smith's exposed, erect penis. *See* Def. Exh. 10, at 16-17. Doe then remembered performing oral sex on Smith, but his memory is lacking in detail. As he told Stackow, Doe "wasn't even sober enough to be aware of what was happening." Def. Exh. 10, at 17. While Doe stated that, because he was experiencing fragmentary blackouts, he did not remember exactly what happened between the lifting of his head and the oral sex, he was clear that from what he does remember, Smith was awake the entire time. *See id.*

Doe ***never*** conceded, as Dartmouth claims, that he "caressed" Smith while he was asleep. Instead, Doe argued that, legally and under Dartmouth's policy, Stackow's finding that Doe "caressed" Smith while he was asleep did not meet the allegation in the Notice that Doe performed oral sex on Smith while he was asleep. Doe does not deny performing oral sex. Rather, he alleges that Smith, when awake, initiated and wanted the oral sex, and Doe was too incapacitated by alcohol to say no. Doe focused on Smith's statements and Stackow's findings not matching up to

8

the Notice before the hearing panel and on appeal because he had not been aware he could be found responsible for something other than performing oral sex on Smith while Smith was asleep. Focusing on Dartmouth's failure to provide sufficient notice of the alleged violation does not negate the factual arguments that Doe made at all stages of the process expressly denying that he engaged in any sexual conduct with Smith when Smith was asleep and, instead, that Smith initiated the sexual activity with Doe when Doe was too incapacitated to consent.

Dartmouth analogizes this case to *Doe v. University of Arkansas – Fayetteville*, 974 F.3d 858 (8th Cir. 2020), in which the complainant first alleged that she was incapacitated, but on appeal claimed that the respondent had used force. *See id.* at 867. The court found that the respondent was on notice of complainant's allegations and had an opportunity to respond. Unlike in *Arkansas*, here, Smith did not change the "type" of case he was alleging. His allegation remained that Doe performed oral sex on him while he was asleep. However, the statements he gave to support that allegation did not actually support that allegation. In other words, Smith's allegation remained that he was asleep when Doe performed unwanted oral sexual intercourse on him, but his statements in his interviews were that he was awake before Doe began to perform oral sex and that he saw it occur. In addition to the cases previously cited by Doe, this case is more analogous to *Velez-Santiago v. State University of New York at Stony Brook*, 170 A.D.3d 1182 (N.Y. App. Div. 2019), in which the court overturned the penalty imposed upon the student because the "record reflect[ed] that the complainant did not report to investigators that the petitioner engaged in the act which formed the basis for the hearing panel's conclusion that the petitioner violated" the conduct code. *Id.* at 1183. Similarly, here, Smith has not stated that Doe performed oral sexual intercourse on him while he was asleep; therefore, there is no allegation on which the investigator or hearing panel could have formed the conclusion that he did. *See also Doe v. George Washington Univ.*,

9

366 F. Supp. 3d 1, 11 (D.D.C. 2018) (". . . A.C. had no recollection of talking to Ms. Roe either during the Uber ride or in the bathroom of the dorm after Ms. Roe returned.  Without explanation, the Appeals Panel found that this evidence 'generally corroborate[d]' Ms. Roe's statements that she had spoken with someone on the phone during the Uber ride and that she had spoken to A.C. about the assault when she got back to the dorm. . . .  This conclusion is divorced from the evidence and not explained by GW.").

Doe responded to both Smith's initial allegation and his statements, but Stackow's finding stretched both to find Doe responsible for activity that Smith did not allege and is not supported by the facts.  This constitutes a breach of Dartmouth's obligation to provide sufficient Notice and, as set out below, of Dartmouth's failure to apply the preponderance of the evidence standard fairly, thoroughly, and impartially.

### iii.   Preponderance of the Evidence

Dartmouth again mischaracterizes Doe's argument when it alleges that Doe simply disagrees with the factual findings that Stackow made.  As stated in his Memorandum in Support of a Preliminary Injunction, Doe is owed "basic fairness" which includes both "procedural fairness"—"whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself"—and "substantive fairness"— "whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016).  Doe is not simply disagreeing with Stackow's factual findings.  Rather, he is arguing that the conclusions that were drawn from the facts presented are "unduly arbitrary or irrational" or "tainted by bias or other unfairness," in violation of Dartmouth's own policies.

