UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff<br><br>    v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>        Defendant | Civil Action No:  1:22-cv-00018-LM |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

Defendant Trustees of Dartmouth College ("Dartmouth") submits these Proposed Findings of Fact and Rulings of Law in relation to Plaintiff's motion for a preliminary injunction and expedited relief.

**PROPOSED FINDINGS OF FACT**

1.      Dartmouth is a private institution of higher education in Hanover, New Hampshire.  *Compl.*, ¶ 11.

2.      The plaintiff, John Doe, was a student at Dartmouth's Geisel School of Medicine. ¶ 1.

3.      Doe shared an apartment with "Sam Smith," a friend and fellow student at Geisel. *Id*., ¶¶ 2, 21.

4.      On the night of July 20, 2020, Doe and Smith got take-out food, drank beer and cocktails, and watched a movie, during which they both fell asleep on the couch.  *Id.* ¶¶ 24-27.

5.      Smith woke up to a sensation of "caressing" around his penis.  *Id.* ¶ 92.

6.      As Smith was opening his eyes, he saw that his underwear was pulled down, with his erect penis exposed, and then saw Doe perform oral sex on him.  Exhibit 10, *Investigation*

*Report* at 9-11 (summary of Smith's account), 16-18 (summary of Doe's account).[1]

7.      At no point did Smith indicate that he consented to Doe performing oral sex on him.  *Id*.

8.      Over the next few hours and again the next day, Doe apologized to Smith multiple times, both verbally and by text message.  *Id*. at 46-48.

9.      In his text messages, Doe offered to move out of the apartment and never to see Smith again.  *Id*.

10.      Doe also sent a text to Smith's girlfriend, apologizing for his "inexcusable" conduct, about which he was "mortified and ashamed."  *Id*.

11.      Doe took a leave of absence from school and sought mental health counseling.  *Compl*. ¶¶ 40-41.

12.      In March and April 2021, Smith met three times with Kristi L. Clemens, Dartmouth's Title IX Coordinator.  *Clemens Decl.* ¶ 3.

13.      Smith inquired about Doe's anticipated return from leave.  *Id*.

14.      Clemens checked with Geisel's registrar, who informed Clemens that Doe was not presently enrolled but could return as early as April 2022, which Clemens then shared with Smith.  *Id.* ¶ 4.

15.      It is undisputed that Dartmouth receives funding from the Department of Education, as a result of which it is subject to the provisions of the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the regulations adopted thereunder by the Department of Education, 34 CFR Part 99.

16.      The Geisel School annually notifies students of their FERPA rights in its Student

---

[1] The Exhibits referenced herein are the Exhibits to the Declaration of Kristi L. Clemens.

Education Records Policy, which is posted online.  Exhibit 1, *Records Policy*.

17.     That Policy defines "directory information" to include, among other things, a student's "enrollment status" and "dates of attendance."  *Id*. at 3.

18.     Clemens's disclosure thus was in accordance with the Geisel's Student Education Records Policy, which permits Dartmouth officials to disclose a student's enrollment status and dates of attendance.  *Id*. at 3.

19.     Clemens's disclosure also did not violate the Policy if the information she disclosed was not from an "education record" of Doe.  *Id*. at 1.

20.     Doe contends that the information Clemens disclosed was contrary to the information he provided to Geisel's registrar.  *Compl*., ¶ 43.

21.     Accordingly, the information Clemens shared with Doe was not from an "education record" of Doe.

22.     On April 28, 2021, Smith filed a formal "Title IX complaint" with Clemens's office, alleging that Doe performed nonconsensual oral sex on Smith while Smith was asleep. *Compl*. ¶ 44.

23.     A "Title IX complaint" is shorthand for a complaint that someone has violated Dartmouth's Sexual and Gender-Based Misconduct Policy ("Sexual Misconduct Policy"), *Compl*. Ex. A, which Dartmouth adopted in accordance with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

24.     Relevant to this case, the Sexual Misconduct Policy prohibits "sexual assault," which includes having any sexual contact with another person without that person's consent. *Sexual Misconduct Policy* at 7-8.

25.     "Consent" means "an affirmative and willing agreement to engage in specific

forms of sexual contact with another person" and "requires an outward demonstration, through mutually understandable words or actions, indicating the individual has freely chosen to engage in sexual contact." *Id.* at 9.

26.    "Silence, passivity, or the absence of resistance does not imply consent," nor can consent be "assum[ed]." *Id.* at 10.

27.    A person cannot effectively consent to a sexual act while they are "incapacitated," which means "the inability, temporarily or permanently, to give consent because [the] individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring." *Id.*

28.    Smith's complaint was addressed pursuant to Dartmouth's Process for Resolving Complaints Against Students Pursuant to the Sexual Misconduct Policy ("Process for Resolving Complaints"), *Compl.* Ex. B; *Compl.* ¶ 50; *Clemens Decl.* ¶ 12.

29.    Smith elected to pursue a "formal resolution process." *Clemens Decl.* ¶ 5; Exhibit 2.

30.    In accordance with that process, Clemens issued a Notice of Investigation to both parties and appointed Michael J. Stackow to conduct an investigation. *Clemens Decl.* ¶ 6-7.

31.    The original Notice inadvertently referenced an incorrect version of the Sexual Misconduct Policy and Process; the revised Notice corrected that reference but otherwise was the same as the original Notice. *Compl.* ¶ 50 n.2.

32.    Stackow is an attorney at the law firm Cozen O'Connor, where he regularly conducts sexual misconduct investigations and provides training for educational and other clients on conducting investigations. *Stackow Decl.* ¶¶ 1-2.

33.    He also is a former assistant district attorney with nearly twenty years of

experience prosecuting and investigating sex crimes. *Id.* ¶ 4.

34. In the course of his career, Stackow has investigated reports of sexual assault involving complainants and respondents of the same gender and different genders; allegations involving the use of alcohol or other drugs, including issues of incapacitation; and allegations involving cross-complaints. *Id.* ¶ 5.

35. Stackow has investigated multiple cases involving female complainants and male respondents, with outcomes of both responsible and not responsible. *Id.*, ¶ 7.

36. In Doe's first interview with Stackow, Doe claimed to have been the victim of sexual misconduct by Smith. *Clemens Decl.* ¶ 8.

37. Upon learning this, Clemens contacted Doe to inquire whether he wished to file a complaint against Smith, which Doe then decided to do. Clemens Decl., ¶¶ 8-9.

38. On June 15, 2021, Doe filed a Title IX complaint against Smith, alleging that Smith "took advantage of my incapacitated state while I was intoxicated with alcohol and initiated the events that led me to perform oral sexual intercourse without my consent." Exhibit 2, *Doe's Compl.*

39. Doe claimed that Smith "initiated the events that led [him] to perform oral sexual intercourse" by running his hand through Doe's hair. *Id.; Inv. Report* at 16.

40. Clemens issued a Notice of Investigation to both parties. *Compl.* ¶ 49; *Clemens Decl.* ¶ 10; Exhibit 4, *Revised Notice*.

