UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

John Doe

    v.                                                Civil No. 22-cv-018-LM
                                                         Opinion No. 2022 DNH 085 P
Trustees of Dartmouth College

# O R D E R

In the summer of 2020, John Doe and Sam Smith—whom the court refers to using pseudonyms—were roommates and fourth-year medical students at Dartmouth's Geisel School of Medicine.  Following a disputed incident between the two students in which Doe performed oral sex on Smith, both Doe and Smith filed Title IX complaints against one another.  Dartmouth found Doe responsible for sexual assault and expelled him.  Dartmouth found Smith not responsible.  Doe then filed suit in this court, alleging Title IX sex discrimination and breach of contract.

The court previously denied Doe's motion for a preliminary injunction that would have allowed him to return to Dartmouth, finding that that Doe had not shown he would suffer irreparable harm absent an injunction.  Doc. no. 33.  Presently before the court is Dartmouth's motion to dismiss.  Doc no. 24.  Doe objects, and Dartmouth filed a reply.  For the following reasons, the court grants Dartmouth's motion in part and denies it in part.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In considering a Rule 12(b)(6) motion, the court may consider documents if they are integral to or sufficiently referenced in the complaint or if the parties do not dispute their authenticity without converting the motion into one for summary judgment. Ironshore Specialty Ins. Co. v. United States, 871 F.3d 131, 135 (1st Cir. 2017). In this case, the parties agree that those documents include the relevant Dartmouth written policies, as well as the record of the Title IX proceedings involving Doe and Smith.

## BACKGROUND

I.    Alleged sexual assault and aftermath

On the evening of July 11, 2020, Doe and Smith ordered take-out sushi, drank beer and cocktails, and watched a movie during which they both fell asleep on the couch. In the early morning hours of July 12, a disputed incident occurred.

The parties agree that Doe performed oral sex on Smith, though they disagree about who initiated the interaction and whether each man was capable of consenting to it.

Doe alleges that when he was asleep on the couch, he woke up to Smith running his fingers through Doe's hair.  Doe opened his eyes to see Smith's exposed, erect penis.  Smith lifted Doe's head towards Smith's penis, and Doe performed oral sex on Smith.  After an unknown amount of time, Doe became tired, stopped, and fell back asleep on the couch.  Doe was "blackout drunk" at the time, and thus remembers the incident only in fragments.  Doc. no. 1 ¶ 26.

Smith, on the other hand, asserts that he woke up to a sensation of "caressing" around his penis.  Id. ¶ 92.  Smith stated that as he was opening his eyes, he saw his underwear was pulled down and saw Doe kneeling between his legs looking up at him.  He then saw Doe perform oral sex on him.  Smith then jumped up and ran into another room.

The next thing that Doe remembers is Smith waking him up and telling him that he needed to speak with him.  Smith told Doe that he was uncomfortable with what had just happened.  Doe did not remember what had happened and was unnerved when Smith explained it to him.  During the conversation, Doe was still feeling nauseous from the alcohol and vomited multiple times.  Doe apologized to Smith, explaining that he did not remember what happened.  After Doe sobered up, however, he realized that he had been taken advantage of by Smith, not the other way around.

A couple days after the incident, Doe received a call from his mother, telling him that his aunt was in the hospital.  Feeling overwhelmed, Doe drove to a bridge in Vermont, got on the ledge, and prepared to jump.  In that moment, Doe realized that harming himself would only hurt his family more.  Doe then got down from the ledge, called his father, and told him what had happened.  Doe decided to take a leave of absence from Dartmouth to both support his family and seek mental health treatment.  Doe did so and returned home to California.

II.    Smith's Title IX complaint

Nine months later—around April 2021—Smith asked Dartmouth's Title IX Coordinator whether Doe was returning to Dartmouth.  The Title IX Coordinator informed Smith that Doe would return in the spring of 2022, while Smith was still enrolled.  Doe alleges this information was incorrect, as he had informed the Registrar that he intended to return in the fall of 2022, after Smith had graduated.

Because he was concerned that Doe would be in school with him, Smith filed a Title IX complaint against Doe on April 28, 2021.  Doe then received notice of the complaint.  The notice described the allegation that Doe "sexually assaulted [Smith] by having oral intercourse with him while he was asleep."  Doc. no. 1 ¶ 47.

III.    Doe's Title IX complaint

A month and a half later, Doe filed his own Title IX complaint against Smith, alleging that Smith had engaged in sexual misconduct by initiating oral intercourse

4

with Doe while Doe was incapacitated due to alcohol.  The next day, the Title IX

Coordinator issued a Notice of Investigation to both men regarding Doe's complaint.


IV.    Dartmouth Policies & Procedures

At the time Smith and Doe made their complaints, Dartmouth had three

relevant written policies, as detailed below.  The first two apply to allegations of

sexual assault by students.  The third outlines the school's records disclosure policy,

which is relevant to the Title IX Coordinator's disclosure to Smith of when Doe

planned to return to school.


