UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EXHIBIT A

```
                                    )
DAMILARE SONOIKI,                   )
                                    )
          Plaintiff,                )
                                    )
v.                                  )       Civil No. 19-12172-LTS
                                    )
HARVARD UNIVERSITY et al.,          )
                                    )
          Defendants.               )
                                    )
```

<u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 143)</u>

February 6, 2024

SOROKIN, J.

      Plaintiff Damilare Sonoiki sued Harvard University, Harvard University Board of Overseers, and the President and Fellows of Harvard College (collectively, "Harvard"), alleging various claims arising out of his dismissal from Harvard College. Doc. No. 1. At the outset, the Court notes that the best practices for college disciplinary proceedings involving allegations of sexual assault have generated substantial dispute and many judicial decisions. In 2013, when Harvard resolved several student complaints of sexual misconduct against Sonoiki, its governing procedures in no way mirrored the types of procedures governing criminal trials in the United States.[1] Harvard's then-governing procedures also in no way mirrored the types of procedures typically applied to resolve civil litigation. Whatever challenges Sonoiki may have advanced to Harvard's written procedures, such challenges are not now before the Court. They were dismissed at an earlier stage in the litigation, in a decision the Court of Appeals affirmed with

---

[1] Of course, the range of consequences available to Harvard also did not include imprisonment.

respect to Sonoiki's basic fairness and other claims. What remains are his contentions that Harvard did not accord him the specific protections established in the Harvard Student Handbook ("Handbook"), and that the Handbook entitled Sonoiki to his degree on May 30, 2013, despite the pendency of two allegations of rape or sexual assault made against him two days earlier. The Court resolves those two issues.

Now pending before the Court is Harvard's motion for summary judgment. Doc. No. 143. For the reasons stated below, the Court ALLOWS Harvard's motion.

I.     PROCEDURAL HISTORY

Sonoiki filed this suit against Harvard in federal court in 2019, alleging claims for breach of contract, denial of basic fairness, breach of the covenant of good faith and fair dealing, and estoppel and reliance. Sonoiki v. Harvard Univ., No. 19-12172, 2020 WL 3416516, at *1 (D. Mass. June 22, 2020) (Casper, J.). Harvard moved to dismiss all claims. Id. The District Judge to whom this case was originally assigned allowed Harvard's motion. Id.

Sonoiki appealed. The Court of Appeals for the First Circuit vacated the dismissal of Sonoiki's breach of contract claim, holding that Sonoiki had pled five plausible theories of breach of contract. Sonoiki v. Harvard Univ., 37 F.4th 691, 696 (1st Cir. 2022). It affirmed the dismissal of Sonoiki's other claims and remanded the case for further proceedings.[2] Thereafter, Sonoiki amended his complaint to conform to the Circuit's ruling, Doc. No. 63, and the parties completed fact and expert discovery. Harvard now seeks summary judgment. Doc. No. 143. The motion is fully briefed, and the Court heard oral argument on December 20, 2023. Doc. No. 185.

---

[2] After the issuance of the mandate, this case was randomly reassigned to the undersigned District Judge. Doc. No. 54.

II.     FACTS

The Court recites the facts here consistent with the summary judgment standard. In doing

so, the Court views the facts in the light most favorable to Sonoiki, the nonmoving party,

resolves all factual disputes in his favor, and draws all reasonable inferences in his favor. See,

e.g., Alston v. Town of Brookline, 997 F.3d 23, 35 (1st Cir. 2021).

A.     Harvard's Rules and Disciplinary Structure

The Handbook establishes conduct rules and disciplinary procedures that apply to all

Harvard College students. Doc. No. 146-2 at 2. It states: "Students are expected to comply with

all disciplinary rules from matriculation until the conferring of the degree." Doc. No. 146-4 at 8.

Among the specific conduct rules governing students, the Handbook prohibited rape, sexual

assault, and other sexual misconduct, providing:

> The Faculty of Arts and Sciences will not tolerate sexual misconduct including rape
> and other forms of sexual assault . . . . A student who commits rape, sexual assault,
> or other sexual misconduct is subject to severe penalties under the rules of the
> Faculty of Arts and Sciences. Rape and sexual assault are serious crimes under the
> laws of the Commonwealth of Massachusetts and the individuals responsible for
> such acts are subject to prosecution and legal penalties.

Doc. No. 146-3 at 5.[3] The Handbook defined rape as:

> Any act of sexual intercourse that takes place against a person's will or that is
> accompanied by physical coercion or the threat of bodily injury. Unwillingness may
> be expressed verbally or physically. Rape may also include intercourse with a
> person who is incapable of expressing unwillingness or is prevented from resisting,
> as a result of conditions including, but not limited to, those caused by the intake of
> alcohol or drugs. Rape includes not only unwilling or forced vaginal intercourse,
> but also the sexual penetration of any bodily orifice with a body part.

Id. at 5–6.

---

[3] The Court recites the rules and procedures as they are stated in the 2012–2013 Handbook,
because the complaining students filed formal disciplinary cases against Sonoiki in May and
June of 2013. No party has suggested that the rules or procedures differed materially at any
earlier point in Sonoiki's Harvard career.

Students violating these conduct rules face investigation and discipline by the
Administrative Board ("Ad Board"), Doc. No. 146-6 at 2, as well as possible further
consequences from the Faculty of Arts and Sciences.[4] Doc. No. 146-7 at 8. The Ad Board
employs a particular process for students accused of wrongdoing by peers. Doc. No. 164-11 at 4;
Doc. No. 146-7 at 2–8. Investigations of this type are divided into two phases. First, an
independent fact finder and a subcommittee of the Ad Board conduct an initial review to
determine whether a full investigation is warranted. Doc. No. 162-1 ¶ 4; Doc. No. 146-7 at 4–5.
This initial review usually includes an interview with the complainant student and the respondent
student—though the fact finder and subcommittee may also interview other witnesses at their
discretion. Doc. No. 146-7 at 4–5. If the fact finder and subcommittee determine that further
investigation is warranted, they make a recommendation to the full Ad Board, id. at 6, which can
issue a formal charge against a respondent student by a majority vote, id. at 8.

A majority vote by the full Ad Board triggers a second stage of the investigation, which
involves additional witness interviews and further interviews with the complainant student and
the respondent student. Id. The subcommittee eventually issues a Disciplinary Case Report,
which describes the facts and circumstances of a case and may include a recommendation for
disciplinary action. Id. The Ad Board then votes to determine whether the student violated the
governing rules and, if so, the appropriate disciplinary action. Id. at 7. In the most serious cases
of misconduct, the Ad Board may require a student to withdraw from Harvard College for a
period of time along with a recommendation to the Faculty Council that it dismiss or expel the
student from the College. Id. at 8. Any student required to withdraw for more than one term can

---

[4] The Faculty of Arts and Sciences acts via its governing body, the Faculty Council. The Faculty
Council is composed of the Dean of the Faculty and eighteen elected voting members of the
faculty. Doc. No. 146-5 at 2.

appeal the Ad Board's decision to the Faculty Council. Doc. No. 146-8 at 2. A student can also

object before the Faculty Council to an Ad Board recommendation of dismissal or expulsion.

The Faculty Council is the body responsible for dismissing students from Harvard College. Id.

      B.      Sonoiki Matriculates at Harvard College

In 2009, Damilare Sonoiki started at Harvard College as a freshman. Doc. No. 162-1 ¶ 1.

At that time, Harvard published a yearly Handbook and made the Handbook available to all

students. Id. ¶ 10.

Sonoiki succeeded during his first two years at Harvard. In his classes, he earned As and

Bs. Doc. No. 145-7 at 7. Outside of class, he served as the President of the Harvard Black Men's

Forum. Id. at 14. He also had an active social life and was invited to join the exclusive Phoenix

Club.[5] Id. at 34.

In September 2011, at the start of his third year at Harvard, Sonoiki attended a Phoenix

Club party where he encountered an acquaintance, a fellow Harvard College student named

Ann.[6] Id. at 34. After some conversation, they left the party together. Id. at 14. The pair

ultimately ended up in Sonoiki's dorm room, where they had sexual intercourse. Id. at 14. Much

later, the two would describe the intercourse differently; he said it was consensual, while she

described awaking from a blackout to find him penetrating her.

About a month later, in October 2011, Ann told a friend about what had happened with

Sonoiki. Id. at 67. The friend asked Sarah Rankin, who was then the Director of the Office of

Sexual Assault and Response at Harvard, to reach out to Ann. Id. at 78. Rankin, in turn, emailed

---

[5] The Phoenix Club featured prominently in director David Fincher's film, The Social Network (Columbia Pictures 2010).
[6] Consistent with the parties' submissions and prior court opinions in this case, this Court will use pseudonyms when referring to the women who accused Sonoiki of misconduct.

Ann suggesting they talk. Id. at 77. Although the two exchanged a few short emails, no meeting occurred between Ann and Rankin for many months. Id. at 12.

In June 2012, Ann met with Rankin and discussed her experience with Sonoiki. Id. Ann did not then file a complaint with the Ad Board. Ann told Rankin that she did not wish to take the incident any further, because she wanted to focus on her own mental wellness. Id. Ann did, however, provide Rankin with Sonoiki's name "in case other girls reported so that the administration could track later cases if they became a pattern." Id.

Meanwhile, Sonoiki spent the summer of 2012 working as a summer analyst at Goldman Sachs in New York City. Doc. No. 162-1 ¶ 234; Doc. No. 145-15 at 11. Sonoiki's classmate and friend, Betty, was also working in New York City that summer. Doc. No. 145-15 at 11. The two agreed to share a studio apartment and the apartment's only bed. Id. Sonoiki and Betty were not involved in a sexual relationship when they became roommates. Id. At the outset of the summer, Sonoiki had a girlfriend, with whom Betty was friends. Id. During the first month of their cohabitation, however, Sonoiki and Betty had sex at least twice. Id. Later that summer, Sonoiki broke up with his girlfriend, and he engaged in consensual sex with Betty on "a couple" of occasions. Id.

