UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>John Doe</u>

     v.                          Civil No. 22-cv-018-LM
                                   Opinion No. 2024 DNH 032 P

<u>Trustees of Dartmouth College</u>

**O R D E R**

John Doe brings this action against the Trustees of Dartmouth College ("Dartmouth") alleging that Dartmouth violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., and committed breach of contract in expelling him from Dartmouth's Geisel School of Medicine after finding Doe responsible for sexually assaulting his roommate and fellow medical student, Sam Smith.[1] Presently before the court are the parties' cross-motions for summary judgment. Doc. nos. 59 & 61. Dartmouth moves for summary judgment on all of Doe's remaining claims. Doc. no. 61. Doe moves for partial summary judgment on two of his claims. Doc. no. 59. For the following reasons, the court grants Dartmouth's motion in part and denies it in part, and denies Doe's motion.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a

---

[1] The court refers to Doe and Smith using pseudonyms.

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the" nonmovant. Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 47 (1st Cir. 2019) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A fact is material if it has the "potential to influence the outcome of the suit under the applicable law." Id. at 46 (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). All facts and reasonable inferences are viewed in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). This same standard applies when, as here, the parties file cross-motions for summary judgment. Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## BACKGROUND[2]

The court will first provide a summary of the disputed sexual encounter and certain relevant events that transpired in its aftermath. Then, the court will provide an overview of Dartmouth's internal policies that are relevant to this case before discussing Dartmouth's investigation and its findings. Finally, the court will summarize the procedural history of this litigation.

I.   The Encounter and Its Aftermath

John Doe was a student at Geisel in the summer of 2020. Doe shared an apartment with Sam Smith, a friend and fellow Geisel student. On the evening of July 11, 2020, Doe and Smith ate dinner, drank beer and cocktails, played video

---

[2] The following facts are drawn from the record and are not in genuine dispute, except where indicated.

games, and watched a movie before falling asleep on the couch. At some point

thereafter, Doe performed oral sex on Smith, but both men claimed they did not

consent.

According to Smith, he and Doe each drank about five alcoholic beverages

and were "buzzed" but not drunk. Smith said that, while he was asleep on the

couch, he "felt a sensation like somebody was caressing me around my penis." Doc.

no. 60-4 at 9. He said that the sensation felt similar to someone "jerking [me] off."

Id. at 10. Smith claimed that he opened his eyes and saw that his jeans had been

unbuttoned, his underwear had been pulled down, his penis was exposed and erect,

and Doe was kneeling on the floor in front of him. He said that, when he first

opened his eyes, Doe was not touching him. However, Smith said that, once he

stopped shifting around on the couch, he saw Doe "reach down and grab my penis

and put it in his mouth." Id. at 9. Smith claimed that Doe then performed oral sex

on him for "maybe 10 seconds" before Smith "realized what was going on" and left

the room. Id. at 11.

According to Doe, he and Smith each drank about twelve alcoholic beverages

that night and were "incredibly drunk." Id. at 15-16. Doe said he remembered

watching a movie and falling asleep on the couch, but that his memory became

fragmented after that point. He said that he was lying on the couch with his head

next to Smith's right leg and he was "stirred" from sleep when Smith "ran his hands

through my hair." Id. at 16. Doe said he then looked up to see that Smith's "pants

had been undone and he had an erection." Id. Doe said he remembered performing

oral sex on Smith but could not recall the details of how it began, though he did remember pausing at some point during the act to look up at Smith. Doe claimed that he performed oral sex on Smith for a time before he grew tired and went back to sleep on the couch.

Doe and Smith agreed, however, that almost immediately after the disputed sexual encounter, Smith confronted Doe about what had happened. They also agreed that Doe apologized to Smith multiple times in the encounter's immediate aftermath, both in person and via text message. Doe asked Smith if there was "any coming back from this" and said he was "so sorry for hurting you" and "destroying our friendship." Id. at 40. Doe also offered to move out or cancel their lease, and even to go to the police. In response to Doe's offer to go to the police, Smith declined; while Smith told Doe that "[w]hat you did was rape," Smith said he did not have the emotional, financial, or time capacity to become involved with a criminal prosecution.[3] Id. at 41.

Doe also messaged several of his and Smith's mutual friends, telling them he and Smith had a "huge falling out" that was "my fault," and that they should leave him off their group chats with Smith. Id. In addition, Doe sent a text message to Smith's girlfriend to apologize for his "inexcusable" behavior, about which he was "mortified and ashamed." Id.

---

[3] There is no evidence that Doe replied to Smith's text message characterizing Doe's actions as rape. See doc. no. 61-4 at 4.

Shortly after the incident, Doe took a leave of absence from Geisel and returned home to California. He indicated to Geisel's registrar that he intended to take twelve months off, if not longer. In December 2020, Doe requested an additional year of leave, which would put him on track to begin Year 4 of Geisel's curriculum in April 2022 and to graduate in 2023.

In March 2021, Smith began corresponding with Dartmouth's Title IX Coordinator, Kristi Clemens, concerning the incident that had occurred between him and Doe. Smith expressed concern about Doe returning to Geisel and having to be in classes with him. Clemens informed Smith that Doe was tentatively set to resume coursework in April 2022, contingent on a readmission process. After learning this information, Smith filed a formal Title IX complaint against Doe, alleging that Doe "performed unconsented oral sex on me . . . while I was asleep."[4] Doc. no. 59-16. A month-and-a-half after receiving notice of Smith's complaint, Doe filed his own Title IX complaint against Smith, alleging that Smith "took advantage of my incapacitated state while I was intoxicated with alcohol and initiated the events that led me to perform oral sexual intercourse without my consent." Doc. no. 59-18.

---

[4] During Dartmouth's subsequent investigation, several witnesses said that Smith indicated to them that he decided to file a complaint against Doe at least in part because he did not want to be on campus with Doe at the same time. See doc. no. 60-4 at 28, 30, 32.

II.    Dartmouth's Policies

At the time of the disputed sexual encounter, Dartmouth had three relevant written policies, as detailed below.[5] The first two apply to allegations of sexual assault by students. The third outlines the school's records disclosure policy, which is relevant to Clemens's disclosure to Smith of Doe's anticipated date of return to Geisel.

A.    Sexual and Gender-Based Misconduct Policy ("Misconduct Policy")

The Misconduct Policy (doc. no. 59-9) outlines seven types of prohibited conduct, one of which is "sexual assault." Doc. no. 59-9 at 6-9. Sexual assault is defined as "having or attempting to have sexual contact with another individual without consent." Id. at 7. The Misconduct Policy further defines both "sexual contact" and "consent."

"Sexual contact" is defined as:

> 1. sexual intercourse (anal, oral, or vaginal), including penetration with a body part (e.g., penis, finger, hand, or tongue) or an object, or requiring another to penetrate themselves with a body part or an object, however slight; or
>
> 2. sexual touching, including, but not limited to, intentional contact with the breasts, buttocks, groin, genitals, or other intimate part of an individual's body.

Id. at 7-8. "Consent" is defined in pertinent part as follows:

---

[5] Some of these policies were amended between the time of the incident and the time Doe and Smith filed their complaints. Dartmouth elected to apply the versions of the policies in effect at the time of the incident in conducting its investigation. See doc. no. 59-5 at 27-28. The following summary pertains to the policies actually applied by Dartmouth in this case.

> Consent is an affirmative and willing agreement to engage in specific forms of sexual contact with another person. Consent requires an outward demonstration, through mutually understandable words or actions, indicating that an individual has freely chosen to engage in sexual contact. Consent cannot be obtained through: (1) the use of coercion or force; or (2) by taking advantage of the incapacitation of another individual. Silence, passivity, or the absence of resistance does not imply consent.

Id. at 9-10.

The Misconduct Policy also defines incapacitation in pertinent part as

follows:

> An individual who is incapacitated lacks the ability to make informed judgments and cannot consent to sexual contact. Incapacitation is the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring. . . .

> Where alcohol or other drugs are involved, incapacitation is a state beyond impairment or intoxication . . . [and] requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness. The assessment is based on objectively and reasonably apparent indications of incapacitation when viewed from the perspective of a sober, reasonable person.

Id. at 10-11.


B.   Process for Resolving Reports ("Process Policy")

The Process Policy (doc. no. 59-10) outlines Dartmouth's process for resolving

sexual misconduct reports against students. The school has both an "informal"

resolution process and a "formal" one. Here, both Smith's and Doe's complaints were resolved through the formal process.

**Notice of Investigation.** Under the formal process, the Title IX coordinator must inform the complainant and respondent in writing of various information, including "the date, time (if known), location, and nature of the reported conduct" and "the reported policy violation(s)." Doc. no. 59-10 at 10. "If the investigation reveals the existence of additional or different potential policy violations, including a violation of an interim protective measure, the Title IX Office will issue a supplemental notice of investigation." Id. at 11.

**Investigation & Report.** The formal process begins with an investigation. Dartmouth will appoint "one or more trained investigators to conduct a prompt, thorough, fair, and impartial investigation." Id. at 10. The investigator may or may not be a Dartmouth employee; the Title IX Office has the discretion to appoint internal as well as external investigators. The investigator is responsible for interviewing the complainant, the respondent, and relevant witnesses.[6] The investigator may also gather "other relevant information or evidence," such as "documents, photographs, communications between the parties, . . . and other electronic records as appropriate." Id. at 11. The parties may identify other

---

[6] Both the complainant and the respondent are entitled to the assistance of an "advisor" during these interviews and at all stages of the proceedings. The advisor may be an attorney. While an advisor cannot speak on behalf of the complainant or respondent, the advisor can ask to "suspend any meetings, interviews, or hearings briefly to provide consultation." Doc. no. 59-10 at 8.

witnesses whom the investigator may wish to speak with, as well as any other evidence.