10

As discussed at length in the preceding section, Smith never stated in either of his two interviews that Doe performed oral sex on him while he was asleep.  Nor did Stackow make that finding in his final report.  Yet, Stackow testified before the hearing panel that he had indeed made that finding through "reasonable inferences" even though Smith's actual statements were to the contrary.  That conclusory jump based on inference is unduly arbitrary, irrational, and not supported by a preponderance of the evidence.

With regard to Doe's incapacitation due to alcohol, Stackow failed to appropriately apply Dartmouth's policy on incapacitation, finding in contradictory fashion that subjectively Doe was intoxicated and experiencing a fragmentary blackout, but that he was not too incapacitated to consent because he actively performed the oral sex.  Even setting aside Doe's allegations that Smith initiated and coaxed Doe into performing the oral sex, Dartmouth's policy is clear that incapacitation is not negated by action.  Dartmouth's policy states that

> evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; **capacity to appreciate the nature and quality of the act; or level of consciousness**.  The assessment is based on objectively and reasonably apparent indications of incapacitation when viewed from the perspective of a sober, reasonable person.

Pl. Exh. A., SMP, at VIII.C (bold added).  Doe specifically stated that the night of the incident he was experiencing fragmentary blackouts and that immediately after the oral sex, he did not remember it happening.  Alcohol clearly affected Doe's "capacity to appreciate the nature and quality of the act" and his ability to even know what he was doing or make any decisions for himself.  Stackow cannot accept, as he does, that Doe experienced an "alcohol-induced fragmentary blackout" and still hold Doe responsible for his actions while he was not capable of consciously making any decisions.  That decision is contrary to Dartmouth policy and in violation of Doe's right to both procedural and substantive fairness.

4874-0291-0481, v. 1

### III.     Doe Will Suffer Irreparable Harm if Preliminary Injunction Is Not Granted.

Doe's current leave of absence does not alter the fact that he will suffer irreparable harm if the preliminary injunction is not granted.  Additional leave, beyond that which he felt was necessary to care for his family and his own mental health, at the very least delays his graduation, his residency, and ultimately, his career.  The additional "gap" in his school history is not the only harm Doe presented, however.  Doe also argued that he could suffer the irreparable harm of being forced to pursue his education at a medical school outside of the United States or at an osteopathic medical school within the United States, which will decrease his chances of getting into a residency program in the United States or require him to go through additional training.  All of those possibilities ultimately affect Doe's future earning potential and his ability to pay off the student loan debt he incurred attending Geisel.  Assuming Doe could even get into another medical school with an expulsion on his transcript, Dartmouth cannot truly be suggesting that being forced to trade a Geisel degree for one from the Caribbean is not irreparable harm.  And it would certainly be surprising to current Geisel students burdened with the competitive stress of medical school and residency matching as well as significant tuition payments and student debt that Dartmouth believes a Geisel degree is no more valuable than one obtained by an unaccredited Caribbean medical school.

### IV.     The Balance of Equities and the Public Interest Weigh in Favor of Preliminary Injunction.

The balance of equities and the public interest weigh in favor of granting the preliminary injunction because, as stated in Doe's Memorandum in Support of Preliminary Injunction, the irreparable harm Doe will likely suffer greatly outweighs any damage the university may suffer from not being able to enforce its chosen punishment on a temporary basis.  *See* doc. no. 3-1, at 23.  Further, the public interest favors the preliminary injunction because society has an interest in

12

promoting contractual fairness and holding educational institutions to their obligations to abide by their own policies in their Title IX investigations and to refrain from engaging in unlawful sex-based discrimination, especially because Doe is not seeking to return until after Smith has graduated.

Date: February 24, 2022

Respectfully submitted,

/s/ *William E. Christie*
William E. Christie (NH Bar #11255)
S. Amy Spencer (NH Bar #266617)
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street/P.O. Box 2703
Concord, NH 03302
(603) 225-7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com
obensinger@shaheengordon.com

*Attorneys for plaintiff John Doe*

## CERTIFICATE OF SERVICE

I, William E. Christie, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be served conventionally on all parties or their counsel.

/s/ *William E. Christie*
William E. Christie

13