41. Stackow investigated Doe's cross-complaint against Smith simultaneously with Smith's complaint against Doe. Exhibit 10, *Inv. Report* at 2; *Clemens Decl.* ¶ 11.

42. Stackow conducted a thorough investigation, which included two interviews of Smith, three interviews of Doe, interviews of nine other witnesses, and the collection and review

of documentary evidence including numerous emails and text messages.  Exhibit 10, *Inv. Report* at 6-7, 54-55.

43.     Stackow prepared a comprehensive report of his investigation – over 50 single-spaced pages, not including its appendices – which includes a careful review of the parties' statements and other evidence.  *Id.*

44.     Stackow prepared an initial investigation report and appendix of exhibits, which was made available to Smith and Doe for their review.  Exhibit 10, *Inv. Report* at 7; Exhibit 5, *Initial Report*.

45.     Both parties submitted written responses, which included several attachments. Exhibits 6 & 7, *Responses*; Exhibit 10, *Inv. Report* at 7.

46.     Each party also reviewed and responded to the other party's response.  Exhibit 10, *Inv. Report* at 7.

47.     Stackow considered all of this feedback and prepared a final report, dated August 31, 2021, which Clemens shared with the parties on September 3, 2021.  *Id.* at 1, 7; *Clemens Decl.* ¶ 13.

48.     Throughout the process, Doe had the assistance of counsel, who now represents him in this case.  *Clemens Decl.* ¶ 14.

49.     Stackow took pains to carefully assess the details of both Smith's account, Exhibit 10, *Inv. Report* at 8-14, and Doe's account, *id.* at 14-21, and to explain the rationale for his findings.  *Id.* at 42-52.

50.     With respect to Smith's claim against Doe, Stackow's report notes from the outset that he was investigating an allegation that Doe "engaged in sexual assault by having oral intercourse with [Smith] while [Smith] was asleep."  *Inv. Report*, p. 2.

51.     In framing his conclusions, Stackow noted "specifically" that the "sexual contact"

at issue was "oral sexual intercourse."  *Id*. p. 50.

52.     Having established that framework, Stackow went on to find that Doe "engaged

in sexual contact with [Smith] at a time when [Smith] was unable to consent because he was

incapacitated due to being asleep." *Id*. at 51, 52.

53.     Stackow summarized Smith's account as follows:

> [Smith] said that he was asleep on the couch when he felt a sensation ***as if***
> someone was caressing his penis. He said that he then shifted his body to
> the right and that as he did so, he saw, through half-opened eyes, that his
> penis was exposed and erect and that [Doe] was kneeling on the floor in
> front of him. He said he saw [Doe] pause and look upward before he took
> [Smith's] penis in his left hand, place it in his mouth and then move his
> mouth and hand up and down on the shaft of [Smith's] penis. ***[Smith's]
> account is that he was asleep during this activity and therefore was unable
> to and did not consent to the activity***. He stated that, ***when he fully awoke,
> he stopped the conduct*** by standing up and walking to his bedroom.

*Id.* at 42 (emphasis added).

54.     Stackow specifically found this account to be credible.  *Id.* at 43.

55.     Stackow's final report states that he found sufficient evidence to support a

finding, by a preponderance of the evidence, that Doe engaged in sexual contact with Smith

when Smith was unable to consent because he was asleep.  *Id.*at 51.

56.     Citing Smith's "credible, detailed account," Stackow found the evidence

supported a finding that Smith was asleep when the sexual contact began and was in the process

of waking up, with half-opened eyes, when he saw Doe kneeling in front of him and then saw

Doe perform oral sex on him.  *Id*. at 46, 51-52.

57.     Stackow found that Smith did not say or do anything to initiate or facilitate the

sexual contact or to indicate that he consented to it.  *Id*. at 51.

58.     Stackow did not find that the alleged act of Smith running his hand through Doe's

hair took place.  *Id*. at 51 n.180.

59.     Stackow found that even if Smith ran his hand through Doe's hair, as Doe claimed, that conduct did not amount to an "outward demonstration" of consent by Smith to engage in the sexual contact.  *Id*. at 51.

60.     Stackow also found that the evidence did not support a finding that Doe engaged in sexual contact at a time when he was unable to consent due to incapacitation.  *Id*. at 51-52.

61.     Stackow found that Doe demonstrated through his physical actions that he initiated and consented to the sexual contact – specifically, by positioning his body, grabbing Smith's penis, looking up at Smith, and putting Smith's penis in his mouth.  *Id*. at 51.

62.     Stackow noted that although Doe may have experienced a "fragmentary blackout" due to intoxication, his actions in initiating and performing oral sex indicated that he was not incapacitated.  *Id*. at 51-52.

63.     In accordance with the Process for Resolving Complaints, the parties were allowed to submit written responses to the final investigation report.  *Process*, Compl. Ex. B, at 16.

64.     Then a three-person Hearing Panel was convened to determine whether (1) there was any material, procedural error that substantially impacted the outcome or (2) the investigator failed properly to apply the preponderance of evidence standard.  *Id*.

65.     The three-member Panel was chaired by Katharine L. Strong, the Director of Dartmouth's Office of Community Standards & Accountability.  *Strong Decl.* ¶ 2.

66.     The Panel members all were formally trained in the handling of sexual misconduct hearings, including how to serve as a panel member under Dartmouth's policy.  *Id*. ¶ 3.

67.     There is no evidence of bias in the decisions of these panelists:  One or more of the panelists have served on hearing panels in nine other cases arising under the Sexual Misconduct Policy and Procedures.  Seven of the cases involved a male respondent and either one female complainant (six cases) or two female complainants (one case).  In those seven cases involving a male respondent, the finding was responsible in four cases and not responsible in three cases.  One case involved a female respondent and two complainants – one male and one female; the finding was responsible.  One case involved a female respondent and a female complainant; the finding was not responsible.  *Strong Decl.*, ¶¶ 15-18.

68.     The Panel reviewed the investigative report and its appendices and the statements submitted by both parties, including both parties' responses to the initial report, Doe's response to Smith's initial report submission, Doe's response to the final report, and Smith's written statement to the hearing panel.  *Strong Decl.* ¶ 4.

69.     In addition, the Panel conducted a live hearing, which both Smith and Doe attended.  *Id.* ¶ 5.

70.     Stackow, the investigator, also participated.  *Id.*

71.     Doe argued in his response to the final investigative report that Stackow failed properly to apply the preponderance of evidence standard, by failing properly to consider the evidence relating to whether Smith was awake during the oral sex and the evidence relating to Doe's own intoxication.  Exhibit 11, *Doe Response* at 4-6.

72.     Doe also argued that a procedural error had occurred because Stackow's determination of responsibility did not align with the Notification of Investigation; Doe argued that although the Notice of Investigation said he was being accused of performing oral sex on Smith while Smith was asleep, Stackow made no such finding – instead, Stackow concluded that

Doe "caressed" Smith while Smith was asleep, with the oral sex occurring only after Smith woke up.  *Id*. at 1-3.