A.    Sexual and Gender-Based Misconduct Policy ("Misconduct Policy")

The Misconduct Policy outlines seven types of prohibited conduct, one of

which is sexual assault.  It defines sexual assault as follows, separately listing

"sexual intercourse" and "sexual touching":

> Sexual assault is having or attempting to have sexual contact
> with another individual without consent. . . .  Sexual contact includes:
>
> 1. sexual intercourse (anal, oral, or vaginal), including penetration with
> a body part (e.g., penis, finger, hand, or tongue) or an object, or requiring
> another to penetrate themselves with a body part or an object, however
> slight; or
>
> 2. sexual touching, including, but not limited to, intentional contact with
> the breasts, buttocks, groin, genitals, or other intimate part of an
> individual's body.

Doc. no. 1-1 at 8.

Next, the policy defines consent, noting that consent cannot be obtained through taking advantage of the incapacitation of another individual.  As to incapacitation, the policy states that "[i]ncapacitation is the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring."  Id. at 10.  The incapacitation section specifically defines incapacitation due to alcohol or other drugs as "a state beyond impairment or intoxication."  Id. at 11. Incapacitation due to alcohol does not require that an individual be unconscious. Rather, the policy states that in these instances, "evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness."  Id.

B.      Process for Resolving Reports ("Process Policy")

The Process Policy outlines Dartmouth's process for resolving sexual misconduct reports against students.  The school has both an "informal" resolution process and a "formal" one.  The complainant may elect to have their complaint follow the formal resolution process—as both Doe and Smith did here.

Under the formal process, the Title IX Office appoints a trained investigator. The Process Policy specifically states that the investigator will conduct "a prompt, thorough, fair and impartial investigation."  Doc. no. 1-2 at 10.  The Title IX Office

has discretion to decide whether to appoint an internal investigator (i.e., a Dartmouth employee), or to hire an external investigator (as it did here).

One aspect of the formal process is notice. The policy states that the "Title IX Coordinator will notify the Complainant and the Respondent, in writing, of the following information." Id. It then lists nine types of information, including the names of the complainant and respondent; the date, time, location of the reported conduct; the name of the investigator; and information about the investigatory process. Relevant to Doe's claim, the notice must include "the reported policy violation(s)"—i.e., the relevant violation from the Misconduct Policy. The Process Policy then states that "[i]f the investigation reveals the existence of additional or different potential policy violations . . . the Title IX Office will issue a supplemental notice of investigation." Id. at 11.

During an investigation, the investigator meets separately with the complainant, respondent, and relevant witnesses as well as gathers any documentary evidence. Once the fact-gathering portion of the investigation concludes, the investigator issues an initial investigation report. That report is shared with the complainant and respondent, and each has the opportunity to respond. After reviewing the parties' responses—and additional information as needed—the investigator prepares a final report. In the final report, the investigator determines whether the respondent violated the Misconduct Policy using a preponderance of the evidence standard.

Next, after the final report is issued to the parties, a Title IX Hearing Panel convenes to review the investigator's finding.  The panel consists of three Dartmouth employees: the Director of Judicial Affairs, a dean, and a trained staff member.  These employees must be "fair and impartial decision-makers." Id. at 16. The panel looks at "whether (1) there was a material procedural error that substantially impacted the outcome, or (2) the preponderance of the evidence standard was not appropriately applied by the investigator." Id. at 16.  If the panel upholds a finding of responsibility, the panel determines the appropriate sanction. Sanctions can include anything from a warning to expulsion.

Finally, there is an internal appeals process.  Either party has the right to appeal a final determination on the grounds of "(1) Substantial procedural error or bias that materially affected the outcome and/or sanction; or (2) New evidence not reasonably available at the time of the hearing." Id. at 22.  For graduate students, the Dean of their school considers the appeal.

The end of the Process Policy states that "Dartmouth will seek to complete its investigation and disciplinary process, if any, in a prompt, fair, and impartial manner following the issuance of the notice of the investigation." Id. at 24.  A few lines down, it then reiterates that "Dartmouth's overarching goal is that all Complaints be investigated in a prompt, fair, and impartial manner." Id.

C.    Student Education Records Policy ("Records Policy")

Finally, the Records Policy deals with disclosure of student information.  The Records Policy's stated purpose is to define the guidelines for the use and release of student education records in accordance with the U.S. Family Educational Rights and Privacy Act ("FERPA").

The Records Policy states Dartmouth will not disclose personally identifiable information from a student's records without that student's consent.  Doc. no. 17-4 at 4.  "Directory information," however, is exempted from this requirement and may be released without the student's consent.  Id.  Directory information includes, among other things, a student's "dates of attendance" and "enrollment status."  Id.


III.   Dartmouth Investigation & Hearing

Turning to the investigation of Smith's and Doe's complaints, Dartmouth appointed an outside investigator, attorney Michael J. Stackow.  Stackow interviewed Doe three times, Smith twice, and nine other witnesses.  He also collected and reviewed documentary evidence including text messages and emails.

About three months after Smith filed his complaint, Stackow issued an initial report, to which the parties responded.  Stackow then issued a final report on August 31, 2021.  Stackow's general conclusions were that there was sufficient evidence to find that Doe had sexually assaulted Smith but there was insufficient evidence that Smith had sexually assaulted Doe.