Sonoiki received an offer to return to Goldman Sachs after his graduation. Doc. No. 162-1 ¶ 234. He returned to Harvard for a senior year filled with more public success. His peers selected him to serve as the Male Harvard Orator at Class Day—a special event for graduates and their families, held the day before Harvard commencement. Doc. No. 164-16 ¶ 6. He was admitted into Harvard Business School's 2+2 program, whereby he would work for two or more

years before attending Harvard Business School. Id. ¶ 3. He continued to earn A and B grades.[7]

Doc. No. 145-7 at 7. By May 16, 2013, Sonoiki had completed his undergraduate coursework

and finished his final examinations. Doc. No. 164-16 ¶ 5.

    C.    <u>May 2013 Events</u>

On May 7, 2013, Sonoiki attended a formal with one of his female friends. Doc. No. 145-

9 at 11. Cindy, an acquaintance of Sonoiki, attended the party with one of her friends. Id. Sonoiki

and Cindy had shared a drunken—but consensual—kiss about a month earlier at a school

concert. Id. at 12. They had also exchanged a series of text messages fairly characterized as

flirtatious, though in the texts Cindy expressly rejected Sonoiki's propositions for sex. Id. at 12–

14. Turning back to the formal, at around 1:40 a.m. on May 8, Cindy's date left to go to the

bathroom. Id. at 11, 14. Sonoiki approached Cindy and tried to kiss her, but she turned away. Id.

She then suggested they go somewhere else for a bit before her date returned. Id. The pair left the

dining hall and, at Cindy's suggestion, proceeded downstairs to the basement towards the gym.

Id. Both Sonoiki and Cindy agree that they engaged in kissing in the basement and that

intercourse occurred. They disagree about certain details of this encounter, which are described

later in this section.

On May 8, 2013, Cindy went to University Health Services for emergency contraception.

Id. at 15. She was examined by a doctor, who noted bruising on Cindy's left hip and upper thigh.

Id. Cindy met with Sarah Rankin on May 9 and described to her what transpired with Sonoiki at

the formal.[8] Id. On May 10, Cindy went to Cambridge Hospital, where she underwent a sexual

---

[7] Sonoiki was not enrolled in courses during the Fall 2012 semester, Doc. No. 145-7 at 7, though
no party has raised this issue or suggested why it might have any bearing on the instant case.
[8] In her statement to the Ad Board, Cindy said that she initially told Rankin that she was not
interested in reporting Sonoiki to the Ad Board. Doc. No. 145-9 at 15. Rankin told Cindy that

assault forensic exam. Id. at 16. Cambridge Hospital records report Cindy said she was

"intoxicated" at the formal, and the records include a diagnosis of "Sexual Assault."[9] Id. at 56.

Cindy also spoke with Jay Ellison, Associate Dean of Harvard College and Secretary of the Ad

Board, at some point before May 17, 2013—though she had not yet decided whether to file a

formal complaint against Sonoiki. Id. at 16.

On May 17, 2013, some ten days after the formal, Sonoiki received an email from his

Resident Dean Laura Johnson instructing him to speak with Ellison. Doc. No. 162-1 ¶ 60. That

day, Sonoiki met with Ellison and another administrator regarding possible violations of Harvard

policies. Id. ¶ 62. Ellison informed Sonoiki that "a number" of his peers had raised concerns that

Sonoiki had violated sexual misconduct rules. Id. ¶ 63. The same day, Ellison reiterated his

message in a letter to Sonoiki:

> As we discussed in our meeting this morning, it has been brought to my attention
> that a number of your peers have raised concerns that you may have violated the
> rules established by the Faculty of Arts and Sciences regarding sexual misconduct.
> . . . I advised you that . . . you should be aware that this information is known to the
> College and has caused great concern, and we are continuing to evaluate how best
> to respond to the information we are receiving.

Doc. No. 145-3 at 91. After his meeting with Ellison, Sonoiki spoke with Johnson. He

remembers Johnson telling him that the allegations against him were serious; he remembers her

saying, "it's more serious than sort of a—you know, someone that you hug for too long." Doc.

No. 145-102 at 67.[10]

---

there had been other accusations against him. Id. At the same time, Cindy heard rumors of other
complaints against Sonoiki from friends who knew about what happened to her with Sonoiki. Id.
[9] Cindy submitted medical records from Cambridge Health Alliance to the Ad Board. Doc. No.
145-66 at 6. However, these records are not before the Court, as they were redacted in the
Disciplinary Case Report. Doc. No. 145-66 at 64–81.
[10] Harvard contends that Johnson spoke to Sonoiki and explained the situation was "more
serious" than he had appreciated. Doc. No. 162-1 ¶ 68. In support, Harvard cited Sonoiki's
deposition quoted in the text. Id. Sonoiki "disputed" this assertion because "Sonoiki knew that he
had never been sexually inappropriate with anyone" and "thought the allegations may regard

Shortly thereafter, Sonoiki spoke with Cindy.[11] Id. at 72–73. According to Sonoiki, Cindy said she was being "pressured" to file allegations, that she was "unsure" what to do, that she did not think Sonoiki was a "bad guy," that "she didn't think anything of [their] encounter," but that she was being told Sonoiki was "a serial sort of predator" and "she was really struggling with what to do." Id. Sonoiki described feeling "worried" during his conversation with Cindy. Id. at 74. He was thinking about "worst case" outcomes, and so he was "really pleading and pleading" with Cindy to refrain from filing a complaint against him.[12] Id.

After his conversation with Cindy, Sonoiki emailed Ellison, stating that he was "shocked and upset" by their meeting and wanted to remove himself from campus to "fully ensure" he was not in a position for "any more misunderstanding or miscommunication." Doc. No. 162-1 ¶ 72. On May 28, 2013—two days before the Class of 2013 Commencement Day—Ann and Cindy filed complaints with the Ad Board accusing Sonoiki of sexual assault. Id. ¶ 73.

In her initial statement, Cindy provided the following description of her encounter with Sonoiki during the formal. She went with him willingly into the basement. Doc. No. 145-9 at 14. The two kissed beneath the basement stairwell. Id. Sonoiki pulled down Cindy's underwear and performed oral sex on her. Id. Cindy was shocked and said, "No. Stop it . . . Dam, stop it." Id. Cindy had to take his hand and pull it to get him to stop. Id. They started kissing again. Id.

---

misinterpreted social behavior." Id. Sonoiki's belief in his own innocence does not dispute (a) that Johnson told him the allegations against him were serious, or (b) that Sonoiki was on notice of Johnson's message.

[11] Ellison had instructed Sonoiki not to speak with possible complainants, though Ellison did not identify the possible complainants by name. Doc. No. 145-3 at 91.

[12] Sonoiki now disputes that he ever "pleaded" with Cindy, Doc. No. 162-1 ¶ 70, even though that is the word he said in his deposition that he used in his conversation with Cindy, Doc. No. 145-102 at 74. Sonoiki cannot merely disavow his under-oath testimony by invoking the word "disputed." See, e.g., Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380, 387 (1st Cir. 2016) (authorizing district courts to disregard an affidavit contradicting, without explanation or basis, previous under-oath testimony).

Sonoiki then turned Cindy's whole body around and bent her over. Id. at 15. He pulled down her underwear and began penetrating her. Id. He did not use a condom. Id. The interaction ended when Sonoiki ejaculated on the floor and pulled up his pants. Id. Cindy said she was "shocked." Id.

Sonoiki's initial statement to the Ad Board mirrors Cindy's chronology but differs as to the details of the encounter. According to Sonoiki, both he and Cindy pulled her underwear down before he performed oral sex, Cindy inserted his penis into her vagina, the intercourse lasted for "some time," and Cindy "moan[ed] in approval, or at least in a way that was easy to interpret as approval." Id. at 20–21. At some point thereafter during intercourse, Sonoiki heard Cindy whisper, "stop." Id. at 21. Though it took him a few seconds to process the instruction, Sonoiki claims he complied. Id. The pair subsequently left the stairwell and returned to the party. Id.

Ann's complaint included the following allegations against Sonoiki. She approached Sonoiki at a Phoenix Club party on the night of September 9, 2011, with "no intention of engaging with him in any sort of sexual activity." Doc. No. 145-7 at 11. She explained that she had no memory of much of the evening—despite not drinking very much. Id.

> The next thing I remember is waking up to myself making noises indicating discomfort and pain. I was in a dark room, completely naked. I was lying on my stomach with all four limbs collapsed underneath me. A man was penetrating me from behind. I don't know why, but I knew it was Dam. Although I absolutely did not want to be engaged in this activity with this person, I was so shocked and afraid that I did not say anything. He finished the act a few moments after I awoke. When he pulled away, I turned around and confirmed the identity of my assailant. Dam then got up and left the room.

Id. Ann then grabbed a few of her belongings and left the room. Id.

In his response to Ann's complaint, Sonoiki described a different series of events. He claimed they spoke at a party and, at some point, Ann said, "Let's get out of here." Id. at 14.

They took a taxi to the Quad, entered Sonoiki's dorm, and went to his room. Id. According to

Sonoiki, Ann performed oral sex on him, she inserted his penis into her vagina, they had sex, and

then Ann went to sleep. Id. He then got up and went to a suitemate's room until Ann left. Id. at

15. Sonoiki and Ann both agree she left some of her clothes in his room and that he returned

these items to her the next day. Id.

  In response to the filing of the two complaints on May 28, 2013, Ellison wrote to Sonoiki

that same day: "I need to meet with you tomorrow to discuss a very important issue. I am afraid

you know what this is about but I believe it would be helpful for us to talk once again." Doc. No.

145-8 at 2. Ellison asked Sonoiki if he had time to meet the following morning. Id. Ellison

copied Johnson on the email so "that she c[ould] join [them] if possible." Id. Ellison followed up

with another email the next day, stating that he needed to speak with Sonoiki "immediately."

Doc. No. 145-12 at 2. Ellison wrote Sonoiki a letter on May 29, 2013, notifying him of the

formal complaints against him. The letter stated: "you will not be eligible to receive your degree

on Commencement Day, May 30, 2013." Doc. No. 145-3 at 86. The letter quoted a provision of

the Handbook which states: "Students are expected to comply with all disciplinary rules from

matriculation until the conferring of the degree. A degree will not be granted to a student who is

not in good standing or against whom a disciplinary charge is pending." Id. Johnson forwarded

the letter to Sonoiki via email on May 29, 2013, at 10:03 p.m. Id. at 85. The letter was sent as an

attachment with the filename "Withheld Degree Letter 5 29 13.pdf." Id.