At the conclusion of the investigation, the investigator prepares an "initial investigation report" which is a "fair and thorough summary of all relevant information gathered that supports (or detracts from) the accounts of the Complainant, the Respondent or other witnesses." Id. at 15. The report "may include direct observations and reasonable inferences drawn from the facts and discussion of any consistencies or inconsistencies between the various sources of information." Id. Generally speaking, the investigator has the discretion to determine what evidence is relevant and therefore should be included in the report, and what is irrelevant and should therefore need not be included.[7] The initial investigation report is then shared with the complainant and respondent, who are permitted to "offer additional comment or feedback on the facts as gathered, clarify information previously shared, suggest additional witnesses, suggest additional lines of questioning or inquiry, or identify any other relevant information or evidence to assure the thoroughness, sufficiency, and reliability of the investigation." Id.

After reviewing and incorporating the parties' feedback, the investigator prepares a "final investigation report." Id. The final report includes "findings of fact

---

[7] The Process Policy does state, however, that "[i]nformation that does not directly relate to the facts at issue, but instead reflects upon the reputation, personality, qualities, or habits of an individual is character evidence and is not relevant to the determination of whether there is a [Misconduct] Policy violation." Doc. no. 59-10 at 12.

and credibility assessments based on the investigator's skill and experience, and the investigator's interactions with the Complainant, Respondent, and witnesses, as well as the evidence provided." Id. It will also include the investigator's finding, supported by a "detailed rationale," "as to whether there is sufficient information, by a preponderance of the evidence, to support responsibility for a violation of the [Misconduct] Policy." Id. The report must make a finding "as to each element of each [Misconduct] Policy violation at issue." Id.

**Hearing Panel.** Next, a "Hearing Panel" reviews the finding of responsibility in the final investigation report. "The Hearing Panel will review the investigative finding to determine whether (1) there was a material procedural error that substantially impacted the outcome, or (2) the preponderance of the evidence standard was not appropriately applied by the investigator." Id. at 16. "In evaluating whether the preponderance of the evidence standard was appropriately applied, the Hearing Panel will not conduct a de novo investigation of the facts but will determine whether there is confidence that there is sufficient evidence to support the finding of responsibility as to each element of each [Misconduct] Policy violation at issue." Id. at 17. "Based on this review, the Hearing Panel may accept or reject the investigator's finding in whole or in part, including a determination that the evidence was sufficient to support a different finding; may request that further investigation be undertaken by the same or another investigator; may request that a completely new investigation be conducted; and/or may remand the matter to the Title IX Coordinator with instructions for further action." Id. at 19.

Prior to the hearing, the complainant and the respondent may submit written statements to the panel. The hearing itself "is an opportunity for the parties to address the Hearing Panel." Id. at 18. "The parties may address any information in the final investigative report, supplemental statements submitted in response to the final investigative report or provide verbal impact and mitigation statements." Id. Although the Hearing Panel "has the discretion to determine the format for the hearing and its deliberations," it "may not conduct its own investigation" or hear new evidence. Id. Furthermore, while both parties are permitted to address the panel, their participation is not mandatory, "and the Hearing Panel may not draw a negative or adverse inference from a party's decision not to participate." Id. The parties also have the right to "pose questions to the investigator" at the hearing, and, while the parties "shall not directly question one another, . . . they may proffer questions for the Hearing Panel, which may choose, in its discretion, to pose appropriate and relevant questions regarding the limited issues under review in the hearing." Id. at 18-19.

Once the Hearing Panel completes its review, it deliberates and renders a determination. If the panel upholds the investigator's finding of responsibility for a violation of the Misconduct Policy, it will then determine the appropriate sanction.

**Appellate Review.** Once the panel has rendered its determination as to responsibility and, if necessary, an appropriate sanction, either party may appeal the panel's decision to a "designated Appellate Authority." Id. at 22-23. For cases involving graduate students, the designated Appellate Authority is the dean of the

relevant graduate school. "The Appellate Authority's responsibility will be strictly limited to determining if there was substantial procedural error that materially affected the outcome and/or new evidence not reasonably available at the time of the hearing." <u>Id.</u> at 23.

      C.    <u>Student Education Records Policy ("Records Policy")</u>

The Records Policy deals with the disclosure of student information. Its stated purpose is to define "the guidelines related to use and release of Geisel student education records, in accordance with the requirements of the U.S. Family Educational Rights and Privacy Act (FERPA)." Doc. no. 59-12 at 1. It prohibits the disclosure of "personally identifiable information from a student's education records" without the student' consent. <u>Id.</u> at 3. Exempted from this prohibition on disclosure is "directory information," which may be released without the student's consent. The Records Policy does not define "directory information," but does give several examples of directory information, including a student's name, their age and date of birth, their major, and, as relevant to this case, their "[d]ates of attendance" and "[e]nrollment status." <u>Id.</u>

III.    <u>Dartmouth's Investigation</u>

As noted, Smith and Doe ultimately filed cross-complaints against each other pursuant to the Process Policy, with each student alleging that the other had sexually assaulted him. Clemens issued Smith and Doe a separate "Notice of Investigation," notifying each of them of the other's allegation. The Notice of Investigation sent to Doe alleged that "on July 12, 2020[,] you sexually assaulted

[Smith] by having oral sexual intercourse with him while he was asleep." Doc. no. 59-17. The Notice of Investigation pertaining to Doe's complaint against Smith alleged that Smith "initiated oral sex" while Doe was "incapacitated by alcohol and unable to consent." Doc. no. 60-1.

Dartmouth appointed an external investigator, attorney Michael Stackow, to conduct the investigation. Stackow interviewed Smith twice and Doe three times. He also interviewed nine other persons. All of the interviews were recorded, and a transcript was created for each interview. Stackow also gathered and reviewed documentary evidence, including text messages, emails, and a document Smith prepared immediately after the disputed sexual encounter detailing his recollections.

In his interview with Stackow, Smith conceded that he could not be sure whether Doe began performing oral sex while he was still asleep, or whether Doe only started performing oral sex after Smith had woken up. Smith believed, however, that Doe had begun performing oral sex while Smith was still asleep because he felt a "caressing" sensation around his penis similar to someone "jerking [him] off" while sleeping[8] and because, when Smith awoke, Doe was on his knees

_____

[8] At the evidentiary hearing on Doe's motion for a preliminary injunction in this case, Stackow testified that he inferred that the "caressing" sensation Smith described was the result of oral sexual intercourse. See doc. no. 36 at 42 (transcript of evidentiary hearing); see also id. at 69 ("The reasonable inference that I took is that when . . . Mr. Doe[ ] is between Sam Smith's legs with Sam Smith's pants and underwear pulled partially down, his penis exposed, his penis erect and your client touching his penis and then putting his penis—his mouth on Mr. Smith's penis is that the caressing that had happened moments before . . . maybe seconds before, was that same activity.").

between Smith's legs, Smith's penis was exposed and erect, and Doe looked up at Smith as if to check that he was still asleep immediately before Smith saw Doe put his penis in his mouth. Doc. no. 60-4 at 10 (final report). In addition, Smith told Stackow that Doe's hand was "going up and down on my penis" at the same time Doe was performing oral sex. Id. at 11.

After Stackow completed his investigation, he prepared an initial investigation report and provided it to the parties. Doe submitted a written response to the initial investigation report, in which he asserted that the evidence did not support that he sexually assaulted Smith in the manner alleged in the Notice of Investigation. Because Smith told Stackow that he felt only "caressing" while he was asleep and did not actually witness Doe perform oral sex until after he woke up, Doe argued he could not be found responsible for sexually assaulting Smith in the manner alleged in the Notice (i.e., performing oral sex on Smith while Smith was asleep).

Stackow subsequently issued his final investigation report. Stackow noted in his report that the resolution of the parties' cross-complaints "rest[ed] upon the relative credibility of the parties' accounts." Doc. no. 60-4 at 43. He found that Smith's account was generally credible. Stackow explained that Smith was able to recall specific details about the encounter, such as that Doe grabbed Smith's penis with his left hand and was able to specifically describe the manner in which Doe performed oral sex (i.e., Doe stroked Smith's penis with his left hand while at the same time moving his head up and down on Smith's penis). He further noted that

14

Smith prepared a written document shortly after the encounter recounting what happened, and that Smith was able to elaborate on and discuss the information in that document throughout his interviews with Stackow almost a year later. Stackow also found through his interviews of several persons with whom Smith spoke regarding the incident that Smith's account of the event had been consistent throughout his retellings, and that all of Smith's recountings were consistent with the written document he prepared immediately after the incident. Finally, Stackow noted that Smith's account was corroborated by other evidence, including text messages and call logs showing his repeated attempts to contact friends and family immediately after the incident, and the fact that the persons with whom Smith spoke all described him as being in distress.