73.     During the hearing, Doe argued that Smith's account that he was asleep during the oral sex was not credible, that the finding of the noticed charge was not supported, and that Doe was incapacitated from alcohol and thus unable to consent to the sexual activity that he engaged in.  *Strong Decl.* ¶ 7.

74.     The Panel asked Stackow to clarify his finding and rationale with respect to Smith's state of consciousness during the oral sex.  *Id*. ¶ 8; Ex. 12, *Hearing Tr.* at 17.

75.     Stackow affirmed that he found, by a preponderance of the evidence, that Smith was asleep during the oral sexual intercourse:  he found that oral sex first occurred while Smith was fully asleep, which caused Smith to wake up, and that oral sex resumed while Smith was in the process of waking up, but not yet fully awake.  *Id.*; *Hearing Tr.* at 12, 17-19.

76.     Stackow explained that he wrote the ultimate finding in his report in more general terms – that the evidence supported a finding of "sexual contact without consent," without specific reference to Smith being asleep – so as to track the wording of the Sexual Misconduct Policy, which defines "sexual assault" as "sexual contact with another individual without consent."  *Strong Decl.* at 9; *Hearing Tr.* at 13-12; *Policy* p. 7.

77.     Before Doe gave his closing statement at the hearing, the Panel chair asked Doe, "Have you had a full and fair opportunity to address the information in the final investigation report, as well as the supplemental statements submitted in response to the final investigation report?"  Doe responded, "Yes I believe so."  *Strong Decl.* ¶ 10; *Hearing Tr.* at 21.

78.     The Panel met to deliberate on all of the information presented in the various written submissions and at the hearing.  *Id*. ¶ 11.

79.     The Panel concluded that Stackow properly applied the preponderance of evidence standard and it upheld his finding that Doe engaged in oral sexual intercourse without Smith's consent while Smith was asleep.  *Strong Decl.* ¶ 12; Exhibit 13, *Outcome Letter* at 1.

80.     The Panel thus rejected Doe's claim that the finding of sexual contact without Smith's consent was inconsistent with the charge in the Notice of Investigation.  *Strong Decl.* ¶ 12; *Outcome Letter* at 1.

81.     The Panel also upheld Stackow's finding that Doe was not incapacitated and thus was not unable to consent to the oral sex that he performed.  *Strong Decl.* ¶ 12; *Outcome Letter* at 1.

82.     The Panel considered Doe's claimed incapacitation in relation to his complaint that he was the victim of conduct that Smith "initiated."  *Strong Decl.* ¶ 13.

83.     The Panel concluded that Stackow properly applied the preponderance of evidence standard in his findings not only that Smith did not "initiate" the oral sex that Doe performed but also that Doe in any event was not incapacitated when he was performing the oral sex.  *Id.*

84.     Whether Doe was incapacitated is irrelevant under the Sexual Misconduct Policy to Smith's charge that Doe assaulted him; a policy violation occurred if Doe performed oral sex on Smith without Smith's consent, regardless of whether Doe was incapacitated at the time. *Clemens Decl.* ¶ 16.

85.     The Panel also determined that Doe's "separation" (i.e., expulsion) from Dartmouth was the appropriate sanction.  *Outcome Letter* at 1-2.

86.     The Process for Resolving Complaints allows for appeals on grounds of (1) substantial procedural error or bias that materially affected the outcome and/or sanction or (2)

new evidence not reasonably available at the time of the hearing.  *Compl*. Ex. B at 22.

87.     Appeals by Geisel students are heard by the Dean of the Geisel School.  *Id*. at 23.

88.     Doe appealed, claiming procedural error based upon the claimed disconnect between the Notice of Investigation and the findings and based upon an alleged failure properly to apply the preponderance of evidence standard.  Exhibit 14, *Appeal*.

89.     The Dean, Dr. Duane A. Compton, denied the appeal.  Exhibit 15, *Appeal Decision*.

90.     With respect to Doe's notice argument, the Dean was "not persuaded that a wording distinction between the Notice and the Final Report related to the wakefulness of [Smith] provides sufficient basis" to find a procedural error that materially affected the outcome. *Id*. at 2.

91.     The Dean noted that Doe's argument "seeks an exceedingly narrow technical distinction that appears to circumvent the events that occurred which involve sexual contact in the absence of consent."  *Id*.

92.     Regarding Doe's second point, the Dean also was not persuaded that the preponderance of the evidence failed to support a finding that Doe initiated and consented to the sexual contact.  *Id*.

93.     There have been multiple cases at Dartmouth in just the past few years in which a female complainant alleged sexual assault by a male respondent, but the finding was "not responsible," and a significant factor in that outcome was the female complainant's inability to provide a cogent account of what allegedly happened as a result of her intoxication during the events at issue.  *Clemens Decl.* ¶ 17.

94.     Smith remains enrolled at Geisel.  *Clemens Decl*., ¶ 15.

PROPOSED RULINGS OF LAW

## I.   DOE SEEKS MANDATORY RELIEF, WHICH IS STRONGLY DISFAVORED.

1.      Preliminary injunctive relief typically is allowed only to preserve the status quo, *i.e.*, to enjoin the non-moving party from taking some action.  *See Braintree Lab's, Inc. v. Citigroup Global Markets Inc*., 622 F.3d 36, 41 (1st Cir. 2010); *Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 151 (1st Cir. 1998); *Merrimack Congregation of Jehovah's Witnesses v. Town of Merrimack*, No. 10-CV-581-JD, 2011 WL 1236133, at *2 (D.N.H. Mar. 31, 2011).

2.      Mandatory injunctions, which alter the status quo, are disfavored.  *L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 89 (D. Me. 2009) (collecting cases); *Isaacs v. Trs. of Dartmouth Coll.*, No. 17-CV-040-LM, 2017 WL 4119611, at *3 (D.N.H. Sept. 14, 2017); *Potts NH RE, LLC v. Northgate Classics, LLC*, No. 12-CV-82-SM, 2012 WL 1964554, at *3 (D.N.H. May 10, 2012), *report and rec. adopted*, No. 12-CV-82-SM, 2012 WL 1969051 (D.N.H. May 30, 2012).

3.      A party seeking mandatory injunctive relief must meet an "elevated" burden, demonstrating that "the exigencies of the situation demand such relief."  *Braintree Labs.*, 662 F.3d at 41; *see also NBA Properties, Inc. v. Gold*, 895 F.2d 30, 33 (1st Cir. 1990); *Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency,* 649 F.2d 71, 76 n.7 (1st Cir. 1981).

4.      A "mandatory injunction should not issue unless the facts and the law clearly favor the moving party."  *Robinson v. Wall*, C.A. 09-277-S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013); *see also L.L. Bean*, 630 F. Supp. 2d at 89.

5.      Doe is seeking mandatory relief, which would alter the status quo:  The status quo is that Doe was on leave from the Geisel School, with no plan to return before the fall of 2022,

when he was found responsible for sexual misconduct and expelled.  *Compl.* ¶ 43.  He now seeks a "preliminary injunction enjoining Dartmouth from enforcing [his] expulsion and ordering it to allow him to return to campus, attend classes, and participate in all campus activities pending the outcome of this action."  *Id.*, p. 25.  Doe does not seek to enjoin Dartmouth from finding him responsible or from expelling him, which already have occurred.  Instead, Doe seeks mandatory injunctive relief, which would alter the status quo.