Specifically, as to Smith's allegations against Doe, Stackow found there was "sufficient evidence to support a finding, by a preponderance of the evidence, that [Doe] engaged in sexual contact with [Smith] at a time when [Smith] was unable to consent because he was incapacitated due to being asleep." Doc. no. 17-24 at 51 (emphasis omitted). Stackow described Smith's account that he was asleep on the couch and felt a sensation as if someone was "caressing" his penis, which he described as feeling similar to a sexual dream. Id. at 46. Smith was then in the "process of waking up" and shifted his body and saw that his underwear was pulled down and his erect penis was exposed, with Doe kneeling in front of him. Id. After Smith shifted his body, Doe took Smith's penis with his left hand, put it in his mouth, and began performing oral sex. Smith then ended the encounter by standing up and walking to his bedroom. Overall, Stackow found Smith's account "credible in its level of detail and specificity." Id. at 43.

As to Smith's incapacitation, Stackow wrote that Smith "was asleep when the sexual contact began." Id. at 51. He summarized the Misconduct Policy, stating that being asleep is a form of incapacitation, and that one cannot consent to sexual contact when they are incapacitated. He stated that he found "by a preponderance of the evidence standard that [Smith] was incapacitated and unable to consent to the sexual contact." Id.

Next, as to whether Smith otherwise consented, Stackow found insufficient evidence that Smith made any "outward demonstration" indicating that he had "freely chosen to engage in sexual contact." (Under the policy, such a demonstration

10

could have constituted consent.)  Doc. no. 1-1 at 9.  Specifically, Stackow found that there was insufficient evidence that Smith had run his hand through Doe's hair—as Doe contended.  Moreover, Stackow determined that even if Smith had done so, that gesture would not have constituted consent.

On the other hand, as to Doe's allegations against Smith, Stackow found that Smith had not sexually assaulted Doe.  Specifically, Stackow found that Doe demonstrated through his physical actions—specifically grabbing Smith's penis and placing it in his mouth—that Doe initiated the sexual contact.  Though Doe did not dispute that he had performed oral sex on Smith, he argued that he was unable to consent to the act because he was incapacitated due to alcohol.  To this, Stackow found that Doe "may have subjectively experienced an alcohol-induced fragmentary blackout," but that Doe's actions of initiating and performing the oral sex were inconsistent with him being incapacitated.  Doc. no. 17-24 at 51-52.  As to Doe's credibility, Stackow found that Doe's "inability to provide detail or specificity about the event negatively affected the reliability of the other information he provided." Id. at 45.  In sum, Stackow found that Doe was not unable to consent due to incapacitation.

Before the Hearing Panel convened, Doe submitted a written response to Stackow's Final Report.  Doe pointed out that the policy violation he was on notice of was "having oral intercourse with [Smith] while he was asleep."  Doc. no. 17-34 at 1.  But Doe contended that Stackow did not find that this precise form of misconduct took place.  Instead, Doe argued that Stackow found only "caressing"

had taken place while Smith was asleep, but that the oral sex took place after Smith had woken up.

The panel rejected Doe's argument that he received improper notice and upheld Stackow's findings.  Further, the panel determined that Doe should be expelled from school.  Doe submitted an appeal to the Dean of the medical school, which the Dean denied.

IV.   <u>Claims</u>

Doe then filed suit in this court, alleging both sex discrimination and that Dartmouth breached the student-college contract.  Specifically, Doe makes the following claims:

- Count I: Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, <u>et</u> <u>seq.</u>;

- Count II: Breach of contract by failing to provide sufficient notice;

- Count III: Breach of contract by failing to appropriately apply the preponderance of the evidence standard by failing to consider the standard for incapacitation by alcohol;

- Count IV: Breach of contract by applying the preponderance of the evidence standard differently to Doe because he is male; and

- Count V: Breach of contract by revealing Doe's intended date of return to school to Smith.

Doe requests both damages and injunctive relief.

**DISCUSSION**

Dartmouth moves to dismiss under Rule 12(b)(6), arguing that Doe fails to state any claims upon which relief can be granted.

I.    Count I:  Title IX

Title IX prohibits colleges that receive federal funding from discriminating on the basis of sex or gender.  See 20 U.S.C. § 1681; Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 74 (1st Cir. 2019).  Specifically, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  This provision is enforceable through an implied private right of action.  Doe v. Trs. of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) (Bos. Coll. I).

Doe alleges that Dartmouth violated Title IX by considering the evidence that he was "blackout drunk" differently because he is male.  Stackow found that Doe's inability to provide detail or specificity about the incident detracted from his credibility.  But Doe's memory contained gaps because, as Stackow found, Doe experienced an "alcohol-induced fragmentary blackout."  Doc. no. 17-24 at 51.  Doe alleges that if a female student stated that she had performed nonconsensual oral sex while blackout drunk, the school would not find that her gaps in memory undermined her credibility.  Specifically, Doe alleges that "[u]pon information and belief," Dartmouth has credited intoxicated female students alleging sexual assault against male students "when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances."  Doc. no. 1 ¶ 120.

Based on this argument, Doe advances theories of both "erroneous outcome" and "selective enforcement."  Dartmouth argues that Doe cannot prevail on either theory.  The court examines each in turn.