  On May 28, 2013, Ellison also wrote to the Registrar to remove Sonoiki's name from the

list of students the Faculty Council would consider for graduation. Id. at 88. Ellison stated that

the allegations against Sonoiki were "serious" and that he "expect[ed] more to come." Id. He

predicted that the Ad Board would "need to conduct a full investigation and hearing into the

matter," and accordingly asked that Sonoiki's degree "not be voted and not . . . be awarded." <u>Id.</u> An official in the Office of the Governing Boards confirmed on May 29 that Sonoiki's name was "removed" from the list of students whose degrees would be voted on and awarded. Doc. No. 145-10 at 2.

Sonoiki maintains that he did not read any of Ellison's or Johnson's emails prior to commencement. Doc. No. 162-1 ¶ 83. Nonetheless, the record establishes Sonoiki did respond to some of these emails prior to commencement. Doc. No. 145-12 at 2. Specifically, on May 30, 2013, at 6:10 a.m., Sonoiki replied to Ellison's May 29 email that read: "I need to see you right away. Please come to my office immediately after the class day exercise is over." Doc. No. 145-12 at 2. In his response, Sonoiki stated that he had "fallen very behind on emails" due to his family visiting. <u>Id.</u> He requested a meeting that evening, with Johnson present "if possible." <u>Id.</u>

In response, Ellison suggested a meeting on Monday, June 3, 2013. <u>Id.</u> Sonoiki replied at 9:01 a.m. on May 30, writing: "Okay, phone call Monday. Thank you very much and apologies for being out of touch. I look forward to getting this resolved in a fair manner." <u>Id.</u> at 3. Twenty minutes later, Sonoiki emailed again, this time saying: "Could we speak tomorrow afternoon on the phone or Skype? Thank you."[13] <u>Id.</u>

Sonoiki gave his Class Day speech, as planned. Doc. No. 162-1 ¶ 11. He also participated in commencement ceremonies. While he was waiting in line at commencement, Johnson pulled him aside and told him: "[Y]our degree will not be in the envelope." <u>Id.</u> ¶ 83.

---

[13] The meeting eventually occurred on June 3, 2013, and it was the "initial meeting" regarding the Ann and Cindy complaints. Doc. No. 162-1 ¶ 107.

D.   Disciplinary Investigation: Initial Review Phase

The Ad Board's investigation into Sonoiki's conduct continued in the days after commencement. Ellison met with Sonoiki on June 3, 2013, regarding the Ann and Cindy complaints. Doc. No. 162-1 ¶ 101. The pair reviewed written documents explaining Harvard's disciplinary procedures. Id. ¶ 97. On June 3, Ellison emailed Sonoiki two letters dated May 29, 2013. Doc. No. 162-1 ¶ 108; Doc. No. 145-7 at 4–5; Doc. No. 145-9 at 4–5. In both, Ellison wrote that the letters themselves "serve[d] as written confirmation that the Office of the Dean of Harvard College received on May 28, 2013, a formal complaint against you from another undergraduate student in the College whose name will be given to you orally." Doc. No. 145-7 at 4; Doc. No. 145-9 at 4. The letters further explained that the College was "initiating the process to determine whether a violation of the Faculty's policy occurred" and cited to the Handbook. Doc. No. 145-7 at 4; Doc. No. 145-9 at 4.

The next day, June 4, 2013, Betty filed a complaint with the Ad Board, alleging that Sonoiki had sexually assaulted her during the first part of the time they lived together in the summer of 2012. Doc. No. 162-1 ¶ 109. The Ad Board's initial review process expanded to encompass all three cases, with an independent fact finder appointed to assist in the three investigations. Id. ¶ 120. Sonoiki picked Johnson to serve as his Board Representative to the Ad Board. Id. ¶ 126. Each complainant student submitted an initial statement explaining her experiences with Sonoiki. Doc. No. 145-7 at 11–13; Doc. No. 145-9 at 11–17; Doc. No. 145-15 at 11–12. Sonoiki promptly submitted an initial respondent statement in each case. Doc. No. 145-7 at 14–16; Doc. No. 145-9 at 18–22; Doc. No. 145-15 at 13–20. The Ad Board subcommittee conducted preliminary interviews with Sonoiki and the complaining students. Doc. No. 162-1 ¶¶ 147–49.

The Handbook and related documents authorized Sonoiki to select a "personal advisor" from among the officers of the University, such as a proctor, tutor, coach, teaching fellow, instructor, or faculty member. Doc. No. 146-7 at 4. At no point in the disciplinary process did Sonoiki select a personal advisor. Doc. No. 162-1 ¶ 130. On June 4, 2013, the day after Sonoiki's initial meeting with Ellison and the day Betty filed her complaint, Johnson wrote to Sonoiki stating:

> Since you haven't told your parents, I will tell you that if my child were involved in a case like this, I would encourage him to consult an attorney. While attorneys don't have a role in the college process, I would still want my child to talk with someone about any legal implications of the process.

Doc. No. 145-16 at 2. At no point in the disciplinary process did Sonoiki follow this advice.

On June 21, 2013, the subcommittee recommended that the Ad Board vote to issue a charge in each of the three cases against Sonoiki. Doc. No. 162-1 ¶ 155. Sonoiki wrote a statement in response to this recommendation. Id. On June 25, 2013, the Ad Board voted to issue a charge against Sonoiki for sexual misconduct in each of the three cases. Id. ¶ 156.

E.       Disciplinary Investigation: Post-Charge Investigation Phase

After Sonoiki was formally charged, the Ad Board subcommittee ramped up its investigative efforts. It interviewed thirteen witnesses and collected a total of nineteen witness statements. Id. ¶¶ 161–64. It also interviewed Sonoiki multiple times. Id. ¶¶ 168–71. The subcommittee's investigation stretched from July 2013 until November 2013. Id. ¶ 193. At the conclusion of its investigation, the subcommittee compiled three confidential reports.[14] The reports contained the subcommittee's findings regarding the factual circumstances of each case, as well as assessments of witness credibility and disciplinary recommendations. In each of Sonoiki's cases, the subcommittee recommended that the Ad Board require Sonoiki to withdraw

---

[14] These reports are sometimes referred to as "Disciplinary Case Reports." Doc. No. 162-1 ¶ 50.

from Harvard College for four terms. Doc. No. 145-7 at 48; Doc. No. 145-9 at 63; Doc. No. 145-15 at 59. As to Cindy's case, the subcommittee concluded that Sonoiki had "engaged in sexual intercourse with Cindy against her will." Doc. No. 145-9 at 63. In its detailed explanation for this conclusion, the subcommittee noted, among other points, that "the purplish bruising on Cindy's left hip and right upper thigh recorded in the report of Cambridge City Hospital" supported the conclusion that Sonoiki had used force. Id. The subcommittee similarly concluded that Sonoiki had committed sexual misconduct in the cases of Ann and Betty. The subcommittee also urged the Ad Board, in each case, to recommend that the Faculty Council dismiss Sonoiki from Harvard College. Id. Sonoiki submitted written responses to the subcommittee's recommendations. Doc. No. 162-1 ¶ 201.

On November 19, 2013, the Ad Board accepted the recommendations of the subcommittee. In particular, it voted in each of the three cases to require Sonoiki to withdraw from Harvard College for four terms. Doc. No. 145-7 at 90. It also recommended to the Faculty Council that Sonoiki be dismissed from Harvard College. Id. Sonoiki indicated that he planned to appeal the Ad Board's decision. Doc. No. 162-1 ¶ 214. Per Harvard's disciplinary policies, Sonoiki had a six-month period to initiate his appeal. Id. ¶ 215.

F.     Sonoiki's Post-Harvard Activities and Appeal

Throughout most of the disciplinary process described thus far, Sonoiki worked as an investment analyst at Goldman Sachs. Doc. No. 162-1 ¶ 234. On May 5, 2014, with weeks left to appeal the Ad Board's decisions and recommendations and his appeal not yet filed, Sonoiki received an offer to join a hedge fund called Taconic Capital Advisors. Doc. No. 145-67 at 2. The new job offered higher pay than his position at Goldman Sachs. Compare Doc. No. 145-67 at 2, with Doc. No. 162-1 ¶ 236. Sonoiki accepted the offer. Taconic, however, rescinded the

offer on May 16, 2014, after an investigative report revealed that Sonoiki lacked a college degree. Doc. No. 145-70 at 2; Doc. No. 162-1 ¶ 243.

Sonoiki continued to work at Goldman Sachs after Taconic rescinded its job offer. Id. ¶ 247. On May 19, 2014, Sonoiki filed his objection to the Ad Board's recommendation of dismissal. Doc. No. 145-73 at 2–8. He filed the appeal himself, without the assistance of a lawyer. Sonoiki disputed that he had committed any rape or sexual assault. Id. at 2. He argued that he was "blind-sided by the subcommittee's recommendation of dismissal" because "Cindy told [him] the worst thing that could happen to [him] is that [he] would have to withdraw for one or two years." Id. at 4. He went on to explain that, had he understood his diploma hung in the balance, he would have retained counsel and selected a personal advisor. Id.

He also claimed that Harvard's disciplinary process was "fundamentally unfair" because the sanctions arose in one consolidated proceeding, denying him the opportunity to "learn [his] lesson" after an initial punishment. Id. He identified various evidentiary reasons from the record that, in his view, supported his position, and he highlighted the many positive contributions he had made to the Harvard community. Id. at 5–7. The appropriate sanction, he argued, would be to allow him to withdraw from Harvard and "eventually" receive his diploma. Id. at 6.

In July 2014, Sonoiki was working in the technology group at Goldman Sachs. Doc. No. 146-10 at 4. He told Mychal Kendricks, who was then an NFL player for the Philadelphia Eagles, that one of Goldman's clients was the target of a takeover. Id. Kendricks traded on this inside information, with Sonoiki executing the trades. Id. at 5. Sonoiki and Kendricks worked together to orchestrate trades on three more occasions between September and November 2014 based on material, non-public information Sonoiki received by virtue of his position at Goldman Sachs. Id. at 6–8. Sonoiki received cash and tickets to NFL games for his role in the scheme.