By contrast, Stackow did not find Doe's account consistent with other credible evidence. For example, although Doe claimed that Smith was generally calm immediately after the incident, this was inconsistent with evidence showing that Smith was in distress. In addition, Stackow noted that Doe had made inconsistent statements to other individuals about the events of that night. Two persons whom Stackow interviewed told him that Doe had recounted the night's events in a manner that led them to believe the interaction had been consensual. This was inconsistent with Doe's statements to Stackow that Smith had initiated oral sex without Doe's consent. Stackow further explained that Doe's claim that he was incapacitated was not consistent with Doe's claim that he remembered stopping the sexual encounter once he grew tired. Finally, Stackow found that Doe's inability to

15

explain how Smith running his fingers through Doe's hair led to Doe performing oral sex negatively impacted his credibility, as well as his inability to elaborate on what took place between the time he saw Smith's exposed and erect penis and when the oral sexual intercourse began.

In the analysis portion of the final report, Stackow explained that, in evaluating each complaint, he "considered whether the following two elements were established, by a preponderance of the evidence: (1) that either or both [Smith] and [Doe] had or attempted to have sexual contact with the other; and (2) that the sexual contact occurred in the absence of the other's consent." Doc. no. 60-4 at 50. Highlighting that the Misconduct Policy defined sexual contact as including oral sexual intercourse, Stackow noted that "both parties agree that they engaged in oral sexual intercourse, specifically that [Smith's] penis penetrated [Doe's] mouth." Id. "Accordingly," Stackow explained, he found "by a preponderance of the evidence that the parties engaged in sexual contact." Id.

Turning to consent, Stackow found that Smith "was asleep when the sexual contact began." Id. at 51. Because the Misconduct Policy states that incapacitated individuals cannot consent, and that persons who are asleep are incapacitated, Stackow found that Smith "was incapacitated and unable to consent to the sexual contact." Id. Stackow did not credit Doe's assertion that Smith ran his hand through Doe's hair before the sexual contact began, but noted that, even if this had occurred, it would not show that Smith consented to the sexual contact because it "would not

have amounted to an 'outward demonstration' indicating that [Smith] had freely chosen to engage in the sexual contact." Id.

With respect to Smith's complaint against Doe, Stackow's ultimate conclusion was that there was "sufficient evidence to support a finding, by a preponderance of the evidence, that [Doe] engaged in sexual contact with [Smith] at a time when [Smith] was unable to consent because he was incapacitated due to being asleep." Id. (emphasis omitted).

As to Doe's complaint against Smith, Stackow largely credited Smith's version of the sexual encounter over Doe's. As such, he found that Doe "demonstrated through his physical actions that he freely chose to engage in sexual contact" by voluntarily "grabbing [Smith]'s penis and placing it in his mouth." Id. Although Doe contended that his consent was the product of incapacitation by alcohol consumption, Stackow noted that the Misconduct Policy required an objective analysis of whether an individual was incapacitated. Stackow explained that Doe's volitional actions of positioning his body between Smith's knees, moving his hand up and down Smith's penis, looking up at Smith, and then placing his mouth on Smith's penis, were inconsistent with him being incapacitated. Accordingly, Stackow concluded that there was insufficient evidence to support a finding "that the sexual contact occurred at a time when [Doe] was unable to consent due to incapacitation." Id. at 52.

Doe submitted a written response to the final report. His primary objection to the final report was that the final report found him responsible for an that he was

not provided notice of. Specifically, although the Notice of Investigation issued to Doe alleged that he performed oral sex on Smith while he was asleep, Doe contended that the final report only found him responsible for having "sexual contact" with Smith while he was asleep. Moreover, Doe argued that the evidence could not support a finding by a preponderance of the evidence that he performed oral sex on Smith while he was asleep because Smith described the sensation he felt while asleep as "caressing," not as oral sex.

The Hearing Panel convened on September 29, 2021, to review the final report. After Smith and Doe gave opening statements, the panel asked Stackow questions regarding his investigation and findings. One of the panel members asked Stackow to explain "the language in the conclusion of the report being different from the language in the Notice of Investigation." Doc. no. 62-6 at 13. Stackow explained that the final report applied the definition of sexual assault in the Misconduct Policy, a definition which has two elements: (1) sexual contact and (2) lack of consent. Noting that sexual contact is defined to include oral sexual intercourse, Stackow explained that the Notice of Investigation specified that the alleged sexual contact in this case was oral sexual intercourse, and that this alleged sexual contact was done without Smith's consent because he was asleep. "To be clear," Stackow said, "I've found that that happened. In other words, that [Doe] had initiated and engaged in oral sexual intercourse with [Smith] while [Smith] was asleep and unable to consent." Id.

Doe asked Katharine Maguire,[9] chair of the Hearing Panel, to question Stackow regarding where in the final report he found that Doe performed oral sex on Smith while he was asleep. He also asked the panel to question Stackow regarding whether Smith ever stated in his interviews that oral sex took place while he was asleep. The panel did not ask Stackow these precise questions, however. Maguire instead asked Stackow to identify where in the final report he found that oral sex occurred at all. She also asked him to discuss the evidence that led him to conclude that Smith was asleep when the oral sex began, but did not specifically ask him whether Smith ever affirmatively stated that the oral sex began when he was asleep.

The Hearing Panel issued written notice of its decision on October 6, 2021. The panel upheld Stackow's findings and determined that Doe would be sanctioned in the form of expulsion from Geisel. The panel stated that it considered Doe's claim that the final report found him responsible for an act that was not alleged in the Notice of Investigation, but ultimately determined that Doe had adequate notice of the allegation against him and that the findings in the final report sufficiently conformed to the Notice. Doe then appealed the Hearing Panel's decision to Geisel's dean, primarily reiterating the notice argument he made to the panel. The dean considered Doe's arguments but found them unpersuasive.

_____

[9] At the time of the hearing, Maguire's last name was Strong. Doc. no. 59-4 at 6.

IV.    <u>Procedural History of This Litigation</u>

Doe instituted this action on January 20, 2022, alleging one count of sex discrimination under Title IX (Count I) and four counts of breach of contract under New Hampshire law (Counts II through V). He filed a motion for a preliminary injunction contemporaneously with the filing of his complaint. The court held an evidentiary hearing on Doe's motion for a preliminary injunction via video on March 29, 2022, at which Stackow was the only witness. The court thereafter denied Doe's motion because Doe failed to show that he was likely to suffer irreparable harm in the absence of preliminary injunctive relief. <u>See</u> <u>Doe v. Trs. of Dartmouth Coll.</u>, 597 F. Supp. 3d 511, 515 (D.N.H. 2022).

Dartmouth moved to dismiss the complaint. The court granted the motion in part and denied it in part. <u>See</u> <u>Doe v. Trs. of Darmouth Coll.</u>, 615 F. Supp. 3d 47 (D.N.H. 2022). The court granted the motion with respect to Doe's Title IX claim insofar as that claim was premised on a theory of "selective enforcement," but denied the motion to the extent the claim was based on an "erroneous outcome" theory. The court also granted the motion as to one of Doe's breach of contract claims (Count III). The court otherwise denied the motion.

After the court's order on the motion to dismiss, the following claims remain:

- Count I: sex discrimination in violation of Title IX pursuant to an erroneous outcome theory;

- Count II: breach of contract by failing to give Doe adequate notice of the allegations against him;

- Count IV: breach of contract by applying the preponderance of the evidence standard differently to Doe because he is male; and

20

- Count V: breach of contract by revealing Doe's intended date of return to Smith.

Doe seeks both damages and injunctive relief.

## DISCUSSION

The parties have filed cross-motions for summary judgment. Dartmouth seeks summary judgment on all of Doe's remaining claims. Doe seeks summary judgment on Counts II and V. The court will first consider Dartmouth's motion, then turn to Doe's.

I.   Dartmouth's Motion for Summary Judgment

A.   Title IX Claim (Count I)

Under Title IX, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision is enforceable 'through an implied private right of action.'" Doe v. Trs. of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) [hereinafter B.C. I] (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281 (1998)); see also Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979). There is no dispute in this case that Dartmouth receives federal financial assistance and is therefore subject to Title IX.

When a plaintiff brings a Title IX erroneous outcome claim, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." Doe v. Brown Univ., 166 F. Supp. 3d 177, 185 (D.R.I. 2016) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)). To prevail on an erroneous outcome claim, a plaintiff must (1) "cast[ ] some articulable doubt on the accuracy of the outcome of

the disciplinary proceeding" and (2) show a causal connection between gender bias and the outcome of the proceeding. B.C. I, 892 F.3d at 90 (quoting Yusuf, 35 F.3d at 715). "The standard of causation under Title IX is an unresolved question in this circuit . . . ." Ing v. Tufts Univ., 81 F.4th 77, 84 n.5 (1st Cir. 2023). Dartmouth contends that Doe must establish that gender bias was the but-for cause of the finding against him, whereas Doe contends he need only establish it was a "motivating factor." The court need not resolve this dispute because, even under the less stringent "motivating factor" standard, Doe has not adduced evidence from which a reasonable trier of fact could conclude that gender bias contributed to the finding against him.[10]

    To prove a causal connection between a plaintiff's gender and the outcome of the disciplinary proceeding, the plaintiff can rely on, "inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Brown Univ., 166 F. Supp. 3d at 185 (quoting Yusuf, 35 F.3d at 715). Dartmouth contends that it is entitled to summary judgment on Doe's Title IX claim because he cannot identify evidence tending to show gender bias contributed to the result of the proceeding against him. In response, Doe contends that Stackow discounted Doe's version of events because Doe was intoxicated and unable to remember the events of the night in a linear fashion. Doe further notes that, in discovery, Dartmouth

_____

[10] For this same reason, the court need not determine whether Doe adduced evidence from which a reasonable trier of fact could conclude that it doubts the accuracy of the outcome of the disciplinary proceeding against Doe.

produced reports from other Title IX investigations in which an intoxicated female student's statements were at least partially credited by the investigator. According to Doe, this shows that Dartmouth has a "pattern of crediting the statements of intoxicated female students," which, Doe contends, creates a genuine dispute of material fact as to whether Dartmouth's investigation was affected by gender bias. Doc. no. 66-1 at 7-8.