6.      There are no special "exigencies" that favor the granting of such extraordinary relief, nor does "the law clearly favor the moving party," for the reasons that follow.

## II.    DOE HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Contract Claims

7.      The college-student relationship is contractual in nature.  *Gamble v. Univ. Sys. of New Hampshire*, 136 N.H. 9, 13 (1992).

8.      The interpretation of that contract is a question of law for the Court, to which traditional contract principles apply, but with the Court taking into account the distinctive nature of the college-student relationship.  *Id.*

9.      The contract, which may include student handbooks and policies, should be given the meaning that a reasonable student would ascribe to it.  *Id.*

#### 1.    Doe's FERPA claim

10.     As Doe concedes, there is no private right of action under FERPA.  Pl. Mem. at 6.

11.     Thus, the question is whether Dartmouth violated a contractual obligation to Doe when Clemens disclosed to Smith her understanding that Doe intended to return to Geisel as early as the spring of 2017 – i.e., whether Dartmouth failed to comply with the policy it adopted in accordance with the FERPA statute and the regulations adopted thereunder by the Department

of Education (DOE).

12.     The FERPA regulations require each school that receives DOE funding to provide its students with an "annual notification" of their FERPA rights including, among other things, what the school includes within its definition of "directory information."  34 CFR §§ 99.37, 99.7.

13.     "Directory information" is among the categories of student information which a school can disclose without a student's consent, and a school may define "directory information" to include, among other things, a student's "enrollment status" and "dates of attendance."  20 U.S.C. § 1232g(a)(5); 34 CFR §§ 99.31, 99.37.

14.     Because the Geisel School's FERPA policy defines "directory information" to include, among other things, a student's "enrollment status" and "dates of attendance," Exhibit 1, *Records Policy*, at 3, Clemens did not violate the policy by disclosing to Smith the anticipated timeframe for Doe's return from leave.  *See Fonovisa, Inc. v. Does 1-9*, No. CIV. A. 07-1515, 2008 WL 919701, at *7 (W.D. Pa. Apr. 3, 2008) (FERPA "expressly authorizes" a school that complies with FERPA's rules on "directory information" to disclose such information without the student's prior consent).

15.     Clemens disclosure also did not violate the Geisel FERPA policy because the policy applies only to information from a student's "education records, Exhibit 1, *Records Policy*, at 3, and, as noted above, Doe contends the information Clemens disclosed is contrary to the information he provided to Geisel's Registrar, *Compl.* ¶ 43; thus, what Clemens shared with Doe was not information from Doe's education records.

16.     Under New Hampshire law, Doe can recover in contract only for harm that is a foreseeable consequence of the breach.  *Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 138 N.H. 110, 113 (1993).

17.     Thus, even if Doe could establish that Clemens's disclosure about his anticipated return from leave was a violation of the Student Education Records Policy, that violation would fail to support his breach of contract claim in any event:  The harm for which Doe seeks to recover is his allegedly wrongful expulsion from Dartmouth, which was not a foreseeable consequence of Clemens's disclosure to Smith.

### 2.     Doe's claim of inadequate notice

18.     Doe's claim that Dartmouth breached its promise to provide adequate notice of the charge for which he was found responsible – i.e., his claim that the Notice of Investigation alleged that he engaged in oral sexual intercourse without Smith's consent when Smith was asleep, but the investigator made no such finding – is not supported by the record:  Stackow found, by a preponderance of the evidence, that Doe first performed oral sex on Smith while Smith was fully asleep, which caused Smith to begin waking up, and then performed oral sex on Smith again while Smith was opening his eyes but not yet fully awake, and the Hearing Panel affirmed those findings.  *Strong Decl.* ¶ 8, 12; *Hearing Tr.* at 12, 17-19.

19.     Doe's argument misstates Stackow's conclusion and the evidence on which it was based:  With respect to Smith's claim against Doe, Stackow's report notes from the outset that he was investigating an allegation that Doe "engaged in sexual assault by having oral intercourse with [Smith] while [Smith] was asleep."  *Inv. Report*, p. 2.  In framing his conclusions, Stackow noted "specifically" that the "sexual contact" at issue was "oral sexual intercourse."  *Id*. p. 50. Having established that framework, Stackow went on to find that Doe "engaged in sexual contact with [Smith] at a time when [Smith] was unable to consent because he was incapacitated due to being asleep." *Id*. at 51, 52.

20.     Other aspects of the report also make clear that Stackow found the oral sex

occurred, at least in part, while Smith was asleep:  Stackow summarized Smith's account as follows:

> [Smith] said that he was asleep on the couch when he felt a sensation *as if* someone was caressing his penis. He said that he then shifted his body to the right and that as he did so, he saw, through half-opened eyes, that his penis was exposed and erect and that [Doe] was kneeling on the floor in front of him. He said he saw [Doe] pause and look upward before he took [Smith's] penis in his left hand, place it in his mouth and then move his mouth and hand up and down on the shaft of [Smith's] penis. ***[Smith's] account is that he was asleep during this activity and therefore was unable to and did not consent to the activity***. He stated that, ***when he fully awoke, he stopped the conduct*** by standing up and walking to his bedroom.

*Id.* at 42 (emphasis added).  Stackow specifically found this account to be credible.  *Id.* at 43.

21.     Even if it were the case, as Doe alleges, that Stackow found that Smith only "caressed" Smith's penis while Smith was asleep, and that Doe performed oral sex only after Smith was awake, Doe's "notice" argument fails in any event:  The Process for Resolving Complaints requires that respondents be notified in writing of the "nature of the reported conduct" and the "reported policy violation(s)," and provides that a supplemental notice of investigation will issue if the investigation reveals additional or different potential policy violations.  *Compl*. Ex. B at 10.  The Notice of Investigation notified Doe of the "nature of the reported conduct," i.e., oral sex, and the "policy violation," i.e., sexual assault, which the Sexual Misconduct Policy broadly defines as any "sexual contact with another individual without consent."  *Compl*. Ex. A at 7.  The Process for Resolving Complaints does not require that a Notice of Investigation parse all of the potential findings or describe the nature of the reported conduct in any greater detail than was described in the Notice of Investigation. *See Doe v. Samford Univ.*, No. 21-12592, 2022 WL 872338, at *15 (11th Cir. Mar. 24, 2022) (Jordan, J. concurring) (rejecting claim of insufficient process where Doe was told before his first interview that there was an allegation he sexually assaulted another student; "[a]lthough Mr. Doe was not

17

provided with specifics, he knew what the basic charge was before he met with the investigator for his interview.").