A.    Erroneous outcome

An erroneous outcome claim has two elements.  A plaintiff must (1) "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) show a causal connection between gender bias and the outcome of the proceeding.  Bos. Coll. I, 892 F.3d at 90 (citing Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d. Cir. 1994)).  To show the first element—articulable doubt—a complaint can, for example, allege a "particular evidentiary weakness" or "particular procedural flaws affecting the proof."  Yusuf, 35 F.3d at 715.

As to the second element—causation—the parties disagree about the appropriate standard.  Doe argues that the court should apply the causation standard that the Second Circuit adopted in Yusuf, that is, that "gender bias was a motivating factor behind the erroneous finding."  Id.  The First Circuit has used the "motivating factor" standard previously, though in those cases the parties agreed it applied.  See Bos. Coll. I, 892 F.3d at 90; Haidak, 933 F.3d at 74.  For its part, Dartmouth cites out-of-circuit precedent examining the statutory language of Title IX and holding that Title IX cases require the higher standard of but-for cause.  See Sheppard v. Visitors of Va. St. Univ., 993 F.3d 230, 236-37 & n.7 (4th Cir. 2021)

(citing Bostok v. Clayton Cnty., Ga., 140 S. Ct. 1731, 1739 (2020)) (comparing the language of Title IX to that of Title VII and noting that the Supreme Court has held that Title VII requires but-for cause). At this stage, the court need not resolve this dispute because—as will become apparent—Doe states an erroneous outcome claim under even the higher standard of but-for cause.

Looking to Doe's case, Doe first argues that there was "articulable doubt" because Dartmouth's proceeding suffered from "particular procedural flaws affecting the proof." Yusuf, 35 F.3d at 715. Specifically, Doe alleges that Dartmouth wrongly applied the preponderance of the evidence standard by finding that Doe, an intoxicated student who "subjectively experienced an alcohol-induced fragmentary blackout," lacked credibility because he could remember some but not all of the specific details of the event in a way that it would not have done if Doe were female. Drawing inferences in Doe's favor as the court must at this stage, the court finds that Doe has plausibly alleged articulable doubt. Given that the evidence was largely Smith's word against Doe's, Dartmouth's discounting of Doe's credibility based on his intoxication raises articulable doubt as to the outcome of the proceeding.

Turning to the second element, to show causation, a plaintiff needs more than "superficial assertions of discrimination, but must establish that 'particular circumstances suggest that gender bias'" caused the outcome. Bos. Coll. I, 892 F.3d at 91 (brackets omitted). For example, a plaintiff's "allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent

university officials, or patterns of decision-making that also tend to show the influence of gender." Yusuf, 35 F.3d at 715. A plaintiff may rely on circumstantial evidence alone to show causation in a Title IX claim. Bos. Coll. I, 892 F.3d at 92.

One difficulty in these types of cases is that the best evidence of a pattern of decision-making is generally in the possession of the university—that is, data showing the evidence and outcome in comparable prior cases. Doe v. Brown Univ., 166 F. Supp. 3d 177, 187 (D.R.I. 2016). As such, where plaintiffs allege a pattern of discrimination without data of the pattern, courts have grappled with whether their allegations meet the pleading standard. Id. at 186 (noting disagreement about whether "absent any female comparators at the pleading stage, . . . the allegation that schools are concerned about appearing too lenient on male students accused of sexual assault, and therefore those students are systematically found guilty regardless of the evidence, [is] a factual allegation—which must be credited—or a conclusory legal allegation—which does not get the presumption of truth").

On the one hand, where plaintiffs allege only conclusory allegations of a pattern of discrimination, courts dismiss the complaint. For example, in Doe v. University of Massachusetts-Amherst, the plaintiff alleged that "'male respondents in sexual misconduct cases at [the University] are discriminated against solely on the basis of sex' and are 'invariably found guilty, regardless of the evidence, or lack thereof.'" 2015 WL 4306521, at *9. The court found that the statements were "unsupported by even minimal data or credible anecdotal references" and thus were conclusory allegations that did not meet the pleading standard. Id. Similarly, in

Doe v. Western New England University, the court dismissed plaintiff's Title IX claim where his complaint contained only "bare averments of motive" that the university had "prejudice and bias against him" because he was male. 228 F. Supp. 3d 154, 188 (D. Mass. 2017). There, the court noted that plaintiff alleged no facts asserting that a similarly-situated female student would have been treated differently. Id. at 189; see also Doe v. Trs. of Dartmouth Coll., No. 21-cv-085-JD, 2021 WL 2857518 (D.N.H. July 8, 2021) (dismissing Title IX claim where plaintiff alleged only speculative assertions that bias could have caused the outcome); Doe v. Harvard Univ., 462 F. Supp. 3d 51, 62 (D. Mass.  2022) (dismissing Title IX claim where complaint contained only a conclusory allegation of gender discrimination).