Doc. No. 146-9 at 3. Though these events occurred in 2014, they did not come to light for almost four years. Id.

On October 16, 2014, the Docket Committee of the Faculty Council overruled Sonoiki's objections to the suspension imposed by the Ad Board and affirmed the Ad Board's decision. Doc. No. 162-1 ¶ 219; Doc. No. 28-4 at 2. On December 10, 2014, again over Sonoiki's objections, the Faculty Council dismissed Sonoiki from Harvard, thereby adopting the Ad Board's recommendation. Doc. No. 145-83 at 2. The Faculty Council took all of these actions in each of Sonoiki's three cases. Id.

A few months later, in May 2015, Sonoiki resigned from Goldman Sachs after an anonymous caller informed his employer that he lacked a Harvard degree. Doc. No. 162-1 ¶ 247.

Sonoiki switched gears and started working in the entertainment industry. By May 2015, he had an offer to work as a staff writer on ABC's Black-ish. Id. ¶ 250. He sold television pilots to Warner/TBS and HBO. Id. ¶ 256. After he was not invited back for another season of Black-ish, id. ¶ 253, he became a story editor for The Simpsons, id. ¶ 258.

In 2017, Sonoiki petitioned the Faculty Council to readmit him to Harvard College. Id. ¶ 222. He also corresponded with Betty and Cindy and urged them to consider supporting his application. Doc. No. 145-87 at 2–22. Neither Betty nor Cindy did so. The Faculty Council sent Sonoiki's petition to the Ad Board for a recommendation. Doc. No. 145-88 at 2. The Ad Board did not recommend Sonoiki's readmission to the College. Doc. No. 145-89 at 2. On March 22, 2018, the Secretary of the Faculty informed Sonoiki that the Faculty Council had denied his request for readmission. Doc. No. 145-91 at 2.

In September 2018, while still working on The Simpsons, Sonoiki pled guilty to securities fraud and conspiracy charges in a Pennsylvania federal court based on his role in the

2014 insider-trading scheme described above.[15] Doc. No. 162-1 ¶ 268. Some three months later, Sonoiki lost his job on The Simpsons. Id. ¶ 262. He moved back to his hometown of Houston, Texas, and began working as a writer for online publications. Doc. No. 125-7 at 3–4.

Sonoiki filed suit against Harvard in October 2019. Doc. No. 1. The Court discusses additional facts, when relevant, in Section IV, infra.

III.    LEGAL STANDARD

A.    Summary Judgment Framework

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Facts are material when they have the "potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). Disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992)).

The nonmoving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986)). On issues where the non-moving party bears the ultimate burden of proof, the non-moving party must present "'definite, competent evidence'" to rebut the motion. Mirabella v. Town of Lexington, Mass., 64 F.4th 55, 57 (1st Cir. 2023) (quoting Mesnick v. Gen. Elec. Co.,

---

[15] On July 29, 2021, the federal court sentenced Sonoiki to one month in prison followed by three years of supervised release. Doc. No. 146-13 at 3.

950 F.2d 816, 822 (1st Cir. 1991)). The "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

  B.  Breach of Contract Law

  Sonoiki has one remaining claim; it is for breach of contract. A successful breach of contract claim under Massachusetts law has four elements. The plaintiff must demonstrate: first, "that there was an agreement between the parties . . . supported by consideration"; second, that "the plaintiff was ready, willing, and able to perform his or her part of the contract"; third, that "the defendant committed a breach of the contract"; and fourth, that "the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).

  In the context of colleges, "[a] student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)). The Handbook and its incorporated documents supply the terms of the contract.[16] Sonoiki, 37 F.4th at 704. Massachusetts law governs the

---

[16] The parties cite to the 2012–2013 Handbook and related documents, listed below, constituting the contract.
- General Regulations regarding Sexual Assault and Other Sexual Misconduct. Doc. No. 146-3 at 4.
- The Faculty of Arts and Science's Policy Statement on Rape, Sexual Assault, and Other Sexual Misconduct. Doc. No. 146-3 at 5–8.
- General Regulations regarding the Ad Board. Doc. No. 146-4 at 4–14.
- The Ad Board's "Information for students facing allegations in a peer dispute case" ("Student Information Form"). Doc. No. 146-7 at 2–9.
- The Ad Board's "General Information on Disciplinary Cases" ("General Information Form"). Doc. No. 146-6 at 2–3.
- The Ad Board's "Disciplinary Process" flowchart "for allegations involving a peer dispute." Doc. No. 146-1 at 2.
- The Ad Board's "Reconsideration and appeals" statement. Doc. No. 146-8 at 2.
- The Faculty of Arts and Science's "Rules of Faculty Procedure." Doc. No. 146-5 at 2–7.

contract, as both parties concede. See Doe v. Stonehill Coll., 55 F.4th 302, 316 (1st Cir. 2022); Doc. No. 163-1 at 14; Doc. No. 144-1 at 19.

Massachusetts law recognizes breach of student-university contracts based on the "reasonable expectations" of a reasonable student. Stonehill, 55 F.4th at 316–17. In assessing a "reasonable expectations" breach of contract claim, courts consider the university's "'manifestation'" toward its students and "'what meaning the . . . university, should reasonably expect the student to give it.'" Id. at 316 (quoting Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000)). "A student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language." Sonoiki, 37 F.4th at 709. The appropriate inquiry is whether "the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions." Id.; accord Stonehill, 55 F.4th at 316.

## IV.   DISCUSSION

Sonoiki advances two categories of theories in support of his breach of contract claim. In the first category, he advances four theories of breach arising from Harvard's handling of his disciplinary cases. In the second category, he advances one theory arising from Harvard's failure to confer his college degree. The Court first addresses the disciplinary process theories.

### A.   The Disciplinary Process Theories

Sonoiki advances four breach of contract theories related to Harvard's disciplinary procedures: (1) that Johnson failed to advocate for him during the disciplinary process; (2) that Johnson breached her duty of confidentiality; (3) that Johnson failed to communicate the names of adverse witnesses; and (4) that Harvard failed to conduct one required initial disciplinary meeting and conducted another such meeting improperly. To defeat Harvard's motion on each

theory, Sonoiki must demonstrate a contractual right, breach, and harm.[17] Specifically, as to

harm, he must present evidence showing that the breach committed by Harvard would have

"changed the outcome" of his disciplinary cases. Doe v. Williams Coll., No. 20-30024, 2022 WL

4099273, at *16 (D. Mass. Sept. 7, 2022); accord Doe v. Brown Univ., 210 F. Supp. 3d 310, 335

(D.R.I. 2016) (holding plaintiff-student must demonstrate that breach "actually affected"

outcome of disciplinary case); cf. Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 726 (1st Cir. 1983)

("Failure of the university to produce the witnesses requested by [plaintiff], whose relevance and

importance are far from obvious, did not violate the [applicable] fairness standard . . . .").

Sonoiki must present "definite, competent evidence" to support each element of each

theory. Mirabella, 64 F.4th at 57. The Court addresses these theories first individually, and then

collectively.

     1.  Advocate Theory

Sonoiki claims that Johnson failed to advocate on his behalf despite an alleged duty to do

so under Harvard's published procedures. To establish this duty, Sonoiki points to language from

the Student Information Form, which describes the Representative Role as follows:

> Your Board Representative is an officer of the College and you should be open and
> honest when talking with him or her. The role of your Board Representative,
> whether your resident dean or Board alternate, is to represent you to the
> subcommittee and the Board. He or she will be present at all meetings and will
> make certain that you are kept informed throughout the process. Your Board
> Representative also will present to the Board a full summary of the facts of the case
> in which you are involved; he or she will not advocate for you but will make certain
> that your perspective is clearly presented. Though your Board Representative does
> not vote on your case, he or she does speak on your behalf and participates in
> deliberations about your case.

Doc. No. 146-7 at 4.

---

[17] The parties do not dispute that they formed a valid, binding contract. See Doc. No. 162-1
¶ 104.

Sonoiki primarily relies on these statements to support his assertion that Johnson had a duty to "advocate" for him, citing, among other provisions, the language requiring his Board Representative to "represent" him, keep him "informed," and "make certain that [his] perspective is clearly presented." Id. Of course, the Form also states the Board Representative "will not advocate for" the respondent student and will address the subcommittee if there are relevant facts that the Board Representative and respondent student had discussed, but that the respondent student failed to raise himself. Id. at 4–5. The General Information Form states that the Board Representative's role is to "mak[e] certain the student's 'voice' is heard" and encourages respondent students to "work closely with their Board Representative[s]" to "ensure that the Board receive[d] a full and balanced account of a case or petition." Doc. No. 146-6 at 2.

At the dismissal stage, the Court of Appeals found the contract documents ambiguous regarding Harvard's contention that Board Representatives were not "advocates":

> While the Ad Board Procedures disavowed any advocacy role of the Board Rep in one phrase (which Sonoiki acknowledges in his complaint), the various descriptions of the Board Rep's role in relation to the student—such as represent, speak on behalf of, clearly present the student's perspective—seemingly contradict this one disclamatory phrase and do sensibly suggest some level of advocacy from the Board Rep would be reasonably expected by the student.

Sonoiki, 37 F.4th at 710–11.

Several further considerations are material. Harvard's disciplinary process does not permit respondent students to attend interviews of witnesses or complaining students. Rather, respondent students receive written summaries of the statements and reports from their Board Representatives. Doc. No. 146-7 at 5. Similarly, respondent students cannot attend most Ad Board meetings, but instead depend upon their Board Representatives to keep them abreast of case developments. Id. at 6. The Circuit decision along with the text of the contract and the

foregoing provisions together extinguish any notion that the contract imposes no advocacy role whatsoever upon the Board Representative.

Drawing all reasonable inferences in favor of Sonoiki, and considering the text of the contract, a reasonable student could conclude that his Board Representative would act as an advocate in some form. This is particularly so given that Harvard's disciplinary process excludes respondent students—but not Board Representatives—from most Ad Board meetings pertaining to their case.[18] That Board Representatives do not vote in disciplinary cases, id. at 4, also supports this understanding of the role.