The court finds that Doe has not sufficiently identified evidence from which a reasonable trier of fact could conclude that the outcome of the proceeding against him was motivated by gender bias. It is true that, in gender discrimination cases, bias may be inferred from disparate treatment. See Carey v. Mt. Desert Isl. Hosp., 156 F.3d 31, 37-38 (1st Cir. 1998). When a plaintiff relies on disparate treatment to show discrimination, however, they must demonstrate that "the proposed analogue is similarly situated in material respects." Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996). "Accordingly, the proponent of the evidence must show that the individuals with whom he seeks to be compared have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [decisionmaker's] treatment of them for it.'" Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)). "While an exact correlation is not necessary," the plaintiff must demonstrate that a "prudent person, looking objectively at the [plaintiff and the comparators he identified], would think them roughly equivalent." Id. (quoting Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989)).

23

In this case, Doe has attached excerpts from prior Title IX investigations at Dartmouth to his objection to Dartmouth's motion for summary judgment. In these investigations, the investigator at least partially credits the account of an intoxicated female student. However, Doe does not attempt to demonstrate that his circumstances are "roughly equivalent" to any of these purported comparators. Id. (quotation omitted). Simply attaching documents from other Title IX investigations to his summary judgment objection without attempting to demonstrate that the female students in these investigations are relevant comparators is insufficient to defeat Dartmouth's motion for summary judgment with respect to whether a reasonable trier of fact could find gender bias based on a theory of disparate treatment. See Theidon v. Harv. Univ., 948 F.3d 477, 501 (1st Cir. 2020) ("[I]t is [plaintiff's] burden to connect the dots between her candidacy for tenure and that of her male comparators . . . ."); Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004) (holding that plaintiff failed to successfully oppose summary judgment motion with respect to plaintiff's retaliation claim by "[m]erely attaching six complete depositions to his [objection] and inviting the district judge to read them in their entirety, without designating which specific facts contained therein created a genuine issue as to pretext or established a reasonable inference of retaliation"); Knight v. O'Reilly Auto Enters., LLC, Docket No. 2:17-cv-300-NT, 2019 WL 1302545, at *5 (D. Me. Mar. 21, 2019) (reasoning that plaintiff failed to present evidence of disparate treatment merely by "provid[ing] hundreds of pages" of documents pertaining to other workers because she "does not tease out the

24

information necessary to determine whether those other workers are fair comparators"; "[i]t is neither the Defendant nor the Court's burden to parse the data looking for comparator evidence").

Moreover, even when viewing the evidence in the light most favorable to Doe, no reasonable factfinder would conclude based on this summary judgment record that Dartmouth has a "pattern" of invariably crediting intoxicated female students. Since 2016, there have been twenty-five cases at Dartmouth involving an intoxicated female complainant alleging that a male student sexually assaulted her. See doc. no. 61-41. In thirteen of those investigations—just over half—the male student was found not responsible for the alleged assault. In several cases where Dartmouth found the male student not responsible, Dartmouth declined to credit the complainant's version of events because she was intoxicated and could not recall important details or gave inconsistent accounts.

Thus, in numerous Title IX cases over the last eight years, Dartmouth has declined to credit the account of an intoxicated female complainant at least in part because she could not adequately describe the events in question. While Doe points to other cases in which Dartmouth has credited the accounts of intoxicated female students, this does not amount to evidence from which a reasonable factfinder could conclude that Dartmouth invariably defers to female students' accounts regardless of their degree of intoxication or ability to recount or describe the events in question. See B.C. I, 892 F.3d at 90-92 (finding no triable issue with respect to gender bias where, despite the fact that all thirty-two students accused of sexual

25

assault since 2005 were male, ten of those thirty-two students were found not
responsible); Bleiler v. Coll. of Holy Cross, Civ. No. 11-11541-DJC, 2013 WL
4714340, at *8 (D. Mass. Aug. 26, 2013) (finding that no triable issue with respect to
gender bias arose from prior Title IX investigations where two of six male students
accused of sexual misconduct were found not responsible). It simply shows that
Dartmouth sometimes credits intoxicated female students, and sometimes it does
not. It does not create a genuine dispute as to whether Dartmouth has a "pattern" of
gender bias in favor of female students, much less a genuine dispute as to whether
Doe's investigation was motivated by discriminatory animus.

In a footnote to his objection to Dartmouth's summary judgment motion, Doe
notes that he has "alleged" that Stackow's questions during his investigation
demonstrate that he was motivated by "gender or anti-LGBTQ+ bias." Doc. no. 66-1
at 8 n.4. Doe contends that Stackow's deposition testimony that "Doe was in control
of the situation, physical control of the situation" because "he was able to get off the
couch and on his knees and perform the sexual act on Smith," doc. no. 66-4 at 79,
may show that Stackow had a "subconscious" anti-LGBTQ bias, doc. no. 66-1 at 8
n.4. Finally, Doe asserts that Stackow was preoccupied with Doe's inability to
explain how Smith's actions physically caused Doe to begin performing oral sex,
which, according to Doe, "demonstrates bias against males who perform, rather
than receive, sexual acts from other males." Id.

Doe's arguments are not persuasive. It is true that a decisionmaker's
statements in a Title IX investigation can show the existence of gender bias. See

Brown Univ., 166 F. Supp. 3d at 185. But at the summary judgment stage, it is not enough to "merely rest on superficial assertions of discrimination"; rather, Doe "must establish that 'particular circumstances suggest[ ] that gender bias was a motivating factor.'" B.C. I, 892 F.3d at 91 (quoting Yusuf, 35 F.3d at 715). The asserted causal link between Stackow's investigative focus and alleged gender or LGBTQ bias is speculative and tenuous. No reasonable trier of fact would conclude that Stackow was biased against men who perform sexual acts on other men from the fact that Stackow wanted Doe to describe how he came to perform oral sex on Smith. The only reasonable conclusion is that Stackow was investigating Smith's and Doe's allegations and wanted to discern Doe's account of the night as it bore on critical issues—how the oral sex began, who initiated it, and whether the means of its initiation demonstrated that either man consented. Nor does Doe develop an argument or otherwise explain why a reasonable trier of fact could conclude that Stackow's investigation was infected with discriminatory, anti-LGTBQ animus from Stackow's deposition testimony that Doe was in "control" of the encounter.[11]

For these reasons, there is no genuine dispute of material fact as to whether there is a causal connection between gender bias and the outcome of the

---

[11] Moreover, read in the context of Stackow's fuller response to the question posed to him at the deposition, it is clear that Stackow was explaining why he found that Doe was not incapacitated by alcohol—he was able to take the volitional actions of getting off the couch and positioning his body in front of Smith's while kneeling on the floor. In other words, Stackow found "there wasn't any indication within those acts that [Doe] had difficulty controlling himself or his actions or was unaware of what was happening." Doc. no. 66-4 at 79-80.

disciplinary proceeding against Doe. As such, Dartmouth is entitled to summary judgment on Doe's Title IX claim in Count I.[12]

B.      Breach of Contract Claims (Counts II, IV, and V)

In Counts II, IV, and V, Doe brings breach of contract claims under New Hampshire law. Under New Hampshire law, the relationship between students and universities is contractual in nature. Gamble v. Univ. Sys. of N.H., 136 N.H. 9, 12-13 (1992). However, given the "distinctive" relationship between a university and its students, "a strict doctrinal approach is inappropriate." Id. at 13. "Thus, although the first step of the analysis is to examine the language of the contract under the basic tenets of contract law, the parties' unique relationship must also be considered." Id. "The proper interpretation of a contract is a question of law for the court, and the contract's proper meaning will be determined 'based on the meaning that would be attached to it by reasonable persons.'" Marlowe v. Keene State Coll., 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (quoting Gamble, 136 N.H. at 13) (applying New Hampshire law). In determining the contract's proper interpretation, the court "will consider the objective intent of the parties at the time the contract was made." Gamble, 132 N.H. at 13.

---

[12] Doe's Title IX claim is his only ground for invoking federal question jurisdiction in this case. However, the allegations of the complaint establish that the court has both supplemental and diversity jurisdiction over Doe's state law claims, and Doe expressly alleges in the complaint that the court has both supplemental and diversity jurisdiction over those claims. See doc. no. 1 at 3. Although the court has found that Dartmouth is entitled to summary judgment on Doe's only federal law claim, the court will not consider dismissing Doe's breach of contract claims pursuant to 28 U.S.C. § 1367(c) given the existence of diversity jurisdiction.

A successful breach of contract claim under New Hampshire law requires the plaintiff to show (1) that it had a valid, binding contract with the defendant and (2) that the defendant breached the terms of the contract. Data Intensity LLC v. Spero, Case No. 21-cv-781-PB, 2024 WL 1256253, at *6 (D.N.H. Mar. 25, 2024). "A breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Lassonde v. Stanton, 157 N.H. 582, 588 (2008) (brackets omitted) (quoting Poland v. Twomey, 156 N.H. 412, 415 (2007)). As this court previously noted when ruling on Dartmouth's motion to dismiss, courts have concluded that student handbooks and other materials may set out the terms of a contract between a university and its students. See Dartmouth Coll., 615 F. Supp. 3d at 60 (citing Nierenberg v. Trs. of Dartmouth Coll., No. 2152016CV00259, 2017 WL 10259668, at *2 (N.H. Super. Ct. July 7, 2017)); see also, e.g., Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998).