22.    Moreover, with respect to whether Doe was on notice as a matter of fairness, Doe was fully apprised of Smith's allegations, which remained consistent throughout the case.  Smith alleged that while he was sleeping on the couch, Doe touched him sexually in some way, which caused him to wake up; when he did so, he saw that his underwear was pulled down, exposing his erect penis; he saw that Doe was kneeling in front of him; then he saw Doe perform oral sex on him – all without his consent.  Doe had ample opportunity to respond to Smith's account, not only in multiple interviews with the investigator, but also in multiple written submissions before and after the issuance of the final investigative report, at the hearing, and in his appeal.  Doe contested that Smith was asleep when Doe performed oral sex on him, but he never contested that he touched Smith sexually while he was asleep – instead, he argued that "caressing" Smith was not the same as oral sex.  Nor did Doe contest that he performed oral sex on Smith at least while Smith was awake.  Nor did Doe ever contend that Smith communicated consent to Doe pulling down his shorts, touching his penis while he was asleep, or performing oral sex at any time.  Instead, Doe's defense was that Smith "initiated" the sexual contact by running his fingers through Doe's hair and that Doe then performed oral sex while he was incapacitated by his own intoxication.

23.    That the Notice of Investigation satisfied the notice requirements of the Process for Resolving Complaints is further supported by the notable absence from Doe's "notice" argument of any claim that there was some evidence that he otherwise would have offered, or some argument that he otherwise would have made in his defense, that could have changed the outcome.

24.     Absent such a showing, Doe's "notice" argument fails.  *See Doe v. Stonehill Coll., Inc.*, CA. No. 20-10468-LTS, 2021 WL 706228, *13 (D. Mass. Feb. 23, 2021) (a student's "reasonable expectation" is that a disciplinary process will be "free from errors that cause significant prejudice and affect the outcome," not "entirely free from minor errors"); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016) ("[A] student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions.  Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court.").

25.     As in *Stonehill*, Doe had no reasonable expectation that he could overturn the finding in his case based on a purported procedural error for which he experienced no harm or prejudice.  Only procedural errors that are "substantial" and that "materially affected the outcome" are grounds to overturn a finding.  *Compl*. Ex. B. at 23.

20.     Doe's notice argument is analogous to one that the Eighth Circuit recently rejected in *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 867 (8th Cir. 2020).  The plaintiff in that case argued that he lacked reasonable notice of a claim of sexual assault "through use of force," where the original notice alleged only sexual assault through lack of consent due to incapacitation.  The complainant did not claim the plaintiff had used force until her appeal, but the Court found that the plaintiff at that point had reasonable notice of these arguments and an opportunity to respond to them.  *Id.* at 867.  Similarly in this case, Doe was on notice of Smith's allegations in their entirety, including that sexual activity occurred both before and after Smith was awake – through his multiple interviews with the Investigator, his review of the draft investigation report, and his review of the final investigation report.  Doe had an opportunity to respond to those allegations on multiple occasions – in his response to the draft investigation

report, his response to the final report, and during the hearing – and he affirmed that he had a full and fair opportunity to address all of the allegations.  *Strong Decl.*, ¶ 19; *Hearing Tr.* at 21.

21.     Doe's claim that the Hearing Panel "dismissed and compounded" the "procedural error" of inadequate notice, by failing to ask Stackow appropriate clarifying questions at the hearing, *Compl.* ¶ 87, also lacks merit:  Under Dartmouth's procedures, the parties are allowed to proffer questions to the Hearing Panel, "which may choose, in its discretion, to pose appropriate and relevant questions."  *Compl.* Ex. B at 18-19.  Doe had no reasonable expectation that the Panel would pose verbatim the specific questions he proposed.  *See Anderson v. Trs. of Dartmouth Coll.,* 2020 WL 7129968, at \*13 (where hearing board has power to make rulings on relevance and admissibility, its exclusion of evidence provides no basis for breach of contract claim).

22.     The case of *Nokes v. Miami Univ.*, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017), on which Doe relies, *Pl. Mem.* at 9, is distinguishable.  The written notice at issue in that case made no mention of the complainant's alleged intoxication and the plaintiff otherwise received no notice that intoxication might be at issue until a week before the hearing, after he had been required to submit a statement and other evidence.  2017 WL 3674910, at \*10.  No such thing occurred in this case.  Doe was fully apprised of Smith's allegations and had ample opportunity to respond both before the hearing – following his review of the preliminary report and following his review of the final report – and at the hearing.  Moreover, as noted above, he acknowledged having sufficient opportunity to respond.

23.     Also inapposite is *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d 154 (D. Mass. 2017), *Pl. Mem.* at 9, in which a university found the plaintiff responsible for sexual misconduct by applying a newly adopted definition of that term, from a policy which had not been published

at the time of the conduct at issue, and which differed from the policy referenced in the notice that plaintiff received. *Id.* at 181. There is no such issue in this case. *Compl.* ¶ 50, n.2. Doe was found responsible for violating a policy which had not changed, and which was clearly referenced in the Notice of Investigation.

24.      This case also is unlike *Velez-Santiago v. State Univ. of New York at Stony Brook*, 170 A.D.3d 1182 (N.Y. App. Div. 2019). In that case the question before the Court was whether there was substantial evidence to support the hearing panel's finding. *Id.* at 1183. The hearing panel found the respondent not responsible for the conduct alleged by the complainant, but responsible for a separate sexual act that the complainant did not report. *Id.* The only mention of this act was in the investigation report, as reported by the respondent, and it was referenced without the full context. *Id.* As a result, the Court found that there was not substantial evidence for the finding made by the panel. *Id.* Here, there is no question that Smith reported the sexual conduct for which Doe was found responsible.

25.      Nor is this a case in which the panel's findings were divorced from and inconsistent with the evidence, as was the case in *Doe v. George Washington Univ.*, 366 F. Supp. 3d 1, 11 (D.D.C. 2018). In that case, there was new evidence in the form of text messages, in which a witness indicated she did not recall speaking to the complainant. *Id.* The appeals panel, however, concluded that these text messages corroborated the complainant's statement that she had spoken to that witness. *Id.* Here, in contrast, the evidence and the reasonable inferences drawn therefrom fully supported the finding that Doe performed oral sex on Smith while Smith was asleep.

26.      Doe's citation to the notice standards in the current Title IX regulations, *Pl. Mem.* at 10, is irrelevant to his breach of contract claim. The question is not whether Dartmouth

violated any notice requirement in the regulations, which do not give rise to any private right of action, *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 291-92 (1998), but whether Dartmouth violated any notice requirement in its Process for Resolving Complaints, *Compl.* Ex. B at 10-11.

27.     Moreover, the current Title IX regulations do not apply to conduct that occurred before the effective date of the regulations, August 14, 2020.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30028 (May 19, 2020), codified at 34 C.F.R pt. 106; *see also* Part 1: Questions and Answers Regarding the Department's Title IX Regulations, U.S. Dept. of Education, January 15, 2021 at p. 2, available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-part1-20210115.pdf.

28.     Doe had no reasonable expectation that Dartmouth would follow the new regulations with respect to Smith's complaint concerning conduct that occurred in July 2020.

### 3.     Doe's basic fairness claims

29.     One New Hampshire court has recognized an obligation of "fairness" of private universities in the context of student discipline arising from the implied contractual covenant of good faith and fair dealing.  *See Nierenberg v Trs. of Dartmouth Coll.*, No. 2152016CV00259, 2017 WL 10259668, at *4 (N.H. Super. July 07, 2017).