On the other hand, in Doe v. Brown University, the court declined to dismiss plaintiff's claim where plaintiff cited a handful of comparable cases. Specifically, the plaintiff alleged that "[u]pon information and belief" the university's handling of his case "fit[] within a pattern of showing gender bias toward female students in cases of sexual misconduct," and named two prior cases as well as other instances documented in student newspapers from specific dates. 166 F. Supp. 3d at 189. There, in support of its motion to dismiss, the university cited a Sixth Circuit opinion which found that "one case [filed six years earlier] by an individual who was subjectively dissatisfied with a result does not constitute a 'pattern of decision-making.'" Id. at 190 (citing Mallory v. Ohio Univ., 76 Fed. Appx. 634, 640 (6th Cir. 2003)). But the court was unmoved by the university's argument. Id. It noted that the Sixth Circuit was deciding summary judgment, not a motion to dismiss. Id. It

found that although the isolated prior examples plaintiff cited would likely not be enough to prevail at the summary judgment stage, they were—along with other allegations—sufficient to survive a motion to dismiss.  Id.  The court held that plaintiff's allegations had "created a reasonable expectation that discovery may yield evidence of the defendant's allegedly tortious conduct."  Id. at 189.

Turning to Doe's case, the court finds that as in Brown University, Doe has made more than conclusory allegations of discrimination.  Unlike in the cases where courts dismissed the Title IX claim, Doe has asserted "credible anecdotal references" about similarly-situated female students being treated differently.  See Univ. of Mass.-Amherst, 2015 WL 4306521, at *9.  Specifically, he alleges that "[u]pon information and belief," Dartmouth has credited intoxicated female students alleging sexual assault against male students "when the female student could not remember specific details of the alleged assault either at all or at least could not remember details of the alleged events in a linear fashion in similar circumstances."  Doc. no. 1 ¶ 120.  As in Brown University, this "upon information and belief" claim is "a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis."  166 F. Supp. 3d at 190 (citation omitted).  Moreover, viewing the pattern of discrimination that Doe alleges in the light most favorable to Doe, it is sufficient to allege that discrimination was the but-for cause of the school's finding that Doe lacked credibility and therefore the finding that he was responsible for sexual misconduct.  Whether evidence uncovered in discovery will substantiate

Doe's claim of a pattern remains to be seen.  But at this stage, viewing the facts in the light most favorable to Doe, he has sufficiently stated a plausible claim for relief.

Against this conclusion, Dartmouth argues that there can be no gender bias in this case because both Smith and Doe are male.  The court does not see why that bars the possibility of gender discrimination in how the school assesses the credibility of intoxicated students of various genders.

In sum, the court finds Doe has stated a claim of Title IX discrimination on theory of erroneous outcome.

B.    Selective enforcement

Doe also alleges Title IX discrimination on a selective enforcement theory. For a selective enforcement claim, a plaintiff must allege that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Haidak, 933 F.3d at 74 (citing Yusuf, 35 F.3d at 715).  Specifically, a plaintiff must show that "a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Rollins Coll., 352 F. Supp. 3d 1205, 1211 (M.D. Fla. 2019); Haidak, 933 F.3d at 74.  "Unlike an erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding." Doe v. Amherst Coll., 238 F. Supp. 3d 195, 222 (D. Mass. 2017).

Doe has not shown that a selective enforcement theory is applicable under the facts here. He does not allege that the decision to initiate the proceeding was affected by his gender; indeed, Dartmouth proceeded with both Doe's and Smith's complaints. And he does not allege facts that suggest a similarly-situated female student would have received a lesser penalty under the facts. Indeed, Doe does not appear to take issue with the severity of the penalty imposed in this case. The court thus grants Dartmouth's motion on the selective enforcement theory.

B.     Counts II-V: Contract claims

Next, Doe alleges various breach-of-contract claims. To state a claim for breach of contract under New Hampshire law, a plaintiff must allege (1) that a valid, binding contract existed between the parties, and (2) that the defendant breached the terms of that contract. Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 311 (D.N.H. 2012) (citing Lassonde v. Stanton, 157 N.H. 582, 588 (2008)). "A breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Lassonde, 157 N.H. at 588. The proper interpretation of a contract is a question of law for the court. Gamble v. Univ. Sys. of N.H., 136 N.H. 9, 13 (1992). The court determines the meaning of the contract based on how a reasonable person would understand it. See id.

Under New Hampshire law, the college-student relationship is contractual in nature. Anderson v. Trs. of Dartmouth Coll., No. 19-cv-109-SM, 2020 WL 7129968,

at *10 (D.N.H. Dec. 4, 2020) (citing Gamble, 136 N.H. at 13).  Courts have concluded

that student handbooks and other materials may set out the terms of a contract

between a university and its students.  See, e.g., Nierenberg v. Trs. of Dartmouth

Coll., No. 2152016CV00259, 2017 WL 10259668, at *2 (N.H. Super. Ct. July 7,

2017).  Here, the parties do not dispute that the Misconduct Policy, Process Policy,

and Records Policy set out the terms of valid contracts between Dartmouth and its

students.  The question, then, is whether Dartmouth breached those contracts.


        1.      Count II: Notice

        Doe's first claim of contract violation is that Dartmouth did not fulfill its

obligation under the Process Policy to provide notice.  In essence, Doe argues that

he received notice that he was being investigated for one violation, but then was

found responsible for another.  Specifically, Doe received notice that he was being

investigated for performing oral sex on Smith while Smith was asleep, but then he

was found responsible for a different violation—sexual touching of Smith while

Smith was asleep.  Under the Misconduct Policy, sexual touching and sexual

intercourse (which includes oral sex) are separate forms of misconduct.  See doc. no.