Yet, no reasonable student would think the Board Representative is an advocate in the sense of the commonly understood role of a criminal defense attorney. For starters, the language of the contract includes a disavowal of the role of "advocate." Id. at 4. It also precludes participation by lawyers, requires students to speak for themselves, designates a student's Resident Dean as his default Board Representative, and limits a student's choice of alternate Board Representatives to voting members of the Ad Board. Id. A respondent student must communicate directly to the Ad Board, rather than speak through his Board Representative. Id. While the Board Representative can review a student's statement for organization, length, and clarity, Harvard emphasizes that a respondent student must write his own statements—establishing that the student bears the responsibility to explain himself. Id.

In any event, the Court need not define the precise contours of the Board Representative's advocacy responsibilities, because Sonoiki must submit evidence that Johnson

---

[18] Respondent students are, however, interviewed by the Ad Board subcommittee on multiple occasions. Doc. No. 146-7 at 5–6.

breached her duty.[19] This he fails to do. With the full benefit of discovery, Sonoiki has failed to offer evidence that Johnson: did not do or say something she should have; said or did something she should not have; did not present his point of view to the Ad Board; or failed to review his written statements to the Ad Board in advance of filing. In short, Sonoiki points to no evidence that Johnson breached her duty to advocate on his behalf, however it is defined.[20] That alone forecloses Sonoiki's advocate theory.[21]

There are three more issues here. First, Sonoiki claims he cannot know how Johnson breached her duty, as he was not present in the Ad Board meetings. Not so. Discovery presented an opportunity to learn more about the Ad Board proceedings. Sonoiki had the opportunity to obtain documents, interrogatory answers, and depositions regarding the entire scope of the process. Moreover, Sonoiki bears the burden of proof on each element of his contract claim.

---

[19] Sonoiki fails to define his interpretation of the "advocate" role, or explain how Johnson should have done more, given the constraints imposed by Harvard's procedures. The Ad Board process does not provide for the cross-examination of witnesses, requires respondent students to author their own statements, and does not allow for professional lawyers to participate in the process. Doc. No. 146-7 at 4–5.

[20] Sonoiki testified that Johnson "didn't want to be there in the first place [which] is reflected in just her performance in general." Doc. No. 164-12 at 30. When asked to "point to anything specifically," Sonoiki stated that Johnson "could have helped me formulate things better or help do things better." Id. at 30–31. This generalized accusation is not evidence of breach—or, for that matter, of harm—especially in a proceeding in which Sonoiki bore the obligation to develop a response. Sonoiki fails to offer further elaboration on this point in his Memorandum in Opposition to Summary Judgment. Doc. No. 163. The Court does note that, at his deposition, Sonoiki stated that Johnson "could have probably given me the identities of the witnesses" Id. The Court addresses that point in Section IV(A)(3), infra.

[21] Sonoiki states that he asked Johnson to share her notes from the Ad Board meetings and she failed to share them. Doc. No. 162-1 ¶ 38. Even if this factual assertion could constitute a breach of Johnson's advocate duties, Sonoiki has failed to demonstrate that sharing the notes: (1) would have revealed something he did not already know; (2) would have resulted in him doing something differently in the course of the disciplinary processes; or (3) otherwise affected the outcome of the disciplinary process.

Second, the summary judgment record shows that on May 31, 2013, Johnson sent the

following email to Ellison:

> I would love to talk sometime today about whether it would be better for [Sonoiki]
> to work with another Board representative. I just found out that Betty will be one
> of the complainants, and I feel very close to her. In addition, she will be in [my]
> House next year, and [Sonoiki] will not. I want the process to be as smooth as
> possible for both students, and it's always hard to balance conflicting needs, but I
> think on balance it might be harder for Betty to have me working with [Sonoiki]
> than it would be for [Sonoiki] to work with someone else.

Doc. No. 145-14 at 3.

Ellison replied, stating that Betty was probably going to choose another Ad Board

member as her Representative, and that Johnson was expected to work with Sonoiki. Id. at 3.

Ellison also stated, "[Sonoiki] knows you and so far seems to want to work with you. As you

know students are told that the Board representative is not an advocate or an adversary but

simply a representative." Id. at 2. Neither Johnson nor Ellison revealed this email exchange to

Sonoiki. Doc. No. 162-1 ¶ 121. For present purposes, the Court assumes that Sonoiki, despite his

friendship with Betty, was unaware of Betty's bond with Johnson, or that Johnson had served as

Betty's Board Representative in a prior, unrelated disciplinary case. Doc. No. 164-10 at 28.

Nonetheless, these facts are of no assistance to Sonoiki's advocate theory. He has pointed to no

evidence showing that Johnson breached her duties as his Board Representative. Insofar as

Sonoiki advances that this was a sort of "conflict" giving rise to a form of structural error, the

Court rejects that notion. Whatever the contours of the advocacy duty may be, they do not go so

far as to establish breach based on a possible conflict of interest in the absence of evidence of

harm.[22] Cf. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980) (requiring criminal defendant to

---

[22] Whether Ellison and Johnson proceeded wisely by not informing Sonoiki of Johnson's May
31, 2013, email or the concern it expressed is not a matter for adjudication by the Court.

"establish that an actual conflict of interest adversely affected his lawyer's performance" and holding "that the possibility of a conflict is insufficient to impugn a criminal conviction").

Third, Sonoiki claims that Johnson shared adverse facts about him with the Ad Board. Though Johnson candidly admitted she believed her "purview" entitled her to do so, she testified as follows:

> Q: Did you ever share facts that you felt were undermining Damilare's position?
>
> A: *I don't recall doing so*, although it would have been in the purview of the Board representative to do so.

Doc. No. 164-10 at 8 (emphasis added).

In follow up, counsel asked Johnson if she "refrain[ed] from sharing facts" that would undermine Sonoiki's position, to which she responded, "No." Id. at 8–9. To "refrain" is merely "to keep oneself from doing, feeling, or indulging in something and especially from following a passing impulse." Refrain, Merriam-Webster's Collegiate Dictionary (11th ed. 2019). Johnson's statement is not evidence that she shared undermining facts about Sonoiki. It is only evidence that she did not stop herself from sharing such facts. This is especially so when read in conjunction with her prior answer, which immediately preceded this one. The entire exchange shows only that: (1) Johnson thought she had the power to share undermining facts; (2) she did not hold herself back from sharing such facts; and (3) Johnson did not recall revealing any undermining facts about Sonoiki. Now, with the benefit of full discovery, Sonoiki cannot point to a single undermining fact that Johnson disclosed to the Ad Board. In short, even if the contract precluded Johnson from sharing undermining facts, there is no evidence that she did so.

Finally, even if Sonoiki could establish that Johnson breached her duty—which he has not done—he would also be required to establish the breach affected the outcome of one or more of his disciplinary cases. Williams Coll., 2022 WL 4099273 at *16; Brown Univ., 210 F. Supp.

3d at 335. This he has not done. He has identified no evidence whatsoever that would permit a jury to conclude that Johnson's "performance" as his Board Representative affected the outcome of his disciplinary proceedings.

For the foregoing reasons, Harvard's Motion for Summary Judgment is ALLOWED as to the advocate theory.

### 2. Confidentiality Theory

Sonoiki next claims that Johnson had, and breached, a duty to keep their conversations confidential. The contract does not explicitly state that the Board Representative has a duty to maintain confidentiality, though it does explicitly define confidential relationships in other contexts. Compare Doc. No. 146-7 at 4 (describing Board Representative's role), with id. at 2 (describing confidential resources for students). The Student Information Form, however, encourages students to be "open and honest" with their Board Representatives. Id. at 4. The General Information Form also encourages students to "work closely with their Board Representative[s]" and share draft statements with their Board Representatives for feedback. Doc. No. 146-6 at 2. Drawing all inferences in Sonoiki's favor, a reasonable student could expect his Board Representative to keep their discussions, or at least some portion of them, confidential.[23]

The existence of the duty of confidentiality is of no assistance to Sonoiki, however, for he fails to show that Johnson breached her duty. This is so even though Johnson did not view their discussions as confidential, Doc. No. 164-10 at 14, because Sonoiki cannot identify any

---

[23] Harvard points out that the contract also states that the Board Representative will "present to the [Ad] Board a full summary of the facts of the case." Doc. No. 146-7 at 4. Viewed through the summary judgment lens, no reasonable student would understand this statement to mean that the Board Representative would inform the Ad Board of materially adverse facts disclosed privately.

confidential information that she did disclose—even after full discovery. See, e.g., Doc. No. 145-27; Doc. No. 145-28. Indeed, the following exchange occurred during Sonoiki's deposition:

> Q: Is there anything that you shared with Ms. Johnson that you expected would be kept confidential and wasn't?

> A: I don't know.

Doc. No. 164-12 at 39.[24]

Sonoiki does make one more argument on this point. He thought Johnson "might" have disclosed information from an email dated July 6, 2013. Doc. No. 162-1 ¶¶ 190–91. In the email, Sonoiki shared one of his journal entries, in which he expressed frustration with Harvard's disciplinary process. Doc. No. 145-3 at 64. But the undisputed evidence establishes that Sonoiki copied Ellison on the same email. Id. Ellison, of course, owed Sonoiki no duty of confidentiality. Sonoiki, therefore, had no reasonable expectation of privacy as to the Ad Board in this email, and it cannot serve as evidence to support his confidentiality theory. Thus, Sonoiki has failed to present any evidence showing that Johnson breached her duty of confidentiality.

Even if Sonoiki could provide evidence establishing such a breach, he has not offered any evidence to show that the breach affected the outcome of the disciplinary proceedings against him—which is necessary to prove harm. Williams Coll., 2022 WL 4099273, at *16; Brown Univ., 210 F. Supp. 3d at 335.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to the confidentiality theory.

---

[24] Sonoiki's affidavit is silent on this point, Doc. No. 164-16, as are his other submissions in opposition to summary judgment.