1.   Count II – Inadequate Notice

In Count II, Doe alleges that Dartmouth breached its contractual obligation under its policy on sexual assault investigations to provide sufficient notice of the allegations against Doe.[13] As discussed above, the Process Policy requires Dartmouth's Title IX coordinator to inform the complainant and respondent in writing of various information, including "the date, time (if known), location, and nature of the reported conduct" and "the reported policy violation(s)." Doc. no. 59-10 at 10. The Title IX Office will issue a supplemental Notice of Investigation "[i]f the

---

[13] The parties do not dispute that the Misconduct Policy and the Process Policy formed part of the contract between Doe and Dartmouth.

29

investigation reveals the existence of additional or different potential policy violations . . . ." Id. at 11. The Process Policy accords with Title IX's implementing regulations, which require that schools subject to Title IX provide written notice of the allegations to the accused, "includ[ing] the identities of the parties involved in the incident, . . . the conduct allegedly constituting sexual harassment . . . , and the date and location of the alleged incident." 34 C.F.R. § 106.45(b)(2)(i)(B); see also id. § 106.45(b)(2)(ii) (requiring schools subject to Title IX to provide notice of any additional allegations that the school "decides to investigate . . . about the complainant or respondent that are not included in the notice provided pursuant to paragraph (b)(2)(i)(B) of this section").

In this case, the Notice of Investigation accused Doe of "sexually assault[ing] [Smith] by having oral sexual intercourse with him while he was asleep" on July 12, 2020. Doc. no. 59-17. Doe makes three overlapping arguments with respect to Count II: (1) the Notice failed to warn him of the conduct for which Dartmouth ultimately found him responsible; (2) there was insufficient evidence to support a finding by a preponderance of the evidence that he committed the act alleged in the Notice;[14]

_____

[14] As an initial matter, the court notes that Count II of Doe's complaint alleges that Dartmouth committed breach of contract by failing to provide him with notice of the allegation against him as required by the Process Policy. In other words, Count II alleges that Doe was given notice of one accusation—oral sex while Smith was asleep—but he was ultimately found responsible for another accusation—sexual contact while Smith was asleep. Count II does not allege that Dartmouth committed breach of contract by failing to correctly apply the preponderance of the evidence standard, in that Doe was found responsible for an act for which there was insufficient evidence. The court nonetheless addresses the sufficiency of the evidence argument as part of its analysis of the viability of Count II.

and (3) Dartmouth violated "basic fairness" by giving Doe insufficient notice, by failing to correctly apply the preponderance of the evidence standard, and by failing to meaningfully engage with Doe's defenses throughout the Title IX proceeding. The court will address these arguments separately.

a.   Insufficient Notice Argument

Doe first argues that the Notice failed to give him notice of the conduct Dartmouth ultimately found him responsible for. Although the Notice accused him of performing oral sex on Smith while Smith was asleep, Doe contends that Dartmouth found him responsible for a different act: either performing oral sex on Smith while he was awake or performing sexual touching on Smith while he was asleep. Thus, Doe contends, Dartmouth breached its obligations under the Process Policy to provide him with sufficient notice of the allegation against him. Dartmouth contends that it did not breach any obligation to provide Doe with notice of the accusation against him because Stackow found, in his final report, that Doe committed the act alleged in the notice, i.e., that Doe performed oral sex on Smith while he was asleep.

As noted, neither the Hearing Panel nor the dean to whom Doe appealed the Hearing Panel's decision made any factual findings. The Hearing Panel merely "upheld [Stackow's] findings" in his final report that Doe was responsible for sexually assaulting Smith, doc. no. 60-7 at 1, and the dean only determined that Doe had not shown that substantial procedural error or bias materially affected the outcome of the proceeding. As such, to determine whether Dartmouth's finding against Doe comported with the allegations in the Notice, the court must interpret

31

Stackow's final report, the Notice, and the Misconduct Policy. Under New Hampshire law, the proper interpretation of written documents is a question of law for the court. E.g., Ryan James Realty, LLC v. Vills. at Chester Condo. Ass'n, 153 N.H. 194, 196 (2006). When interpreting a written document, the court gives the language of the document "its reasonable meaning, considering the circumstances and the context in which" the document was written, and "reading the document as a whole." Id. (quotation omitted).

The final report recognizes that, under the Misconduct Policy, sexual assault has two elements: (1) "sexual contact" (2) "in the absence of . . . consent." Doc. no. 60-4 at 50. The final report correctly states that the Misconduct Policy defines "sexual contact" to include both "sexual intercourse (anal, oral, or vaginal)" and "sexual touching." Id. at 3. In the analysis portion of the final report, Stackow notes that Smith and Doe agreed that they engaged in oral sexual intercourse, in that the parties agreed that Smith's "penis penetrated [Doe's] mouth." Id. at 50. And, on that basis, the final report finds "by a preponderance of the evidence[ ] that the parties engaged in sexual contact." Id.

The final report next analyzes whether this sexual contact occurred in the absence of consent. The final report recognizes that the Misconduct Policy requires "an affirmative and willing agreement to engage in specific forms of sexual contact with another person." Id. Moreover, the report explains that a person who is incapacitated is incapable of consenting to sexual contact. Id. The Misconduct Policy defines incapacitation in pertinent part as "the inability, temporarily or

permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring." Doc. no. 59-9 at 10. Ultimately, the final report finds, "by a preponderance of the evidence standard, that [Smith] was asleep when the sexual contact began." Doc. no. 60-4 at 51. Because the policy defines individuals who are asleep to be incapacitated and therefore unable to consent, the final report finds, "by a preponderance of the evidence standard, that [Smith] was incapacitated and unable to consent to the sexual contact." Id. The final report declines to credit Doe's assertion that the sexual contact was preceded by Smith running his hand through Doe's hair, and explains that "[e]ven if [Smith] did engage in this conduct . . . such conduct, by itself, would not have amounted to an 'outward demonstration' indicating that [Smith] had freely chosen to engage in the sexual contact." Id.

Doe makes much of the fact that the Notice of Investigation stated that he stood accused of committing sexual assault "by having oral sexual intercourse with [Smith] while he was asleep," doc. no. 59-17 at 1, yet the final report finds only that Doe "engaged in sexual contact with [Smith] at a time when [Smith] was . . . asleep," doc. no. 60-4 at 51. Because the Misconduct Policy defines sexual contact to include both sexual intercourse and sexual touching, Doe contends that the final report did not find that he committed the act alleged in the notice. Doe's argument, however, fails to interpret the final report as a whole, which New Hampshire law requires when interpreting written documents. See Town of Pembroke v. Town of Allenstown, 171 N.H. 65, 70 (2018) (contracts); Hodges v.

33

Johnson, 170 N.H. 470, 481 (2017) (instruments); Trombly v. Blue Cross/Blue

Shield of N.H.-Vt., 120 N.H. 764, 768 (1980) (insurance policies); Monadnock Reg.

Sch. Dist. v. Monadnock Dist. Educ. Ass'n, NEA-NH, 173 N.H. 411, 419 (2020)

(collective bargaining agreements).

The final report notes that the parties did not dispute that they engaged in

"oral sexual intercourse, specifically that [Smith's] penis penetrated [Doe's] mouth."

Doc. no. 60-4 at 50. Because of the lack of dispute that this occurred, the final report

"[a]ccordingly" found "that the parties engaged in sexual contact." Id. Thus, as to

the first element of sexual harassment under the Misconduct Policy, the "sexual

contact" that the final report found to have occurred was "oral sexual intercourse."

Id. In the portion of the final report which analyzes whether there was proof by a

preponderance of the evidence of the second element of sexual harassment—the

absence of consent—the report consistently refers to "the" sexual contact that it had

previously found took place. Because "the" sexual contact that the report found was

"oral sexual intercourse," when the report concludes that there was proof by a

preponderance of the evidence "that [Smith] was asleep when the sexual contact

began," the report necessarily found that Smith was asleep when the oral sexual

intercourse began. Id. at 51. The court therefore rejects Doe's argument that he was

found responsible for an act that was not alleged in the Notice of Investigation.

b.   Sufficiency of the Evidence Argument

In addition to arguing that Stackow did not actually find in the final report

that Doe performed oral sex on Smith while Smith was asleep, Doe contends that

the evidence available to Stackow would not have supported such a finding.

34

According to Doe, Stackow was not permitted to conclude by a preponderance of the evidence that Doe performed oral sex on Smith while Smith was asleep because Smith described the sensation he felt while sleeping as "caressing" similar to someone "jerking [him] off." Doe asserts that, even if Smith's description is credited, the only permissible conclusion is that Doe touched Smith's penis with his hand while Smith was asleep, and that the oral sex only began after Smith was awake.

The parties do not devote time in their briefing to the question of whether the sufficiency of the evidence in this context is a question of fact or law. As a general matter, the sufficiency of the evidence to support a factual finding is a question of law. E.g., State v. Spinale, 156 N.H. 456, 463-64 (2007). But here, Doe argues that Dartmouth breached its contract with Doe because the evidence was insufficient to find that he committed the act he was given proper notice of. Whether a breach of contract has occurred is generally a question of fact. Kathy Walsh Real Estate, Inc. v. Sewall Farms Realty, LLC, Case No. 2008-0809, 2009 WL 10643729, at *1 (N.H. Oct. 28, 2009). The court need not resolve this issue, however, because even if Doe's argument presents a factual question, the court finds that no reasonable trier of fact would conclude for Doe on this issue.