30.     Applying Massachusetts law, the First Circuit has held that where a university's policies include an explicit promise of fairness, any obligation to provide "fundamental" or "basic" fairness becomes redundant under the covenant of good faith and fair dealing, and the Court's inquiry focuses on whether the university complied with its express promise.  *See Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 534 n.6 (1st Cir. 2019) (*Boston College II*) (quoting *Boston*

*College I*, 892 F.3d at 88) (where a college's procedures contain an explicit promise of fairness, any implied promise of basic fairness "becomes superfluous and the court's [determination whether] the proceedings were 'conducted with basic fairness'… focuses on assuring compliance with the express contractual promise" – whether the university substantially complied with its stated policies); *Boston College I*, 892 F.3d at 80-82, 82-83, 88-89 (rejecting arguments that a university should have done things differently because they were arguments for procedures other than those the university adopted).

31.     The implied covenant of good faith and fair dealing functions "to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations as well as with common standards of decency, fairness and reasonableness." *Nierenberg*, 2017 WL 10259668, at \*4. (citing *Birch Broad., Inc. v. Capitol Broad. Corp.*, 161 N.H. 192, 198 (2010)).

32.     The covenant precludes one party from exercising its contractually vested discretion in a manner that "exceeds the limits of reasonableness" and the party's "reasonable expectations," "going to the essence of the contract." *Anderson v. Trs. of Dartmouth Coll.*, 2020 WL 7129968, at \*14 (quoting *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 141 (1989).

33.      "Although the implied duty of good faith and fair dealing can limit a party's discretion in certain circumstances, the duty does not abrogate the principle that '[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably.'"  *Milford-Bennington R. Co. v. Pan Am Railways, Inc.*, No. 10-CV-00264-PB, 2011 DNH 206, 2011 WL 6300923, at \*5 (D.N.H.

Dec. 16, 2011), *aff'd*, 695 F.3d 175 (1st Cir. 2012) (quoting *Mills v. Nashua Fed. Sav. & Loan Ass'n*, 121 N.H. 722, 726, 433 A.2d 1312, 1314 (1981)).

34.    Doe's allegations regarding basic fairness thus fail for the reasons set forth above. He is restating his breach of contract arguments in the guise of "basic fairness," and they fail because he has not plausibly alleged any breach:  Dartmouth complied with its policies and procedures and Doe's reasonable expectations about them.  The Court should decline Doe's invitation to impose disciplinary procedures different from or in addition to those Dartmouth itself has adopted.  *See Boston College II*, 942 F.3d at 529 (applying Massachusetts law) (reversing District Court's ruling that basic fairness required an opportunity for "some form of cross-examination," which the university's conduct procedures did not provide); *Havlik*, 509 F.3d at 35 (applying Rhode Island law) ("Good faith and fair dealing cannot be separated from context ... and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline.").

### 4.    Doe's claims about the preponderance of evidence

35.    Doe's claims that Dartmouth breached its promise to conduct a fair, thorough, and impartial investigation because the investigator failed to apply the preponderance of the evidence standard – specifically, by failing properly to consider (a) supposed inconsistencies in Smith's account, (b) the distinction between "caressing" Smith's penis and performing oral sex while Smith was asleep, and (c) evidence concerning Doe's level of intoxication.  *Pl. Mem.* at 10-13 – are belied by Stackow's report, which demonstrates his careful assessment of each of these issues; Stackow took pains to carefully assess the details of both Smith's account, Exhibit 10, *Inv. Report* at 8-14, and Doe's account, *id*. at 14-21, and to explain the rationale for his findings. *Id*. at 42-52.

36.     Doe's disagreement with those findings – his argument that the evidence should have led Stackow to reach a different result – fails to support a claim that Dartmouth breached its contractual obligations to him.  *See Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99 (D. Mass. 2021) (whether a different factfinder might reach a different outcome "is not a relevant line of inquiry"); *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d at 180 (because there "was an evidentiary basis for the [board's] decision," plaintiff's "disagreement with that decision does not constitute a claim upon which relief can be granted"); *Doe v. Phillips Exeter Acad.*, No. 16-CV-396-JL, 2016 WL 6651310, at *2 (D.N.H. Nov. 10, 2016) (it "is not the court's role in contract-based cases such as this" to conduct an "appellate review of the investigator's factual findings and conclusions"); *Doe v. Brown Univ.*, 210 F. Supp. 3d at 313 (the court "is not a super-appeals court for sexual misconduct cases"); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 14 (D. Me. 2005) (it is not the court's task to make an independent determination about the underlying events or who was credible); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 479 n.9 (2000) (where there was evidence that could support the board's decision, the existence of conflicting evidence failed to support a breach of contract claim).

### 4.     Doe's bias claim

37.     Doe has the burden to come forward with specific evidence of bias in the record of his case, not just "speculation" or "tenuous inferences."  *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) (*Boston College I*) (citations omitted).

38.     Such "specific evidence" is required to overcome courts' presumption that, as a legal matter, university officials – including those involved in student conduct matters such as this one – act without bias.  *Id*.

39.     Doe's claim fails because he cites no such evidence:  He has identified no comparable case involving a female complainant, and his assertion that such cases exist "upon information and belief" fails to justify the "extraordinary remedy" of preliminary injunctive relief.  *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971); *Bowles v. Montgomery Ward & Co.*, 143 F.2d 38, 42 (7th Cir. 1944); *see also Eaton v. Fed. Nat. Mortg. Ass'n*, 462 Mass. 569, 590 (2012); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2002).

**B.     The Title IX Claim**

**1.     Erroneous outcome**

40.     To succeed on an erroneous outcome claim under Title IX, Doe first must offer evidence that would "cast some articulable doubt on the accuracy of the outcome" of the investigation.  *Boston College I*, 892 F.3d at 91 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

41.     Such doubt may be shown, for example, by "particular evidentiary weaknesses" in the case or "particular procedural flaws affecting the proof."  *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 60 (D. Mass. 2020) (quoting *Yusuf*, 35 F.3d at 715).

42.     If Doe provides sufficient evidence of a flawed outcome, he then must demonstrate that gender bias was the cause of that outcome.  *Boston College I*, 892 F. 3d at 91.

43.     He "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias'" caused the outcome, *id.* (quoting *Yusuf*, 35 F.3d at 715), such as statements by decision-makers or other "pertinent university officials, or patterns of decision-making that … tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.