1-1 at 7-8.  Doe argues that he cannot be found responsible for sexual touching

when he did not receive notice of that potential violation.

        In moving to dismiss, Dartmouth first argues that, contrary to Doe's

contention, Doe was in fact found responsible for oral sex—consistent with the

notice he received.  Stackow's final investigative report found "that there is

sufficient evidence to support a finding, by a preponderance of the evidence, that [Doe] engaged in <u>sexual contact</u> with [Smith] at a time while [Smith] was unable to consent because he was incapacitated due to being asleep."  Doc. no. 17-24 at 51 (emphasis changed).  The written report does not specify whether "sexual contact" refers to oral sex or sexual touching.

Construing reasonable inferences in Doe's favor, the court finds that the violation for which Dartmouth found Doe responsible was sexual touching while Smith was asleep.  Specifically, Smith stated to Stackow that he felt "caressing" while he was asleep, and oral sex only once he woke up.  Doc. no. 17-24 at 9.  He described the caressing as a feeling like someone was "jerking [him] off," <u>id.</u> at 11— i.e., sexual touching.  This evidence gives rise to a reasonable inference that Dartmouth found Doe responsible for the act of sexual touching of Smith, not oral sex, while Smith was asleep.

The next question, then, is whether Dartmouth violated its notice obligations. The Process Policy spells out the notice Dartmouth must provide.  It specifies that that the school will provide notice of, among other things, "the reported policy violation(s)."  Doc. no. 1-2 at 10.  It then goes on to state that "[i]f the investigation reveals the existence of additional or different potential policy violations, including a violation of an interim protective measure, the Title IX Office will issue a supplemental notice of investigation."  <u>Id.</u> at 11.  Drawing inferences in Doe's favor, because "sexual intercourse" and "sexual touching" are separately delineated in the Misconduct Policy, they are separate "policy violations" for notice purposes.

22

Dartmouth argues that even if Stackow found that Doe only committed sexual touching of Smith's penis while Smith was asleep—and then performed oral sex once Smith woke up—Doe's notice argument fails.  It argues that as a practical matter, Doe was fully appraised of Smith's allegations (that Doe touched Smith's penis while Smith was asleep, Smith woke up, Doe performed oral sex on Smith).  Dartmouth asserts that Doe has not alleged that if he had adequate notice, he would have offered some other evidence or made some other defense that would have changed the outcome.  Essentially, Dartmouth argues that Doe has failed to show prejudice.  On his part, Doe states in a footnote in his objection to Dartmouth's motion to dismiss that "it would have changed the emphasis of Doe's defense if he understood the shifting nature of the claim."  Doc. no. 34 at 13 n.4.

Doe need not allege in his complaint how the purportedly inadequate notice harmed him because, under New Hampshire law, a plaintiff need not allege damages to sufficiently plead a breach of contract claim.  Wilcox Indus., 870 F. Supp. 2d at 311.  In other words, a plaintiff must prove damages to ultimately prevail on the contract claim, but in the complaint he need not allege damages separately from the breach.  Id. ("[I]t would appear in a tort claim, breach of duty and injury are separate elements while, in a breach of contract claim, a breach is presumed to cause injury." [citation omitted]).

Nonetheless, Dartmouth argues that based on the language of the contract, Doe had no reasonable expectation that he could overturn the finding in his case based on a procedural error that did not result in harm or prejudice.  Dartmouth

analogizes this case to Doe v. Stonehill Coll., Inc., CA. No. 20-10468-LTS, 2021 WL 706228, *13 (D. Mass. Feb. 23, 2021).  There, the plaintiff alleged that the school failed to share with the plaintiff a specific statement by the complainant—which, under the school's policy, it should have turned over.  Id.  Yet this evidence was cumulative to other evidence the plaintiff had received and the plaintiff did not allege how his lack of knowledge of the complainant's statement prejudiced him.  Id.  The court found that the school's policy took into account the potential for minor, non-prejudicial errors.  Id.  Specifically, the policy stated that appeals would be considered based on "[f]ailure to follow the process or procedures outlined within this Policy, which resulted in significant prejudice such that it impacted the outcome.  Minor deviations from designated procedures will not be the basis for sustaining an appeal unless significant prejudice results."  Id.  Thus, the court found that "the reasonable expectation set by the Policy is that a student is entitled to a disciplinary process free from errors that cause significant prejudice and affect the outcome, not that a student is entitled to a process entirely free from minor errors."  Id.  Finding the error minor, the court held the allegation of a contract violation insufficient and dismissed the contract claim.  Id.

Like the policy in Stonehill College, Dartmouth's policy contains a caveat that students only have right to appeal the school's determinations in certain circumstances.  Specifically, students only have a right to appeal on two "limited grounds."  Doc. no. 1-2 at 22.  One of those limited grounds is "[s]ubstantial procedural error or bias that materially affected the outcome and/or sanction."  Id.

Dartmouth argues that allegedly improper notice does not qualify because it did not materially affect the outcome.