3.  <u>Witness Name Theory</u>

Sonoiki argues that Harvard breached the contract because Johnson failed to give him the names of all witnesses who provided evidence to the Ad Board.[25] It is undisputed that Sonoiki learned some of the names, Doc. No. 162-1 ¶ 207, but Sonoiki denies knowing all of them, Doc. No. 164-16 ¶ 19, which, of course, the Court accepts as true for present purposes.

While the contract does not expressly provide for the disclosure of witness names, it does state that the respondent student's Board Representative will attend all pre-charge witness interviews, "so that they can inform [the respondent student] about what was said during the interview and *any information* that was obtained." Doc. No. 146-7 at 5 (emphasis added). After a charge has been issued, the Board Representative is still expected to attend all witness interviews and provide the respondent student with "copies of all documents *and other information* obtained by the fact finder and subcommittee." <u>Id.</u> at 6 (emphasis added). A reasonable student could— and likely would—expect that "any information" or "other information" obtained from interviews would include the witnesses' identities.[26] Additionally, the disciplinary procedures permit respondent students to issue final statements to the Ad Board after all interviews have been conducted. <u>Id.</u> at 6–7. A reasonable student would expect that this process was designed to give him an opportunity to rebut statements from adverse witnesses. Knowledge of witnesses'

---

[25] Sonoiki's argument has changed since he filed his Amended Complaint. He originally argued that "the Subcommittee never identified by name any of the adverse student witnesses against him." Doc. No. 63 ¶ 313. Now, he claims that Johnson failed to share the names with him. Doc. No. 163-1 at 32. Harvard has not shown that it was prejudiced or harmed by Sonoiki's decision to change his theory. For example, it has not identified any discovery or investigation it would have undertaken, had it known of this shift in theory earlier. Moreover, district courts are to "freely give" parties leave to amend their complaints in the absence of prejudice to another party. Fed. R. Civ. P. 15(b)(1). Thus, the Court considers the theory as articulated by Sonoiki in his opposition to the summary judgment motion.

[26] This is especially true when viewed through a plaintiff-friendly, summary judgment lens.

identities could be of critical importance when responding to their statements. It would provide the respondent student with a basis to investigate, to raise bias concerns, to challenge a witness's opportunity to observe, or even to challenge a witness's capacity to testify. Sonoiki has established, at least, that a reasonable student could expect to know the witnesses' names and that his Board Representative would provide the information. Of course, Sonoiki had no other way of learning the names, because the process excluded him from attending witness interviews.

Harvard contends that Sonoiki needed to proactively ask Johnson for the names—and that he not only failed to ask, but affirmatively told her that he did not wish to hear about witness statements. Doc. No. 145-53 at 2. While Harvard argues that Sonoiki willfully avoided hearing the witness statements, this evidence is not clear enough to render Harvard entitled to summary judgment.

Thus, for purposes of Harvard's motion, the Court concludes that Johnson bore an affirmative duty to share all witness names with Sonoiki, and that she did not discharge this duty as to every witness. Nonetheless, this theory still fails because Sonoiki offers no evidence that he suffered harm as a result of Johnson's breach. During the course of discovery, Sonoiki obtained the names of all the witnesses. Doc. No. 145 ¶ 39. Yet, he offers no evidence suggesting that, had he been armed with this information during the disciplinary process, he would have undertaken different or more investigative efforts, communicated additional or different information to the Ad Board, refrained from sharing certain information with the Ad Board, or done anything else differently. In sum, he has not identified evidence showing that the alleged breach actually affected the outcome of the disciplinary proceedings. Williams Coll., 2022 WL 4099273, at *16; Brown Univ., 210 F. Supp. 3d at 335.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to this theory.

    4.  <u>Meeting Theory</u>

Finally, Sonoiki argues that Harvard conducted its initial disciplinary meetings

incorrectly by failing to notify him of his right to have Johnson present for his initial meeting

with Ellison, or, in the case of the Betty complaint, by failing to conduct an initial meeting at all.

This theory of breach fails as well.

    The Handbook states: "Disciplinary cases . . . begin with a conversation between the

student, his or her Resident Dean, and the Secretary of the Administrative Board or his or her

designee, during which they discuss the incident, the relevant College rules or standards of

conduct, and possible courses of action." Doc. No. 146-4 at 6–7. A reasonable student could

conclude that he was entitled to this meeting, so that he could have the relevant College rules

explained to him and learn the possible courses of action the University might pursue against

him. While the contract does not explicitly state that the student's Board Representative must be

present at the initial meeting, it does state that a student's Resident Dean will be present. A

reasonable student could conclude that he was entitled to have his Resident Dean present at the

meeting considering the contract language.[27] Additionally, the default procedure is for a

respondent student's Resident Dean to serve as his Board Representative. Doc. No. 146-7 at 4.

Sonoiki chose his Resident Dean, Johnson, to serve as his Board Representative. Doc. No. 162-1

¶¶ 27, 126.

    The undisputed facts establish that Ellison conducted an initial meeting on June 3, 2013,

during which he and Sonoiki discussed the Ann and Cindy complaints. Id. ¶¶ 96–101. The

meeting was conducted via telephone. Id. ¶ 99. Sonoiki denies Johnson was present for the

---

[27] Many Harvard students have personal relationships with their Resident Deans, and the Dean's presence might serve as a source of emotional support. <u>See</u> Doc. No. 162-1 ¶ 186.

meeting, id.; thus, for summary judgment purposes, Sonoiki has established that Harvard

breached its duty to have her present at the June 3 meeting.[28]

As for the initial meeting regarding Betty's complaint, Sonoiki claims that it never

happened, Doc. No. 163-1 at 27, while Harvard insists that it occurred around June 5, 2013, Doc.

No. 144-1 at 29–30. Applying the summary judgment standard, the Court will presume that the

meeting never occurred.

Nonetheless, this theory does not proceed past summary judgment, because Sonoiki has

not provided any evidence suggesting that he suffered harm because of Harvard's breaches. He

cannot and does not show that Johnson's presence at the June 3 meeting mattered. When asked

about the June 3 meeting at his deposition, and what effect Johnson's absence had on that

meeting, Sonoiki said, "Well I can't really speculate. I don't know." Doc. No. 145-102 at 109;

Doc. No. 162-1 ¶ 106. After fact discovery, Sonoiki has not shown any deficiency in the meeting

as to Ann's and Cindy's cases or that it affected the outcome of those two cases. In other words,

he has failed to demonstrate harm. As for Betty's case, Sonoiki has not shown how Harvard's

failure to hold another initial meeting affected his understanding of the disciplinary procedures

---

[28] Whether Johnson attended the meeting presents an issue of fact that can only be resolved at a
trial. Harvard submitted a document signed by Ellison after the meeting, which states that he was
"accompanied" by Johnson. Doc. No. 145-18 at 2. At the motion hearing, Sonoiki's counsel
stated that Sonoiki "signed" the document as well. Ordinarily the Court would accept such a
concession; however, the undisputed facts establish this meeting was conducted over the phone.
Doc. No. 162-1 ¶ 99. While this fact alone would not have made a contemporaneous signature
impossible in 2013, it does seem implausible under the circumstances. The Court declines to
treat this document as establishing Johnson's presence for purposes of summary judgment. In
addition, as to Sonoiki's affidavit denying Johnson's presence, Harvard urges the Court to reject
this assertion in reliance on SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp., 188 F.3d 11 (1st
Cir. 1999). That case held that a court need not credit "conclusory conjecture" or "self-serving
speculation." SMS Systems, 188 F.3d at 24–25. That ruling does not stand for the proposition
that the Court may disregard the under-oath statement of a percipient witness testifying as to who
did or did not participate in a meeting the witness attended merely because the testimony
comports with the self-interest of the witness.

or the allegation against him. Doc. No. 162-1 ¶ 31 (outlining topics covered at initial disciplinary meetings). Nor has he argued that he suffered any harm due to the absence of the initial meeting.

Accordingly, Harvard's Motion for Summary Judgment is ALLOWED as to the meeting theory.

### 5.   The Disciplinary Process Theories Considered Collectively

To be clear, the Court does not find that Harvard conducted Sonoiki's disciplinary cases flawlessly. As to two of his four theories, however, Sonoiki has failed to demonstrate breach. And, as to all four theories, he has failed to provide evidence supporting a finding that he was harmed by any procedural errors committed by Harvard, or that the errors affected the cases' outcomes. This was his burden on summary judgment. Williams Coll., 2022 WL 4099273 at *16; Brown Univ., 210 F. Supp. 3d at 335. The outcome of the analysis is the same when the four theories are considered collectively. That is, even when his theories are considered collectively, Sonoiki has failed to establish harm and thereby failed to sustain his breach of contract claim.

The Court therefore ALLOWS Harvard's motion and enters summary judgment in its favor on all four disciplinary process theories.

### B.      The Charge Theory

The Court now turns to Sonoiki's one remaining theory of liability. To succeed on his charge theory, Sonoiki must present admissible evidence showing that he performed his contractual obligations, thereby entitling him to a Harvard degree on Commencement Day, May 30, 2013. The question here is not whether Sonoiki personally felt that he would receive his degree on Commencement Day, but whether, on the summary judgment record, Sonoiki had a contractual entitlement to the degree. The Court's focus, then, turns to whether Sonoiki's

"expectation, viewed objectively alongside the express terms of the contract, is based on . . . [his] fair interpretation of the contract's provisions." <u>Sonoiki</u>, 37 F.4th at 709. Even viewing the record through a plaintiff-friendly, summary judgment lens, Sonoiki fails to meet his burden.

In the context of the Harvard-student contract, a student undertakes at least the following performance obligations, which are each conditions precedent to Harvard's obligation to confer a degree. First, the student must pay all the required fees and charges. Doc. No. 164-16 ¶ 10. The evidence establishes Sonoiki fulfilled this requirement. <u>Id.</u> Second, the student must complete all academic requirements for conferral of a degree, including by enrolling in the requisite number of courses and earning satisfactory grades. <u>Id.</u> ¶ 5. The evidence establishes that Sonoiki fulfilled this requirement as well. Doc. No. 162-1 ¶ 88. Finally, the student must remain in compliance with the governing conduct rules, as measured by Harvard, pursuant to Harvard's policies, which themselves are part of the contract. <u>See, e.g.</u>, Doc. No. 146-2. This is where Sonoiki's theory founders. He has not supplied evidence that would permit a jury to conclude that he satisfied this last performance obligation, which was a necessary precondition to obtaining a Harvard degree.