Smith told Stackow that, as he was asleep on the couch, he "felt a sensation like somebody was caressing me around my penis." Doc. no. 60-4 at 9. He described this sensation as "similar to someone jerking [him] off." Id. at 10. Smith said that, as he awoke, he "half-open[ed]" his eyes and saw that his jeans had been unbuttoned, his boxer briefs were pulled down, and his penis was erect. Id. He said

that Doe was kneeling on the floor in front of him, in between his legs. Smith said that he "shifted a little bit" on the couch, and Doe looked up at him. Id. at 9-10. Smith further told Stackow that, after he "settled" and "stopped moving," he "saw [Doe] reach down and grab my penis and put it in his mouth." Id. at 9. Smith said that Doe's left hand was "going up and down on my penis" as Doe was performing oral sex. Id. at 10-11. Smith told Stackow that Doe continued performing oral sex on him in this manner for "maybe 10 seconds" before Smith "realized what was going on." Id. at 11. Smith said he was "shocked" when he realized what was happening, and he "kind of pretended to be waking up" and, "when [he] felt like [he] could," he stood up, went into his bathroom, and closed the door. Id.

Doe contends that this evidence does not permit a finding that he performed oral sex on Smith while Smith was asleep because Smith described the sensation he felt while he was asleep as "caressing," similar to someone "jerking [him] off." In addition, Doe highlights that Smith conceded to Stackow that he did not actually see Doe perform oral sex on him until after he awoke. Because Smith did not describe the sensation he felt while asleep as oral sex, and did not see Doe perform oral sex on him until he was awake, Doe argues that the evidence does not permit a finding by a preponderance of the evidence that he performed oral sex on Smith while he was asleep, but rather, only permits a finding that sexual touching occurred while Smith was asleep.

Doe takes an unduly narrow view of the evidence. It is unsurprising that a sexual assault victim who was asleep at the time the assault began would report to

an investigator that they did not actually witness the sexual assault until they woke up. Moreover, although Smith described the sensation he felt while asleep as "caressing" around his penis, once Smith awoke and actually witnessed Doe performing oral sex on him, he observed that Doe's hand was "going up and down" on Smith's penis at the same time Doe was performing oral sex. In addition, when Smith awoke, Doe was on his knees in front of Smith. When Smith began to wake up and started shifting around on the couch, the caressing sensation stopped, and Doe looked up at Smith. Once Smith stopped shifting around, with his eyes half-closed, Doe took Smith's penis in his left hand and moved his hand up and down while Smith's penis was in his mouth. This evidence permits a reasonable inference—just as Stackow testified during the preliminary injunction hearing—that the caressing sensation Smith felt mere seconds before he saw Doe performing oral sex was the result of that same activity—oral sex.

c.   Basic Fairness Argument

Doe's final argument with respect to Count II is that Dartmouth was unfair to him by failing to sufficiently engage with him on his notice and sufficiency-of-the-evidence arguments throughout Dartmouth's proceeding. Doe submitted responses to both Stackow's initial report and his final report, in which he raised both his notice defense and his sufficiency-of-the-evidence defense. However, Stackow did not reach out to the Title IX office to discuss Doe's defense, did not reach out to Doe to discuss his defenses with him, and, although Dartmouth had internal discussions with respect to Doe's notice defense, Dartmouth concluded that there was no need to amend the Notice of Investigation in response to Doe's defense. Doe contends that

"[i]n essence, . . . Dartmouth secretly rejected [his] notice defense without informing

him," which violates a "basic fairness" standard Doe contends is applicable to

breach of contract claims arising out of student misconduct investigations at private

institutions. Doc. no. 66-1 at 15-16.

Doe cites no case which has determined—under New Hampshire law—that

violation of a "basic fairness" standard gives rise to a cause of action for breach of

contract in the context of a private university's disciplinary proceedings. Under

Massachusetts law, schools have an "independent duty to provide basic fairness"

which "is rooted in the implied covenant of good faith and fair dealings imposed on

every contract by Massachusetts law." Sonoiki v. Harv. Univ., 37 F.4th 691, 715 (1st

Cir. 2022) (quotation omitted). But even under Massachusetts law, "the precise

contours of such a claim are yet to be clearly defined," and courts are wary of

superimposing quasicontractual "fairness" obligations on the preexisting policies

and procedures which make up the contract between the student and the university.

Id.

At least one trial court in New Hampshire has suggested that a violation of

"basic fairness" may constitute a breach of the implied covenant of good faith and

fair dealing under New Hampshire law. See Nierenberg, 2017 WL 10259668, at *4;

see also Centronics Corp. v. Genicom Corp., 132 N.H. 133, 140 (1989) (Souter, J.)

(explaining that, with respect to the category of good faith and fair dealing claims

applicable to the exercise of discretion in contractual performance, "the obligation of

good faith performance is better understood simply as excluding behavior

inconsistent with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations"). However, Doe has not brought a claim for breach of the implied covenant of good faith and fair dealing, only for breach of contract. These are distinct claims with distinct elements which must be separately pled.[15] See Balsamo v. Univ. Sys. of N.H., No. 10-CV-500-PB, 2011 WL 4566111, at *4 (D.N.H. Sept. 30, 2011) ("To properly allege a good faith and fair dealing claim, a plaintiff must make allegations that are separate and distinct from those underlying his breach of contract claim."); Lessard v. Vt. Mut. Ins. Co., No. 12-cv-236-SM, 2013 WL 757617, at *3 (D.N.H. Feb. 27, 2013) (dismissing claim for breach of implied covenant of good faith and fair dealing where claim "merely restate[d] [plaintiffs'] breach of contract claim").

"Federal courts are not free to extend the reach of state law." Doe v. Trs. of Bos. Coll., 942 F.3d 527, 535 (1st Cir. 2019) [hereinafter B.C. II]. As such, federal courts "must exercise considerable caution when even considering the adoption of a new application" of state law, and should almost always decline to "blaze new and unprecedented jurisprudential trails" where state law is concerned. Id. (quotation omitted). "Rather, this court must take state law as it finds it: not as it might conceivably be, some day; nor even as it should be." Id. (quotation omitted). Here,

---

[15] The court previously explained in ruling on Dartmouth's motion to dismiss in this case that, to the extent New Hampshire law recognized a cause of action for violation of an extracontractual "basic fairness" obligation, that cause of action would be for breach of the implied covenant of good faith and fair dealing, not breach of contract. See Doe, 615 F. Supp. 3d at 63. Doe did not seek to amend his complaint to include any claims for breach of the implied covenant of good faith and fair dealing after the court issued its order on Dartmouth's motion to dismiss.

Doe fails to demonstrate that New Hampshire law recognizes a breach of contract action premised upon a violation of "basic fairness," and he does not develop an argument that the New Hampshire Supreme Court would recognize such an action if asked to do so. See Hosp. San Antonio, Inc. v. Oquendo-Lorenzo, 47 F.4th 1, 7 (1st Cir. 2022).

Even if the court were to consider whether a reasonable trier of fact could find that Dartmouth failed to provide Doe with "basic fairness"—either based on the requirements of the implied covenant of good faith and fair dealing or the Process Policy's express statement that Dartmouth will investigate complaints in a "prompt, fair, and impartial manner"—the court would determine that Doe failed to identify evidence from which a reasonable trier of fact could so find. Generally speaking, "the basic fairness framework ensures that '[a] private school may not arbitrarily or capriciously dismiss a student or do so in bad faith.'" Doe v. Stonehill Coll., Inc., 55 F.4th 302, 317 (1st Cir. 2022) (quoting Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007)) (alteration in Stonehill College). While Doe takes issue with a perceived lack of communication surrounding, or receptiveness toward, his notice and sufficiency-of-the-evidence defenses, Doe's subjective belief that Dartmouth did not adequately communicate with him regarding his defenses does not permit a reasonable trier of fact to conclude that Dartmouth expelled him in bad faith or that it acted arbitrarily or capriciously.

Doe was afforded numerous opportunities to raise his defenses: in a written response to Stackow's initial report; in a written response to Stackow's final report;

at the hearing in front of the Hearing Panel; and in his appeal of the Hearing Panel's decision. Doe does not point to any provisions in any of the at-issue policies that require or suggest he was entitled to greater procedural protections than were afforded him. See Schaer v. Brandeis Univ., 735 N.E.2d 373, 380 (Mass. 2000) (holding that alleged improper admission of testimony at disciplinary hearing did not violate "basic fairness" because the statements' admission did not violate the university's policies and procedures governing the conduct of disciplinary proceedings); Stonehill Coll., 55 F.4th at 331 (holding that plaintiff adequately stated violation of "basic fairness" where he plausibly alleged "procedural irregularities" deviating from university's policies "that may have resulted in prejudice to his defense"). Doe was "able to explain his side of the story, review the facts section of the [initial report], meet with the investigator[ ], and request follow-up questions or interviews." Stonehill Coll., 55 F.4th at 331 n.43 (quotation omitted); see doc. no. 59-10 at 9-12, 15. He was given notice of the accusation against him (Doe's argument to the contrary notwithstanding). He was permitted to consult with an attorney advisor throughout the proceeding.