44.     Moreover, Doe must demonstrate that gender bias is the "but for" cause of the outcome, not merely a "motivating factor." *Sheppard v. Visitors of Va. St. Univ.*, 993 F.3d 230, 236-37 & n.7 (4th Cir. 2021).  While the First Circuit has used the term "motivating factor" in student Title IX cases, it did so because the parties cited that language in *Yusuf*, without addressing whether "motivating factor" or "but for" is the correct standard.  *See Boston College I*, 892 F.3d at 90 & n.12; *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 & n.11 (1st Cir. 2019).  *Yusuf* borrowed the "motivating factor" language from the Civil Rights Act of 1991, which applies to Title VII, not Title IX.  *See Sheppard*, 993 F.3d at 236-37 & n.7 (citing *Yusuf*, 35 F.3d at 715).  Title IX requires "but for" causation.  *Id.* (citing Bostock v. Clayton Cty., Ga., 140 S. Ct. 1731, 1739 (2020); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351-52 (2013); *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 176, (2009); *Jackson v. Birmingham Bd. of Ed*., 544 U.S. 167, 184 (2005)).

45.     Doe has not demonstrated "articulable doubt" in the outcome of his case:  The fact that Doe disagrees with the investigator's findings, or the Hearing Panel's adoption of those findings, does not suffice.  *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015); *see also Doe v. Colgate Univ.*, 760 F. App'x 22, 33 (2d Cir. 2019).  There was ample evidence to support a finding, by a preponderance of the evidence, that Doe performed oral sex on Smith without Smith's consent while Smith was asleep.

46.     Moreover, even assuming Doe had demonstrated "articulable doubt" about that finding, he offers no evidence that gender bias caused the outcome:  His claim of gender bias amounts to nothing more than speculation that he was treated differently because he is a male. *See Doe v. Trs. of Dartmouth Coll.*, No. 21-CV-085-JD, 2021 WL 2857518, at *5 (D.N.H. July 8, 2021) (dismissing Title IX erroneous outcome claim for lack of evidence of gender bias).

47.     To be actionable under Title IX, allegations of bias must pertain to the specific individuals involved in the disciplinary proceeding at issue.  *See Haidak*, 933 F.3d at 75; *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1200 (10th Cir. 2020); *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774 (3d Cir. 2020); *Anderson v. Trs. of Dartmouth Coll.,* No. 19-CV-109-SM, 2020 WL 7129968, at *15 (D.N.H. Dec. 4, 2020)*; Dismukes v. Brandeis Univ.*, No. CV 19-11049-LTS, 2021 WL 1518828, at *3 (D. Mass. Apr. 16, 2021); *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d at 188-89 (citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003)).

48.     Doe, however, has not identified any statements, nor any other evidence, which indicates any anti-male bias on the part of the investigator who made the findings (himself a male) or the Panel that adopted those findings.

49.     Dartmouth also has demonstrated that no such evidence be forthcoming in discovery:  Stackow has investigated multiple cases involving female complainants and male respondents all without bias and with outcomes of both responsible and not responsible. *Stackow Decl.*, ¶ 7, and there is no pattern of bias in the decisions of the Hearing panelists. *Strong Decl.*, ¶¶ 15-18.

50.     Doe's erroneous outcome claim also is not supported by the cases on which he relies, *Pl. Mem*. at 18-19, which all involved allegations of clear procedural irregularities and/or significant evidentiary weaknesses where female complainants were believed or favored over male respondents.  *See Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 972-75 (S.D. Ohio 2018); *Doe v. Oberlin Coll.*, 963 F.3d 580, 581 (6th Cir. 2020); *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, at *1 (N.D.N.Y. Feb. 24, 2016).  In this case, in contrast, there are no such procedural irregularities and no such evidentiary weaknesses, and both the complainant and respondent are male.

51.     Doe's cases also were decided on motions to dismiss, where the Court was accepting plaintiff's factual allegations as true, rather than looking for evidence sufficient to support a request for mandatory injunctive relief.  *Gischel*, 302 F. Supp. 3d at 972-75; *Doe v. Oberlin Coll.*, 963 F.3d at 581; *Prasad*, 2016 WL 3212079, at *1.

## 2.     Selective enforcement

52.     As Doe acknowledges, a student claiming selective enforcement of disciplinary policies in violation of Title IX must show that the decision to initiate a disciplinary proceeding against him and/or the severity of the penalty imposed was affected by his gender.  Pl. Mem. at 19 (citing *Doe v. Amherst Coll.*, 238 F. Supp. 3d  195, 223 (D. Mass. 2017); *see also Haidak*, 933 F.3d at 74 (citing *Yusuf*, 35 F.3d at 715).

53.     To meet that burden, a male student must show that a female student in circumstances "sufficiently similar" to his – i.e., one accused of, or found responsible for, similar conduct – was treated more favorably and that gender bias caused that discrepancy.  *Haidak*, 933 F.3d at 74; *Yusuf*, 35 F.3d at 715; *see also Doe v. St. Joseph's Univ.*, 832 F. App'x at 774; *Mallory*, 76 F. App'x at 641; *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019).

54.     Doe cites no such evidence:  He claims "upon information and belief [that] Dartmouth has treated intoxicated female **accusers** who allegedly initiated or were complicit in the sexual interaction differently than [Dartmouth] treated [him]" and "can cite to at least one relevant example without the benefit of discovery."  *Pl. Mem.* at 20 (emphasis added).

55.     Doe's argument fails not only because he offers no actual evidence for the Court to consider, but also because cases involving female **accusers** are irrelevant to a "selective enforcement" claim in any event.  Doe must be able to show that similarly situated female **respondents**, not accusers, have been treated differently from him.

29

56.     Moreover, even if he had identified such a comparator, he also would need to offer evidence that gender was the cause of the different treatment by the decision-makers in this case, *See Haidak*, 933 F.3d at 75, but he has not done so.

57.     To the extent Doe is asserting "selective enforcement" relative to his status as an accuser, that claim fails because he offers no evidence that Dartmouth has treated female accusers differently from him, and in fact the evidence is to the contrary.  As discussed above: when Clemens learned that Doe considered himself to be a victim of Smith's conduct, she reached out to Doe and invited him to file a complaint; Doe's complaint against Smith was investigated in the same manner as Smith's complaint against Doe; and the evidence is contrary to Doe's speculation that Dartmouth in other cases has treated intoxicated female accusers differently from him.

58.     Doe offers no evidence of any substantially similar case involving a female complainant – i.e., a case in which a female student who performed oral sex (or some other form of sexual contact) claimed that she was sexually assaulted because the other student caused her to initiate the sexual contact while she was incapacitated.  *See Doe v. Univ. of Dayto*n, 766 F. App'x 275, 284 (6th Cir. 2019) (affirming dismissal of selective enforcement claim where male plaintiff failed to identify any women who were treated differently); *see also Austin*, 925 F.3d at 1138 (selective enforcement theory failed in the absence of "nonconclusory allegations that the male students were treated any differently than similarly situated female students based on sex").

59.     Moreover, even if it were true that female complainants in other Dartmouth sexual assault cases were credited despite their intoxication, while Doe was not, these allegations do not plausibly allege any pattern upon which an inference of gender discrimination can be based.  *See Mallory*, 76 F. App'x at 640 ("one case by an individual who was subjectively

dissatisfied with a result does not constitute a 'pattern of decision-making,' referred to in Yusuf as a basis for finding bias").