Yet unlike the plaintiff in <u>Stonehill College</u>, Doe argues that he would have changed his strategy if he had the proper notice.  <u>See</u> doc. no. 34 at 13 n.4. Construing reasonable inferences in Doe's favor, the court agrees.  Looking at Doe's response to Stackow's final report, Doe's first articulated concern relates to the notice issue.  Doc. no. 17-34 at 1.  Given that this was Doe's foremost concern with Stackow's final report, it is reasonable to infer at this stage that proper notice would have affected Doe's defense strategy, and thus could have "materially affected" the outcome of the proceedings.  Doc. no. 1-2 at 22.  Thus, the court finds that Doe has adequately stated a claim that Dartmouth violated the policy by failing to provide proper notice.  In sum, Dartmouth's motion to dismiss Count II is denied.

### 2.    Count III: Doe's intoxication

In Count III, Doe alleges that Dartmouth failed to provide a fair, thorough, and impartial investigation, as the Process Policy requires.  Specifically, Doe alleges that Dartmouth failed to properly apply the preponderance of the evidence standard when considering evidence that Doe was impaired by alcohol to the point of incapacitation.  Doe points out that Stackow found that Doe may have been "blacked out" due to alcohol during the incident, and yet also found that Doe initiated and consented to the sexual contact between him and Smith.  Doe argues that these two findings are inconsistent, because under the Misconduct Policy a

student cannot consent if they are incapacitated due to alcohol.  The Misconduct Policy defines incapacitation as "a state beyond impairment or intoxication" and specifies that that "[w]here alcohol or other drugs are involved, evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affect a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness."  Doc. no. 1-1 at 11.  Based on the fact that an incapacitated student cannot consent to sexual activity under the Misconduct Policy, Doe argues that he also cannot be found culpable of sexual misconduct.

Doe analogizes his case to Amherst College, 238 F. Supp. 3d 195.  There, the court denied a motion to dismiss where the plaintiff argued that because the hearing board found that he was "blacked out" drunk, there was insufficient evidence under the terms of the school's policy that he could be responsible for sexual misconduct.  Id. at 216.  The hearing board found that the plaintiff's account of being "blacked out" was credible, but that "being intoxicated or impaired by drugs or alcohol is never an excuse for sexual misconduct and does not excuse one from the responsibility to obtain consent."  Id. at 213 (brackets omitted).  Amherst's relevant policy was similar to Dartmouth's, in that it defined incapacitation as "a state beyond drunkenness or intoxication," and stated that an incapacitated individual is incapable of giving consent.  Id. at 206.  When he filed suit, the plaintiff argued that the school's policy did not address the problem of an incapacitated individual failing to obtain consent from a non-incapacitated person.

26

Id. at 213.  The court agreed, concluding that at the motion to dismiss stage, "a student reading the Policy could reasonably expect that while 'blacked out' they could be victims of sexual misconduct, but their own actions could not violate the Policy."  Id.  It thus denied the school's motion to dismiss on that count.  Id.

The court is not persuaded by the reasoning of Amherst College.  It would be unreasonable to give Dartmouth's Misconduct Policy an interpretation that allows students to be absolved from their own acts of sexual misconduct solely because they were voluntarily incapacitated by alcohol.  See Gamble, 136 N.H. at 13 (the court determines the meaning of the contract "based on the meaning that would be attached to it by reasonable persons").

Doe also alleges that "Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness."  Doc no. 1 ¶ 134.  While Massachusetts law recognizes a theory of "basic fairness" in college disciplinary proceedings stemming from the implied covenant of good faith and fair dealing, Sonoiki v. Harvard Univ., -- F.4th --, 2022 WL 2128619, at *15 (1st. Cir. 2022), the parties have not cited any case showing that the New Hampshire Supreme Court has adopted this theory.  There may be a requirement of basic fairness stemming either from the implied covenant of good faith and fair dealing under New Hampshire law, see Nierenberg, 2017 WL 10259668, at *4, or simply from the Process Policy's assurances that the school will investigate complaints in a "prompt, fair, and impartial manner."  Doc. no. 1-2 at 24

(emphasis added).  Doe v. Trs. Of Bos. Coll., 942 F.3d 527, 534 n.6 (1st Cir. 2019)

(Bos. Coll. II) (under Massachusetts law, noting that when a school contractually

promises basic fairness, any implied duty of basic fairness becomes superfluous).

Regardless of the source of such a requirement, Doe fails to allege how any principle

of fairness would be violated by the school finding him responsible for sexual

misconduct even though he "may have subjectively experienced an alcohol-induced

fragmentary blackout."  Doc. no. 1 ¶ 104.

    The court thus grants Dartmouth's motion to dismiss as to Count III.


    3.    Count IV: Different treatment on account of gender

    In Count IV, Doe alleges that Dartmouth failed to fulfill its contractual

obligation to provide a fair and impartial investigation because it discriminated

against him on the basis of gender.  His allegation here largely mirrors his Title IX

sex discrimination claim: he alleges that, upon information and belief, Dartmouth

has credited the accounts of intoxicated female students despite their fragmentary

memories, but in his case Dartmouth found that his fragmentary memory detracted

from his credibility.