The contract documents establish that Harvard's conduct rules govern students from "matriculation until the conferring of [their] degree[s]." Doc. No. 146-4 at 8. This is undisputed. Doc. No. 162-1 ¶ 22. All reasonable students reading the contract would understand that they are required to comply with Harvard's conduct rules right up to the moment they receive a diploma at graduation. Next, the undisputed evidence establishes that Harvard published a yearly Handbook at the time of Sonoiki's attendance, which enumerated the College's conduct rules and disciplinary procedures. <u>Id.</u> ¶ 10. These rules prohibited students from sexually assaulting other students. The Handbook contains a section called "General Regulations: Assault and Other Sexual Misconduct," which states: "the Faculty of Arts and Sciences will not tolerate sexual

misconduct including rape and other forms of sexual assault." Doc. No. 146-2 at 5. The

Handbook also defined the meaning of the term "rape" as used in the conduct rules. Doc. No.

146-3 at 5–6. All reasonable students would therefore understand that the contract prohibited

them from sexually assaulting their peers, and Sonoiki does not claim otherwise.

Next, all reasonable students would understand that Harvard would be the one to

determine: (1) whether a student violated the conduct rules; and (2) the consequences of any

violation. The contract documents plainly vest authority in the Faculty Council to determine

whether a student has earned a degree, i.e., satisfied the conditions precedent under the contract.

Doc. No. 146-5 at 3. The contract gives the Ad Board the authority to adjudicate disciplinary

cases as well as to impose discipline short of dismissal or expulsion. Doc. No. 146-4 at 10.

Finally, all reasonable students would conclude that Harvard reserved the right to order dismissal

or expulsion in serious disciplinary cases. While the contract makes clear that dismissal and

expulsion are not common, but rather are imposed only in the "rarest of circumstances," Doc.

No. 146-6 at 2, all reasonable students would understand that these rare circumstances could

include substantiated allegations of rape or sexual assault. Indeed, the very rule prohibiting rape

and sexual assault states: "A student who commits rape, sexual assault or other sexual

misconduct is subject to *severe* penalties under the rules of the Faculty of Arts and Sciences."

Doc. No. 146-3 at 5 (emphasis added).

To summarize, an objectively reasonable student reviewing the contract would fairly

expect that: (1) he would be subject to Harvard's conduct rules until the moment his degree was

conferred; (2) compliance with these rules is a condition precedent to earning a Harvard degree;

(3) these rules prohibited rape and sexual assault; (4) Harvard would determine whether he

violated the conduct rules; and (5) if Harvard determined he violated the conduct rules, then

Harvard would determine the appropriate consequence, which could include dismissal. Here, Harvard found that Sonoiki violated the rules prohibiting sexual assault on multiple occasions, and it determined that dismissal was the appropriate consequence. In short, Harvard did what the contract entitled it to do.

Sonoiki does not challenge the foregoing, nor does he argue that Harvard violated any of the foregoing terms of the contract. Instead, he contends that the contract precluded Harvard from withholding his degree because the Ad Board failed to issue a formal charge against him prior to May 30, 2013, and because the Ad Board allowed him to participate in commencement ceremonies. Put another way, Sonoiki contends that Harvard acted too late to withhold his degree and, therefore, lost jurisdiction to adjudicate the complaints against him. Sonoiki is incorrect.

At the outset, the undisputed facts establish that Harvard can revoke a previously issued degree based upon its determination that the graduate, while a student, violated Harvard's policies.[29] Doc. No. 162-1 ¶¶ 57–58. Here, no one disputes that Harvard determined: (1) that Sonoiki violated its policies; and (2) that dismissal was the appropriate consequence. Harvard acted in a circumstance where Sonoiki had completed all his academic coursework, as it does when it revokes graduates' degrees. Nothing before the Court demonstrates or suggests that Harvard applies a different standard for revocations as compared to dismissals. Even if Sonoiki were correct in stating that he was entitled to a degree on May 30, 2013—and he is not, for reasons the Court will explain—he has not established a *present* contractual right to the degree, because Harvard was free to proceed with a post-commencement revocation identical to the

---

[29] Sonoiki "disputes" these assertions but offers no evidence in support of his position. He merely notes, correctly, that his case did not involve the revocation of a previously issued degree. That response does not dispute Harvard's factual assertions regarding its authority to revoke a degree or that it has done so.

proceeding it conducted.[30] This reason alone entitles Harvard to summary judgment on Sonoiki's charge theory.

Sonoiki's charge theory also fails for a separate and independent reason. As determined on summary judgment, Sonoiki fails to establish that a factfinder could endorse his interpretation of the contract as one an objectively reasonable student would fairly reach. This conclusion arises in the context of the full factual record, which was not before the Circuit. The summary judgment record establishes the following material facts.

Ellison told Sonoiki that "a number" of students had made statements accusing him of sexual misconduct, and that the allegations were of "great concern" to the College. Doc. No. 145-3 at 91. Sonoiki then "pleaded" with Cindy to refrain from filing a complaint. Doc. No. 145-102 at 74. Johnson also told Sonoiki that the charges were "more serious" than he appreciated. Id. at 67. Cindy and Ann both filed formal complaints against Sonoiki just two days before Commencement Day. Doc. No. 162-1 ¶ 73. Cindy alleged Sonoiki had raped her just three weeks prior. Doc. No. 145-9 at 15. Ann alleged Sonoiki had raped her in September 2011 by having sex with her while she was passed out, something she first brought to the attention of Harvard administrators in June 2012, resulting ultimately in her complaint on May 28, 2013. Doc. No. 145-7 at 11–12.

Ellison and Johnson sent Sonoiki multiple emails on May 28 and 29, 2013, notifying him of the formal complaints and explaining that Harvard would delay the conferral of his degree pending the outcome of the disciplinary process. Doc. No. 145-8 at 2; Doc. No. 145-12 at 2;

---

[30] Sonoiki contends that the Ad Board lost jurisdiction over him on Commencement Day. He is wrong. The Faculty Council can recommend that previously awarded degrees be revoked. Doc. No. 162-1 ¶ 57. Nothing in the contract prevents the Faculty Council from referring such a matter to the Ad Board for investigation or a recommendation.

Doc. No. 145-3 at 85. Sonoiki replied to at least one of Ellison's emails before he attended commencement ceremonies. Doc. No. 162-1 ¶ 90. Sonoiki spoke to Johnson at commencement, and she informed him that his degree would not be in the envelope he received during the ceremony. Id. ¶ 83. The Ad Board had not issued any charges against Sonoiki at this time or even had a meaningful opportunity to initiate the first phase of its process after the filing of the complaints. Id. ¶ 156.

In this context, Sonoiki contends the contract entitled him to obtain his degree on May 30, 2013. The Court starts with the Circuit's ruling on this issue:

> Because the contractual language about when Harvard will withhold a degree was ambiguous on its face and because we need not resolve ambiguities in contract language at the motion to dismiss stage, we conclude Sonoiki plausibly alleged he reasonably expected his degree would issue at the graduation ceremony and therefore has plausibly alleged Harvard breached the contract between them when it withheld his degree before issuing any disciplinary charges.

Sonoiki, 37 F.4th at 706 (citation omitted). The Circuit found the terms "charge" and "case" to be ambiguous, id. at 705–06, thereby, at the Rule 12(b)(6) stage, rejecting Harvard's argument that the language of the Student Information Form saying "[a] student cannot receive a degree before a pending disciplinary case is resolved," defeated Sonoiki's charge theory. Id. at 706. The Circuit further declined to resolve the ambiguities it identified and concluded, given said ambiguities, that Sonoiki had plausibly alleged he reasonably expected to receive his degree on May 30, 2013. Id.

Now, Sonoiki must make a more demanding showing. He must present competent evidence permitting a jury to conclude that he was *entitled* under the contract to the degree on May 30, 2013. Moreover, he must make this showing on the fully developed factual record.[31]

---

[31] The factual record before the Circuit was comparatively sparse, based necessarily only on the allegations of the Complaint. Doc. No. 1. Those allegations did not contain information revealed during discovery, including: (1) the details of what Ellison told Sonoiki during their May 17,

Under Massachusetts law, "the interpretation of an unambiguous contract is a question of law for the court, as is the initial determination of whether an ambiguity exists." Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 261 (1st Cir. 2010) (citing Basis Tech. Corp. v. Amazon.com, Inc., 878 N.E.2d 952, 958–59 (Mass. App. Ct. 2008)). "Provisions are not ambiguous simply because the parties have developed different interpretations of them." Basis Tech. Corp., 878 N.E.2d at 959. Genuine ambiguity requires language susceptible of more than one meaning so that "reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998) (citing Jefferson Ins. Co. of N.Y. v. City of Holyoke, 503 N.E.2d 474, 476 (Mass. App. Ct. 1987)). "Even if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context." McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004) (applying Massachusetts law). "'[T]he question whether a provision can reasonably support a proffered interpretation is a legal one, to be decided by the court.'" Pac. Indem. Co. v. Deming, 828 F.3d 19, 23 (1st Cir. 2016) (quoting Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 556 (1st Cir. 1995)).

Sonoiki's interpretation, which requires Harvard to give him a degree because no charge had issued as of May 30, 2013, is not a reasonable interpretation of the contract "in context."

---

2013, meeting; (2) the fact or substance of Ellison's follow-up letter to Sonoiki; (3) Sonoiki's concession that Johnson advised him the informal complaints were serious and involved more than merely hugging others too long, Doc. No. 145-102 at 67; (4) the fact or substance of the emails Ellison and Johnson wrote to Sonoiki two days before Commencement Day telling Sonoiki of the charges and that he would not receive his degree on May 30, 2013, Doc. No. 162-1 ¶¶ 74–92; (5) the fact that Sonoiki, prior to graduation, responded to Ellison's email requesting an "immediate" meeting; (6) the fact that Johnson told Sonoiki the day of commencement that he would not be receiving his degree, id. ¶ 83; (7) the specific details of the allegations made on May 28, 2013, by Ann and Cindy; (8) the fact that Harvard can revoke degrees from graduates based on misconduct committed while they were students, id. ¶ 57; and (9) the course of conduct by the parties under the contract, as described later in this section of the text.