Moreover, the record shows that the Hearing Panel considered Doe's arguments. At the hearing, one of the panel members asked Stackow to address the alleged disconnect between the Notice of Investigation and his ultimate finding that "sexual contact" had occurred while Smith was asleep, and Stackow explained why he worded his findings the way he did. The Hearing Panel's written decision upholding Stackow's findings stated that the panel had considered Doe's "assertion

that . . . the investigator's determination of responsibility did not align with the [Notice] of Investigation," but concluded that Stackow's findings comported with the Notice. Doc. no. 60-7 at 1. The dean of Geisel, to whom Doe appealed the Hearing Panel's decision, further stated in a written decision that he had considered Doe's defense but was not persuaded by it.

Viewed as a whole, Doe's circumstances are not analogous to cases where courts have found that private universities failed to provide "basic fairness" to students facing disciplinary proceedings. See, e.g., Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 603-08 (D. Mass. 2016) (ruling that university failed to provide basic fairness where plaintiff was not notified of allegations against him, not permitted to consult with an attorney, not allowed to examine the evidence against him or review witness statements, not allowed to present his own evidence, and not allowed to access the investigator's report until the proceeding was concluded). Thus, even if Doe could recover on Count II under a "basic fairness" theory, the court would conclude that no reasonable trier of fact could find for Doe under such a theory.

For all of these reasons, there is no genuine dispute of material fact with respect to Doe's breach of contract claim in Count II of the complaint, and Dartmouth is entitled to judgment as a matter of law on Count II.

2.   Count IV – Gender Discrimination

In Count IV, Doe alleges that Dartmouth committed breach of contract by applying the preponderance of the evidence standard required by the Process Policy differently to him because he is a man. The evidence that Doe would rely upon to prove this claim mirrors the evidence he cites in support of his Title IX claim. See

doc. no. 66-1 at 9 (Doe's objection to Dartmouth's summary judgment motion; agreeing that "the facts underlying . . . Count IV are the same as the erroneous outcome claim"). He alleges that—if he were a woman—Dartmouth would have credited his account despite his intoxication and inability to remember important details about the events in question.

Dartmouth moves for summary judgment on this count on the ground that Doe cannot adduce evidence from which a reasonable trier of fact could find that Doe's gender played a role in the way Dartmouth applied the preponderance of the evidence standard. For the same reason the court found Dartmouth was entitled to judgment as a matter of law on Count I, it finds that Dartmouth is entitled to judgment as a matter of law on Count IV. On this record, no reasonable trier of fact would conclude that Dartmouth applied its procedures to Doe in a discriminatory fashion because he is a man.

3.   Count V – Records Disclosure

In Count V, Doe alleges that Dartmouth breached its contract with Doe by revealing his intended date of return to Smith. Doe contends that Dartmouth violated both its own Records Policy as well as the Family Educational Rights and Privacy Act ("FERPA") in so doing. See 20 U.S.C. § 1232g. While FERPA does not create a private right of action, see Gonzaga Univ. v. Doe, 536 U.S. 273, 287 (2002), a university's policy outlining permissible circumstances to disclose information governed by FERPA may form part of the student-university contract, see Doe v. W. New Eng. Univ., 228 F. Supp. 3d 154, 177-78 (D. Mass. 2017); Brandeis Univ., 177

F. Supp. 3d at 598-99 (D. Mass. 2016); Frank v. Univ. of Toledo, 621 F. Supp. 2d
475, 485 (N.D. Ohio 2007).

Generally speaking, FERPA prohibits the disclosure of a post-secondary
student's "education records" without the student's consent in most circumstances,
but it does not prohibit disclosure of a student's "directory information." 20 U.S.C.
§ 1232g(b)(1). FERPA broadly defines "education records" as "those records, files,
documents, and other materials which . . . (i) contain information directly related to
a student; and (ii) are maintained by an educational agency or institution or by a
person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). "Directory
information" is carved out from this definition, however, and includes, among other
things, "dates of attendance." 20 U.S.C. § 1232g(a)(5)(A). FERPA's regulations
further define "dates of attendance" as "the period of time during which a student
attends or attended an educational agency or institution." 34 C.F.R. § 99.3.
Examples of dates of attendance include "an academic year, a spring semester, or a
first quarter." Id. "The term does not include specific daily records of a student's
attendance at an educational agency or institution." Id.

Universities are required to inform students of the rights granted to them by
FERPA. 20 U.S.C. § 1232g(e). Any school which elects to make directory
information public without a student's consent "shall give public notice of the
categories of information which it has designated as [directory] information." 20
U.S.C. § 1232g(a)(5)(B). In its public notice, the university may (but is not required
to) "specify that disclosure of directory information will be limited to specific parties,

for specific purposes, or both," and if the university elects to circumscribe disclosure of directory information, the university "must limit its directory information disclosures to those specified in its public notice." 34 C.F.R. § 99.37(d).

At the time Clemens told Smith Doe's intended date of return to Geisel, Geisel's Records Policy set forth its policy on disclosure of student information. See doc. no. 59-12. The Records Policy states that it is "[i]n keeping with applicable law (including FERPA)" as well as Geisel's "longstanding policy of preserving the confidentiality of education records." Id. at 3. The Records Policy further states that "Geisel will not disclose personally identifiable information from a student's education records to third parties without the student's consent" "[e]xcept in accordance with the terms of this policy." Id. The Records Policy exempts "directory information" from the consent requirement. Id. The Records Policy provides several examples of "directory information," including "[d]ates of attendance" and "[e]nrollment status." Id. The Records Policy does not further define these terms.

Dartmouth contends that it is entitled to judgment as a matter of law on Doe's records-disclosure claim because the Records Policy did not form part of its contract with Doe. Dartmouth contends that, to form part of the student-university contract, the Records Policy must "satisf[y] the usual principles of contract formation," including offer, acceptance, consideration, and a meeting of the minds. Doc. no. 61-1 at 23. Dartmouth claims that the Records Policy was unsupported by consideration because Dartmouth had a preexisting legal duty not to disclose education records under FERPA. See, e.g., Casey v. St. Mary's Bank, Case No. 22-

cv-252-PB, 2023 WL 3479600, at *4 (D.N.H. May 16, 2023) (reasoning that employer's policy did not form part of employment contract because the policy "only states [the employer's] intent to abide by state and federal law—something that [the employer] is already obligated to do").

Dartmouth's argument is incorrect. The argument primarily relies on Brodeur v. Claremont School District, 626 F. Supp. 2d 195 (D.N.H. 2009). However, that case involved a claim that a public high school's student handbook formed part of a contract between the minor student and the public school district. See 626 F. Supp. 2d at 216-17. Judge Laplante distinguished the plaintiff's situation from that of a college student's relationship with his or her university because the plaintiff's school attendance was compulsory, whereas a university student's attendance is not. See id. at 217. Because the minor student in Brodeur had a preexisting legal obligation to attend school, her school attendance could not constitute an "acceptance" of the terms of the student handbook, but even if it did, it would not have been supported by consideration for that same reason. See id. By contrast, here Doe's attendance at Geisel was not compulsory, and there is no dispute that he furnished consideration to attend Geisel.

Moreover, the court does not agree that the Records Policy merely announces an intent to abide by a preexisting legal obligation. FERPA does not require private universities to disclose "directory information" without a student's consent; it merely permits a university to do so if the university follows the procedures set forth in FERPA and its regulations. See 34. C.F.R. §§ 99.31(a)(11), 99.37. FERPA

does not require Dartmouth to promulgate a policy outlining the materials it considers to be directory information—so long as Dartmouth categorically refuses to disclose such information in the absence of a student's consent. By promulgating the Records Policy, which lists the type of information Dartmouth considered to be directory information and therefore subject to disclosure without consent, Dartmouth undertook an obligation that FERPA does not require. This distinguishes the Records Policy from the employer's policy that was at issue in Casey v. St. Mary's Bank, another case upon which Dartmouth relies. The Casey policy merely stated that the employer "d[id] not tolerate discrimination" on the basis of any "protected status." 2023 WL 3479600, at *1. In ruling that the policy did not form a part of the plaintiff's employment contract with his employer, Judge Barbadoro reasoned that state and federal law already barred the employer from tolerating discrimination; thus, the policy "cannot reasonably be understood as manifesting a willingness to enter into a bargain about [plaintiff's] right to be free from unlawful discrimination, as this is plainly not a bargaining chip that [the employer] holds." Id. at *4.

Dartmouth next argues that the Records Policy did not form a part of its contract with Doe because there was no meeting of the minds. For a contract to be enforceable, New Hampshire law "requires a meeting of the minds about the contract's terms: 'each party must have the same understanding as to the terms of the agreement.'" Int'l Bus. Machs. Corp. v. Khoury, 170 N.H. 492, 500 (2017) (quoting Simonds v. City of Manchester, 141 N.H. 742, 744 (1997)). "The parties

must have the same understanding of the terms of the contract and must manifest an intention . . . to be bound by the contract." Fleet Bank-NH v. Christy's Table, Inc., 141 N.H. 285, 287-88 (1996). Whether the parties had a shared understanding of the contractual terms "is determined by an objective standard, and not by actual mental assent" to the same contractual terms. Khoury, 170 N.H. at 501 (quoting Tsiatsios v. Tsiatsios, 140 N.H. 173, 178 (1995)); accord Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006). This objective standard "places a reasonable person in the position of the parties, and interprets a disputed term according to what a reasonable person would expect it to mean under the circumstances." Behrens v. S.P. Constr. Co., Inc., 153 N.H. 498, 502 (2006); see also Maloney v. Bos. Dev. Corp., 98 N.H. 78, 81 (1953) (explaining that the existence of a meeting of the minds "is judged by what the parties say and do, by their overt acts, by what they [cause] each other to understand and not by any undisclosed meaning or intention which one of the parties might have had"). Whether a meeting of the minds has occurred is a question of fact. Chase Home for Child. v. N.H. Div. for Child., Youth, & Fams., 162 N.H. 720, 727 (2011).

Dartmouth contends that no reasonable trier of fact could conclude that there was a meeting of the minds as to the Records Policy because there is no evidence Doe manifested assent to the terms of the Records Policy or had any communication with Dartmouth about the Policy, and because his ultimate interpretation of the Records Policy differed from Dartmouth's interpretation. Dartmouth's argument is not persuasive. Doe testified at his deposition that he reviewed the Records Policy

annually as part of his training at Geisel. There is no dispute that Doe continued

his schooling at Geisel after reviewing the Records Policy. See Panto v. Moore Bus.

Forms, Inc., 130 N.H. 730, 735-36 (1988) (holding that an employer's policy

providing for severance pay for laid-off employees formed part of at-will

employment contract where employee continued working for employer after the

policy was announced). That Doe and Dartmouth may have subjectively understood

the Records Policy differently does not establish that no reasonable trier of fact

could conclude there was a meeting of the minds. See, e.g., Khoury, 170 N.H. at 501.

Dartmouth also argues that it is entitled to judgment as a matter of law on

Count V because Doe's alleged damages—his lost wages and lost earning capacity

as a result of him being unable to work as a physician—were not reasonably

foreseeable. For consequential damages to be recoverable, they must be "reasonably

foreseeable at the time of the contract." P.C. Hoag & Co., Inc. v. Man Lift Mfg., Co.,

Civ. No. 15-cv-498-JL, 2018 WL 4298343, at *7 (D.N.H. Jan. 10, 2018) (quoting

Hydraform Prods. Corp. v. Am. Steel & Aluminum Corp., 127 N.H. 187, 197 (1985)).

Consequential damages are reasonably foreseeable "as a matter of law if the

damages follow the breach in the ordinary course of events." Johnson v. Capital

Offset Co., Inc., Civ. No. 11-cv-459-JD, 2014 WL 2154255, at *2 (D.N.H. May 22,

2014) (quoting George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 134 (2011)); see also

Restatement (Second) of Contracts § 351 cmt. b ("Loss that results from a breach in

the ordinary course of events is foreseeable as the . . . 'natural' result of the breach,

in the sense that its occurrence accords with the common experience of ordinary persons.").

In this case—and bearing in mind the New Hampshire Supreme Court's admonition that a strict doctrinal approach is inappropriate in breach of contract actions between students and their universities—a reasonable trier of fact could conclude that Doe's damages followed in the ordinary course of events from Clemens's disclosure to Smith of Doe's intended date of return to Geisel. Smith reported to Stackow that he only decided to proceed with a formal Title IX complaint against Doe once Clemens informed him that Doe would be returning to campus at a time when Smith would also be on campus. Multiple other persons whom Stackow interviewed reported that Smith had stated he decided to pursue a Title IX complaint because he had learned of Doe's intended date of return to Geisel. See doc. no. 60-4 at 28, 30, 32. In particular, one of these witnesses told Stackow that Smith "could not face seeing [Doe] or being in the same class as him." Id. at 30. Thus, a reasonable trier of fact could conclude that the alleged breach of the Records Policy caused Smith to file a Title IX complaint against Doe in the ordinary course of events. Moreover, while expulsion is certainly not a preordained result of the institution of Title IX proceedings against a student at Dartmouth, see Discussion Pt. I.A, supra, it is nonetheless a reasonably foreseeable outcome of a Title IX proceeding alleging responsibility for sexual assault, see doc. no. 59-10 at 20-21. Cf. Petrie-Clemons v. Butterfield, 122 N.H. 120, 123-25 (1982) (affirming consequential damages award of lost profits where trier of fact could have

reasonably found that plaintiffs' lost profits "followed naturally" from defendant's breach of leasing agreement requiring plaintiffs' business to vacate four months before end of lease).

Finally, Dartmouth argues in its reply brief that it is entitled to judgment as a matter of law on Count V because, even if Dartmouth breached its contract with Doe by disclosing Doe's intended date of return in violation of the Records Policy, there is no evidence that Dartmouth's breach caused Doe's damages. Dartmouth contends that, had Clemens declined to inform Smith of when (and whether) Doe was returning to Geisel, Smith would have filed a Title IX complaint anyway. Dartmouth's argument turns on a genuine dispute of material fact. The court cannot make factual findings about what Smith would have done had Clemens not disclosed Doe's intended date of return. This is the sort of dispute that must be resolved by the jury.

For these reasons, Dartmouth has failed to establish that there is no genuine dispute of material fact such that it is entitled to judgment as a matter of law on Count V.

C.   <u>Summary</u>

Dartmouth's motion for summary judgment is granted in part and denied in part. It is granted with respect to Counts I, II, and IV. It is denied with respect to Count V.

II.     Doe's Motion for Partial Summary Judgment

Doe moves for summary judgment on Count II and Count V. Where, as here, the party with the burden of persuasion on a claim seeks summary judgment on that claim, "the movant must produce evidence that would conclusively support its right to a judgment after trial." 11 James Wm. Moore, Moore's Federal Practice – Civil § 56.40[1][c] (3d ed.) ("Moore"); accord E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002). "[T]he evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it." Moore, supra; see also Calderone v. United States, 799 F.2d 254, 258 (6th Cir. 1986) (cited with approval in Unión Independiente, 279 F.3d at 55).

As discussed, Doe alleges in Count II that Dartmouth committed breach of contract by failing to provide him with sufficient notice of the allegation against him in violation of the Process Policy. Doe alleges in Count V that Dartmouth committed breach of contract when Clemens revealed to Smith Doe's intended date of return to Geisel in violation of the Records Policy. The court will first consider whether Doe is entitled to judgment as a matter of law on Count II, and then it will turn to Count V.

A.     Count II – Notice

Doe's arguments for summary judgment on Count II mirror the arguments in his objection to Dartmouth's motion for summary judgment. The court has already rejected Doe's arguments and determined that, even when viewing the evidence in

the light most favorable to Doe, there is no genuine dispute of material fact with respect to Count II and Dartmouth is entitled to judgment as a matter of law on that count. Given the court's prior ruling, Doe's motion for summary judgment is denied with respect to Count II. See Estes v. ECMC Grp., Inc., 565 F. Supp. 3d 244, 266-67 (D.N.H. 2021).

B.     Count V – Records Disclosure

Doe argues that he is entitled to judgment as a matter of law with respect to his records disclosure claim because his intended date of return to Geisel does not constitute "directory information" under the Records Policy. Dartmouth objects, and reiterates its argument that the Records Policy did not form part of its contract with Doe.

While the proper interpretation of a contract is a question of law for the court to determine, see Keene State Coll., 189 F. Supp. 3d at 332, whether a contract includes a disputed document is a question of fact, see Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 145 (2003). Moreover, in order for a university's policy to form part of the student-university contract, it must be supported by the usual elements of contract formation: offer, acceptance, consideration, and a meeting of the minds. See Brodeur, 626 F. Supp. 2d at 216-17. Here, Dartmouth disputes, inter alia, whether there was a meeting of the minds with respect to the Records Policy, which is a factual issue. Chase Home for Child., 162 N.H. at 727.

Based on this summary judgment record, the court cannot say that the evidence is so overwhelmingly in Doe's favor that a reasonable trier of fact would

necessarily conclude that the Records Policy formed part of the contract between Doe and Dartmouth. Doe testified at his deposition that he reviewed the Records Policy annually as part of his Geisel training. There is little else in the record pertaining to Doe's annual review of the Records Policy. The circumstances surrounding Dartmouth's provision of the Records Policy to Doe need further factual development. See Fleet Bank-NH, 141 N.H. at 287-88 (meeting of the minds requires that the parties "manifest an intention . . . to be bound by the contract"); Maloney, 98 N.H. at 81 (meeting of the minds "judged by what the parties say or do, by their overt acts, [and] by what they [cause] each other to understand").

Doe does not develop an argument in his motion for summary judgment that the Records Policy forms part of his contract with Dartmouth; he assumes that a breach of the Records Policy can support a claim for breach of contract and argues that Clemens's disclosure to Smith breached the Policy. In his reply brief, Doe broadly asserts that "[e]very policy Dartmouth enacts in relation to students forms the contractual relationship between Dartmouth and its students." Doc. no. 69 at 9. Doe does not explain why this is so, and he cites no authority—New Hampshire or otherwise—for such a sweeping proposition. While New Hampshire law may relax the elements of contract formation somewhat in the student-university context, a court cannot simply bypass "the basic tenets of contract law" in determining the contractual relationship between a student and his university. Gamble, 136 N.H. at 13.

For these reasons, Doe has not established that there is no genuine dispute of material fact such that he is entitled to judgment as a matter of law with respect to Count V.

## CONCLUSION

Dartmouth's motion for summary judgment (doc. no. 61) is granted in part and denied in part. It is granted with respect to Counts I, II, and IV, but denied with respect to Count V. Doe's motion for partial summary judgment (doc. no. 59) is denied. The only count remaining for trial is Count V.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 17, 2024

cc:     Counsel of Record

55