60.     Nor would any inference of discrimination based on the findings in past cases support an inference of bias in Doe's case unless those cases involved the investigator or Panel members in Doe's case.  *See Haidak*, 933 F.3d at 75 (rejecting inference of gender bias based on data from past cases without any showing of bias on the part of the decision-maker in plaintiff's case); *Doe v. W. New Engl. Univ*., 228 F. Supp. 3d at 189 (dismissing complaint that failed to allege bias on the part of the decision makers).

## III.    DOE HAS NOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM IF A PRELIMINARY INJUNCTION DOES NOT ISSUE.

61.     Irreparable harm is "a substantial injury that is not accurately measurable or adequately compensable by money damages."  *Ross–Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

62.     "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

63.     "[A]n attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."  *Ross-Simons*, 102 F.3d at 19.

64.     Doe has failed to meet his burden to show that, without injunctive relief, he likely will suffer an immediate, substantial injury that is not adequately compensable by money damages.

65.     Doe claims that his expulsion or even a "gap" in his education will cause him to suffer lost educational and career opportunities, *Pl. Mem.* at 3, but courts in the First Circuit

repeatedly have held that such harms are entirely compensable with money damages.  *See Doe v. Trs. of Dartmouth Coll.*, 1:19-cv-00013-JL (D.N.H. Jan. 2019), Dkt. Nos. 17 & 29; *Doe v. Williams College*, 3:16-cv-30184-MGM, Dkt. No. 65 & 74 at pp. 51-55 (D. Mass. March 29, 2017); *Doe v. Amherst Coll.,* No. 14-CV-30114-MGM, 2014 WL 12597613, at *3 (D. Mass. July 28, 2014) (citing *Powell v. City of Pittsfield*, 221 F. Supp. 2d 119 (D. Mass 2002)); *Bray v. Worcester Polytechnic Inst.*, 540 F. Supp. 3d 94, 103 (D. Mass. 2021).

66.     Other courts have reached the same conclusion.  *See, e.g., Phillips v. Marsh*, 687 F.2d 620, 622 (2d Cir. 1982); *Doe v. Texas A&M Univ.*, No. CV H-20-4332, 2021 WL 257059, at *8 (S.D. Tex. Jan. 26, 2021); *Montague v. Yale Univ.*, No. 3:16-CV-00885(AVC), 2017 WL 4942772, at *4 (D. Conn. Mar. 8, 2017).

67.     This case is distinguishable from *Doe v. Middlebury Coll.*, No. 1:15-cv-192-JMG, 2015 WL 5488109 (D. Vt. Sept. 16, 2015), on which Doe relies.  *Pl. Mem.* at 21-22.  That case involved "a unique situation" in which the college sought to re-investigate a case in which the plaintiff had been exonerated, notwithstanding that its policy did not allow for a second investigation.  2015 WL 5488109 at *3.  There is no such policy violation in this case.  In addition, the plaintiff in *Middlebury* had obtained a specific job offer, which he stood to lose without injunctive relief.  *Id.*  No such circumstance exists in this case, where Doe was on a voluntary leave from medical school at the time of his expulsion and he has cited no specific job offer or other opportunity that he will lose without injunctive relief.

68.     The fact that Doe already was on leave at the time of his expulsion also distinguishes this case from the ones Doe cites for the supposed harm resulting from any gap in a student's education.  *Pl. Mem.* at 21-22.  Unlike the plaintiffs in all of those cases, Doe will have to explain a gap in his education regardless of whether the Court grants an injunction, as he was

on an extended leave before the disciplinary action at issue.  *See Isaacs v. Trs. of Dartmouth Coll.*, 2017 WL 4119611, at *5 (denying injunction where injunction requested would not prevent the harm plaintiff seeks to avoid).

69.     Doe's reliance on *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd*, 872 F.3d 393 (6th Cir. 2017), *Pl. Mem.* at 21, also is unavailing.  The decision in that case stemmed from the "unique" nature of plaintiff's graduate program, in which a one-year suspension would have affected plaintiff's ability to pursue a career.  *Id*. at 712.  Here, there is no such evidence.  Doe offers only his own, self-serving speculation that if he prevails at trial and his separation is expunged, he nevertheless will be unable to continue his medical education and finish his degree.  *Pl. Mem.* at 3, 22.  Similarly, there is no evidence that Doe will suffer stigma resulting from his conduct case in the event that he prevails and his separation is expunged.

70.     Doe's argument that irreparable injury arises from a denial of "equal protection," *Pl. Mem.* at 22, also is unavailing, because Doe's constitutional rights are not implicated in this case:   Dartmouth is a private university, not a state actor.  *See Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019) (*Boston College II*); *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

71.     Doe's claim that his rights under Title IX implicate rights protected by the Fourteenth Amendment is incorrect.  Title IX applies to Dartmouth not under the Fourteenth Amendment, but by virtue of the Spending Clause in Article I of the Constitution – i.e., compliance with Title IX is a condition for Dartmouth to receive federal funding.  *See Gebser*, 524 U.S. at 286-87.

72.     Doe's reliance on *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016), on this point is misplaced because that case involved a public university, not a private one.  *Id.* at 977.

73.     Doe's "equal protection" argument also fails because his Title IX claims are without merit in any event, for the reasons discussed above.

## IV.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

74.     Dartmouth has a strong interest in enforcing its student conduct policies, including its prohibition against sexual misconduct.

75.     Courts should not discount the harm resulting from an injunction that undermines a college's authority to address such misconduct.  *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) (vacating preliminary injunction where allowing a student to remain enrolled undermined the school's authority to take disciplinary action).

76.     It is well-settled that Courts should not lightly interfere with such judgments.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("courts should refrain from second-guessing the disciplinary decisions made by school administrators"); *Boston College II*, 942 F.3d at 535 (quoting *Schaer*, "Courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities")*; Havlik*, 509 F.3d at 35 (courts must accord a school some measure of deference in matters of discipline); *Morale*, 422 F. Supp. at 1004–1005 ("federal courts do not sit in judgment of the wisdom of school administrators").

77.     Dartmouth's interest in protecting sexual assault victims such as Smith from experiencing a hostile educational environment similarly weighs in favor of denying the injunction.  *Doe v. The Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) (citing *Bonnell v. Lorenzo*, 241 F.3d 800, 822 (6th Cir. 2001)).

78. Where, as in this case, a university has found sexual harassment in violation of Title IX, it must take steps effectively to address the harassment.

79. Dartmouth's judgment in that Doe's conduct warranted his separation and public policy favors the upholding of such judgments.

80. The balance of equities and the public interest thus favor preserving the status quo, rather than granting the extraordinary remedy of mandatory injunctive relief.

TRUSTEES OF DARTMOUTH COLLEGE,

/s/ Daron L. Janis
Daryl J. Lapp (admitted pro hac vice)
Elizabeth H. Kelly (admitted pro hac vice)
Daron L. Janis (N.H. Bar No. 271361)
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100 telephone
(617) 227-4420 facsimile
daryl.lapp@lockelord.com
liz.kelly@lockelord.com
March 25, 2022                          djanis@lockelord.com

**Certificate of Service**

I certify that on March 25, 2022, I caused the foregoing document to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

/s/ Daron L. Janis
Daron L. Janis