    The Process Policy makes clear that Title IX investigations must be fair and

impartial.  See, e.g., Doc. no. 1-2 at 7 ("Formal resolution begins with a thorough,

impartial, and reliable investigation."); id. at 10 ("The Title IX Office will appoint

one or more trained investigators to conduct a prompt, thorough, fair and impartial

investigation."); id. at 16 ("A Title IX Hearing Panel consists of fair and impartial

decision-makers."); id. at 24 ("Dartmouth's overarching goal is that all Complaints be investigated in a prompt, fair, and impartial manner.").

When reviewing whether a university hearing body has acted fairly and impartially, the First Circuit has stated that "a presumption of impartiality favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." Bos. Coll. I, 892 F.3d at 84 (brackets omitted).  To that end, allegations of impartiality cannot be based on "speculation or inference."  Id.

Here, Doe has alleged that upon information and belief, Dartmouth has treated similarly-situated female students differently.  At this stage, Doe has plausibly alleged a claim of gender bias for the same reasons as with his Title IX gender discrimination claim.  The presumption of impartiality does not change the result at this stage where the court must draw reasonable inferences in Doe's favor. Given his "upon information and belief" comparators, he has alleged more than "speculation or inference" of gender bias.  See Bos. Coll. I, 892 F.3d at 84. Dartmouth's motion to dismiss Count IV is denied.

4.    Count V: Disclosure of information

Doe's final contract claim relates to the Title IX Coordinator's disclosure to Smith that Doe intended to return to school in spring 2022.  Doe alleges both that this information was incorrect (he did not plan to return to school until after Smith

29

had graduated) and that it could not be disclosed without his consent under the Records Policy that Dartmouth adopted in accordance with FERPA.

Dartmouth moves to dismiss this claim, arguing that Doe failed to allege that the disclosure violated the Records Policy.  Further, Dartmouth argues that even if Dartmouth did violate the policy, Doe's expulsion was not a foreseeable consequence of the breach.

FERPA does not create a private right of action, but if a school violates the records policy that it adopts in accordance with FERPA, that violation can support a breach of contract claim.  See Frank v. Univ. of Toledo, 621 F. Supp. 2d 475, 485 (N.D. Ohio 2007).  Dartmouth's Records Policy states that in general, it will not disclose personally identifiable information from a student's education records without the student's consent.  "Directory information" is exempted from this rule, and the school may release directory information without the student's consent.  Doc. no. 17-4 at 4.  Directory information includes, among other things, "dates of attendance" and "enrollment status."  Id.

The issue is whether these terms include not only current and prior enrollment and dates of attendance, but also a student's future intended dates.  FERPA's regulations define "dates of attendance" as "the period of time during which a student attends or attended an educational agency or institution."  34 C.F.R. § 99.3.  Dartmouth's Records Policy states that one of its purposes is to define the guidelines related to use of student records, in accordance with FERPA.  Similarly, the U.S. Department of Education Federal Student Aid

Office provides in its glossary, "[e]nrollment status is reported by the school you attended, and indicates whether you <u>are</u>, or <u>were</u>, full-time, three-quarter time, half-time, less than half-time, withdrawn, graduated, etc." <u>Glossary</u>, Federal Student Aid, https://studentaid.gov/helpcenter/answers/topic/glossary/articles (last visited June 1, 2022) (emphasis added). Under both of these definitions, then, "dates of attendance" and "enrollment status" refer to present and past dates—not future ones.

At this stage of litigation, the court finds that Doe has persuasively argued that "dates of attendance" and "enrollment status" comport with the FERPA regulations and financial aid website definitions, respectively. That is, they refer only to past or present dates and status, not to intended future ones. Under this interpretation, Doe has plausibly alleged that Dartmouth violated the policy by disclosing when Doe intended to return.

Next, Dartmouth notes that FERPA only protects information in a student's "education records." Dartmouth argues that if what the coordinator disclosed was incorrect, it did not come from Doe's education records. Yet Dartmouth neither gives support for this assertion, nor states where else the information would have come from. At this stage, Doe has plausibly alleged that that the information about when he intended to return came from his education records.

Finally, Dartmouth argues that even if the Title IX's Coordinator's disclosure did violate the Records Policy, that violation cannot support a breach of contract claim because Doe can only recover for harm that is a foreseeable consequence of

the breach.  See Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 113 (1993).  The court finds that Doe has plausibly alleged that his expulsion was a foreseeable consequence of the breach.  It was reasonably foreseeable that informing Smith that Doe would return to campus while Smith was still enrolled might lead Smith to file a complaint against Doe so that the two would not have to be on campus together.  Given the nature of the case, it was also reasonably foreseeable that Smith's filing of a complaint would lead to Doe's expulsion.  In sum, the court denies Dartmouth's motion to dismiss Count V.

## CONCLUSION

For the foregoing reasons, the court denies in part and grants in part Dartmouth's motion to dismiss (doc. no. 23).  As to Count I (Title IX) the motion is denied with respect to the erroneous outcome theory but granted with respect to the selective enforcement theory.  As to the other counts, the motion is denied as to Count II (Contract – notice), Count IV (Contract – sex discrimination), and Count V (Contract – disclosure of information).  The motion is granted as to Count II (Contract – Doe's intoxication).

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 12, 2022
cc:  Counsel of Record

32