McAdams, 391 F.3d at 299. Several principles of contract interpretation support this conclusion. First, Sonoiki has not, and cannot, point to any express language in the contract entitling him to the degree. Rather, he infers the right primarily from his good-standing status throughout May 2013, the absence of a formal "charge" against him as of Commencement Day, and one sentence from the contract stating that Harvard will not award a degree while a "charge is pending." Doc. No. 146-4 at 8.

Second, the other terms of the contract run counter to Sonoiki's interpretation. Minturn v. Monrad, 64 F.4th 9, 15–16 (1st Cir. 2023) (holding contract language must be considered "as a whole" and not "in a vacuum"). The structure of the contract provides that a student earns a degree at the end of the contract term, after fulfilling the conditions precedent required by the contract. See Doc. No. 146-4 at 8. In the case of peer disputes, the contract provides an extra measure of process by providing for an initial, more limited investigation prior to a charge. Doc. No. 146-7 at 3. Moreover, the contract provides no statute of limitations on disciplinary charges or any other similar timing rules that might apply here. See Doc. No. 146-4 at 4–14 (outlining general regulations regarding the Ad Board). Deferring award of the degree, as Harvard did, pending the outcome of the disciplinary process comports comfortably with these other contract terms. In contrast, Sonoiki's interpretation is at odds with both the obligations and rights of the parties under the contract as well as the format of the disciplinary process. The contract required him to comply with the conduct rules throughout his time at Harvard as a condition precedent to receiving the degree. It also empowered Harvard to determine whether Sonoiki did so and, if not, the consequence to impose. Sonoiki's construction of the contract either removes a condition precedent to the conferral of a degree (i.e., Harvard certifying compliance with the conduct rules

up to commencement) or requires omitting the very process Harvard established for peer

disputes (i.e., the two-phase approach that begins with a limited initial investigation).

   Third, evaluating the expectations of a student in the particular factual context presented

on May 30, 2013, further undermines Sonoiki's construction. See Stonehill, 55 F.4th at 316–17

(considering whether expectations of a student are "reasonable"); see also McAdams, 391 F.3d at

299. The context substantially magnifies the contract considerations noted above. Cindy alleged

Sonoiki committed a very serious offense. Doc. No. 145-9 at 4, 14–15. She filed the allegation

two days before Commencement Day. Id. Her allegation arose from conduct that occurred just

three weeks earlier, and aspects (though not the core allegation) were buttressed by almost

contemporaneous medical records and conversations with a Harvard official. Id. at 4, 42. Over

the period from May 17 to May 30, 2013, Sonoiki received prompt notice: of the possibility of

allegations; that Harvard had great "concerns"; that the conduct was "more serious" than he

seemed to believe; that complaints had been filed; that Harvard was delaying the conferral of his

degree; that the Dean needed to see him "immediately"; and that his degree would not be in the

envelope when he participated in the commencement ceremony on May 30. In the relevant

context of the present dispute, both Sonoiki and Harvard faced two serious allegations of

misconduct filed on the eve of Sonoiki's Commencement Day, one of which was also facially

corroborated in part by external documents arising from very recent events.

   No reasonable student confronted with this set of circumstances would read the one

sentence Sonoiki highlights (or the entire contract) in the manner he urges.[32] Sonoiki's reading

---

[32] Though Harvard's inconsistent usage of "case" and "charge" renders the contract facially
ambiguous, Sonoiki, 37 F.4th at 706, in context on the full factual record, no reasonable student
would read the contract as entitling Sonoiki to a degree on May 30, 2013, based upon this facial
ambiguity for all the reasons set forth in the text.

would have required Harvard to either: (1) give him a degree on May 30, 2013, despite an unadjudicated allegation of serious misconduct; or (2) skip the entire preliminary investigation and charge him sua sponte.[33] In context and on this record, Sonoiki's interpretation is unreasonable. Cf. Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001) (noting the importance of reading a contract in a manner that "carries out what one might imagine to be a plausible objective" of the parties). The first path would defeat two important substantive purposes of the contract: to ensure that students comply with conduct rules throughout their entire time at Harvard, and to ensure that Harvard degrees accurately certify that fact. The second path harms respondent students who ordinarily benefit from the slower, more careful process resulting from both a preliminary and final investigation. Indeed, not all complaints filed by students result in charges. Doc. No. 146-7 at 2. An objectively reasonable student would not fairly understand the contract as requiring either result that follows from Sonoiki's interpretation.

Finally, the parties' course of conduct undisputedly supports Harvard's interpretation of the contract. Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 910 n.21 (Mass. 2008) (concluding that the parties' conduct is relevant when interpreting an ambiguous contract). Under Massachusetts law, extrinsic evidence may be used as an interpretive guide when contract language is facially ambiguous. Id. at 908. Here, the course of conduct between the parties admits of only one viewpoint: that the Ad Board was qualified to investigate the charges against Sonoiki and withhold the conferral of his degree pending the outcome of its investigation. At no point in nineteen months of disciplinary proceedings did Sonoiki ever argue that the contract entitled him to conferral of his degree on May 30, 2013, or that the Ad Board lacked jurisdiction

---

[33] The contract gives the Ad Board authority to independently initiate a charge against a student. Doc. No. 146-4 at 7.

over him.[34] He authored numerous statements to the Ad Board and the Faculty Council during this period. He had opportunities to evaluate and state the contractual rights he now asserts.

During this time, Sonoiki was not a student arguably isolated in, and dependent upon, Harvard; rather, he was living in New York City working for Goldman Sachs. Doc. No. 162-1 ¶¶ 234–37. His conduct over this period speaks to the view he held then: that Harvard could defer conferral of his degree pending the adjudication of the disciplinary complaints made against him. The absence of any assertion (or behavior) supporting his present interpretation serves as evidence supporting Harvard's construction of the contract. The fact that Harvard proceeded to delay Sonoiki's degree conferral signals its identical view—as does the fact that this is a standard operating practice for Harvard. Harvard's Dean of Student Services, Michael Burke, testified as follows:

> Q: Under what circumstances may names be removed [from the list of students the faculty considers for awarding degrees]?
>
> A: Circumstances such as pending disciplinary cases, failure to pay term bill, failure to meet degree requirements.

Doc. No. 164-11 at 21.

In short, while a disciplinary case is pending, Harvard delays the conferral of the respondent student's degree.[35] Sonoiki points to no extrinsic evidence giving rise to an inference supporting his interpretation of the contract as requiring Harvard to issue his degree on May 30,

---

[34] Proceedings stretched from the filing of the first disciplinary complaints on May 28, 2013, until the day the Faculty Council voted to dismiss Sonoiki from Harvard College on December 10, 2014. Doc. No. 162-1 ¶¶ 73, 220.

[35] In interpreting the meaning of the word "case" as used *by Burke*, the Court looks to Burke's testimony. Burke stated that all disciplinary "case[s]" begin with "an allegation" of wrongdoing, and an initial review when a peer makes the allegation. Doc. No. 164-11 at 7. This is unambiguous testimony establishing that Burke used the term "case" to encompass the disciplinary process beginning with the filing of a complaint by a peer. It also establishes Harvard's view, because he was the Rule 30(b)(6) deponent. Id. at 2. These conclusions are separate and independent of whether the contract's use of the term "case" is facially ambiguous.

2013. Accordingly, for all these reasons, the Court concludes that Sonoiki failed to establish that he was entitled to a degree under the contract on May 30, 2013.

Two more points bear comment here. Subjectively, Sonoiki expected to receive his degree on May 30, 2013, until Johnson informed him that his degree would not be in the envelope he received during the ceremony. Sonoiki's ongoing expectation to receive his degree was not grounded in a reasonable student's fair interpretation of the contract. The charges against him were serious. While the contract documents stated that dismissals from Harvard College were a rare event, Doc. No. 146-6 at 2, that rape or sexual assault could constitute such an event is plain, especially when Harvard's rules warned that rape or sexual assault could lead to "severe penalties," Doc. No. 146-3 at 5. Sonoiki may have personally believed that Harvard would not actually impose the ultimate punishment, even if he was found responsible for the charged conduct. But that personal belief neither entitles Sonoiki to a trial nor authorizes a jury to find in his favor. The material issue before the Court is whether an objectively reasonable student would fairly read the contract as entitling Sonoiki to a Harvard degree in the factual context of May 30, 2013. No reasonable student would reach such a conclusion.

Moreover, though the constitutional presumption of innocence does not apply here,[36] the principles underlying the presumption support Harvard's approach. Harvard permitted Sonoiki to participate in commencement ceremonies while proceeding thereafter with the ordinary preliminary investigation outlined in the contract. This more limited initial inquiry offered the possibility of termination of the complaint without the issuance of a charge or the initiation of a

---

[36] Of course, Sonoiki did not receive the benefit of the panoply of rights accorded by the Constitution to defendants in criminal cases, including the right to confront the witnesses against him, the right to cross-examine the witnesses, the right to the assistance of counsel, the right to a public trial, or the right to a determination by a jury applying the reasonable-doubt standard of proof.

full investigation. The preliminary investigation minimizes the burden on respondent students and maintains greater confidentiality in the context of peer disputes, unless or until the Ad Board determines that the allegations warrant a full investigation. In contrast, Sonoiki's interpretation risks incentivizing Harvard to forego the initial investigation, a course that generally would be to the detriment of respondent students like Sonoiki.

V.    CONCLUSION

For the foregoing reasons, Harvard's Motion for Summary Judgment, Doc. No. 143, is ALLOWED. Considering the Court's ruling on this Motion, it need not resolve the parties' dispute over the admissibility of damage experts. Thus, the Motions to Limit Testimony, Doc. Nos. 123 and 157, are DENIED AS MOOT in light of the ruling on the Motion for Summary Judgment. Judgment shall enter separately, with each side bearing their own fees and costs.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge